**WINKELMAN et al. v. GENERAL MOTORS CORPORATION et al.**

District Court, S. D. New York.

April 10, 1942.

Unger & Pollack, of New York City (Milton Pollack, of New York City, of counsel), for plaintiff Winkelman.

Charles Winkelman, of New York City (Arthur Berenson and Lawrence Berenson, both of New York City, of counsel), for plaintiffs Nishman and Schiff.

John Thomas Smith, of New York City (David Sher, of New York City, of counsel), for defendant General Motors Corporation and others.

Root, Clark, Buckner & Ballantine, of New York City, additional counsel for Donaldson Brown.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (John W. Davis, Ralph M. Carson, and S. Hazard Gillespie,

Jr., all of New York City, of counsel), for defendant George Whitney and others.

LEIBELL, District Judge.

This suit is a consolidation of several actions brought by minority stockholders against General Motors Corporation, its officers and directors, and certain other corporations to which reference will be made later. The actions are all derivative in their nature. The claims are asserted on behalf of General Motors Corporation, on the allegation that General Motors Corporation is not itself in a position to bring these actions, because the individual defendants constitute a large majority of the Board of Directors of General Motors. In August 1940 I ruled upon a motion of three of the defendants, Messrs. Prosser, Whitney and Morgan for a summary judgment. In my opinion on that motion (39 F.Supp. 826, 827) I gave a short resume of the history of this litigation as follows:

"The earliest action of the present consolidated actions was instituted in this court October 19, 1936, by Harry Jacobson holding 150 shares. A few days later the plaintiffs, Augusta Winkelman, Daniel Nishman and Charles Schiff, together with the said Harry Jacobson, instituted a similar action in the New York state court. That action was removed to this court and later consolidated with the original Jacobson action. Kahn v. General Motors Corp., D.C., 29 F.Supp. 802. The latest complaint in the consolidated action is a second amended complaint served October 10, 1938. On April 21, 1938, Fannette S. Kahn instituted in the state court an action identical with that of these other plaintiffs. The Kahn suit was removed to this court June 10, 1938, and by stipulation of attorneys, dated November 28, 1939, the second consolidated and amended complaint in the Winkelman-Jacobson action, with slight changes, was adopted as the amended complaint in the Kahn action."

Thereafter and about August 15, 1940, Fannette S. Kahn sold her stock in General Motors. On motion of the defendants made at the trial, the Kahn action was severed from the consolidated cause, and after severance the Kahn complaint was dismissed by order of this Court, on the ground that she was no longer a stockholder of General Motors.

During the pendency of this suit as consolidated the plaintiff, Harry Jacobson, also sold his shares of General Motors and he is no longer a stockholder. By leave of Court, granted at the trial, another plaintiff, Charles Schiff, duly intervened in and continued the suit originally commenced by Jacobson in this Court.

The remaining plaintiffs own, since the dates given opposite their names, the following shares of stock in General Motors:

Charles Schiff —10 shares—acquired May 27, 1929

Augusta Winkelman —30 shares—acquired October 17, 1930

Daniel Nishman —50 shares—acquired February 19, 1932

No relief can be granted in this action for any transaction of the defendants prior to May 27, 1929. Rule 23 (b) Federal Rules of Civil Procedure, 28 U.S. C.A. following section 723c. Rule 81 (c) F.R.C.P. provides: "These rules apply to civil actions removed to the district courts of the United States from the state courts and govern all procedure after removal." Jacobson v. General Motors Corp., D.C., 22 F.Supp. 255. The requirements of Rule 23 (b) apply equally to intervening stockholders in a derivative action. Piccard v. Sperry Corp., D.C., 36 F.Supp. 1006, affirmed 2 Cir., 120 F.2d 328.

The various General Motors bonus plans are described in my opinion on the motion for summary judgment and they are also set forth in considerable detail in the findings of fact (Nos. 28 to 30 inc.).

In 1918 the General Motors bonus plan provided that 10% of the net income of General Motors Corporation, after deducting 6% (in 1922 increased to 7%) on the capital employed, would be set aside each year as a bonus fund to be distributed among the executives and employees of the company. For the calendar years 1923 to 1929 inclusive, one-half of this fund was paid in cash to the Managers Securities Company and was used by that company to pay for an interest of 30% in the General Motors Securities Company. The latter company owned 7,500,000 shares of General Motors stock so that the 30% interest was the equivalent of 2,250,000 shares of General Motors stock. Through the medium of these bonus payments to Managers Securities Company, about 70 of the chief executives and managers of General Motors Corporation, who were the stockholders of Managers Securities Company, were enabled to acquire an interest in this large block of stock at a very cheap price. Be-

ginning with the calendar year 1930 the General Motors Management Corporation was used as a vehicle through which the principal executives and managers were enabled to acquire 1,375,000 shares of General Motors common stock from General Motors under the Management plan. The arrangement was similar to that used in the Managers Securities plan, but the number of participating executives was increased to 249. The August 1918 bonus plan, the Managers Securities Plan of 1923 and the General Motors Management Corporation plan of 1930 were all duly adopted by an overwhelming vote of the stockholders, are legal and valid. The various amendments to the plans adopted by the stockholders are likewise legal and valid. This includes the 1934 amendments to the General Motors Management plan.

The extent to which the principal executives, managers and employees shared in these bonus funds for the period from 1923 to 1936 is set forth in the report of Mr. Sloan to the Bonus and Salary Committee of the Board of Directors under date of March 22, 1938 (Ex. 44) from which the following is quoted:

"From 1923 through 1929, the supplemental compensation (including bonus awards received over and above the Managers Securities total participation) to the participants in the Managers Securities Company averaged 48.8% of the total 10% Bonus Fund. During this seven year period the total Bonus Fund averaged $13,859,500 a year.

"There were 66 Managers Securities participants at the inception of the plan. Through recaptures of Managers Securities stock from 24 withdrawing executives, the number who participated during the full period was reduced to 42. Following 1923, there were 31 additional participants

brought into Managers Securities Company, and the allotments of 7 of these executives were recaptured prior to 1929. The maximum participation was 80 executives in 1925 and 1926, with 66 participants remaining at the end of 1929.

"In 1930 there were 249 executives who received allotments in the newly organized General Motors Management Corporation. It was anticipated that this group of 249 participating executives would receive total supplemental compensation, including bonus awards, amounting to 49% of the total fund under normal conditions. Management Corporation allotments to the participants, other than to certain principal Corporation executives, were made on the basis that the fixed supplemental compensation of such participants received through the Management Corporation would average approximately 70% of the total normal supplemental compensation for their positions. The supplemental compensation of the twelve principal Corporation executives who were Committee Members was intended to be represented in full by their Management Corporation allotments. The maximum participation in the Management Corporation was 249 executives, with 175 participants remaining in 1936 when the plan terminated.

"It is also interesting to note that during the seven years, 1930 through 1936, that the Management Corporation was in operation, the total Bonus Fund averaged only $7,125,700 a year, or 51.4% of the previous seven year average. No bonus was earned in 1932, and the Bonus Fund for the other six years averaged $8,313,300."

The following table sets forth the amount of the total Bonus Fund and the number of participants in each year over the fourteen year period, 1923 through 1936:

| | Period of Managers Securities Plan | | | Period of Management Corporation Plan | |
|---|---|---|---|---|---|
| Year | Total 10% Bonus Fund | Number of Participants | Year | Total 10% Bonus Fund (a) | Number of Participants |
| 1923 | $ 3,782,600 | 679 | 1930 | $ 9,870,600 | 2,027 |
| 1924 | 1,925,800 | 720 | 1931 | 3,965,700 | 1,479 |
| 1925 | 8,602,800 | 1,008 | 1932 | — | — |
| 1926 | 16,548,200 | 1,584 | 1933 | 2,736,000 | 1,282 |
| 1927 | 20,976,100 | 2,077 | 1934 | 3,677,800 | 1,530 |
| 1928 | 24,817,200 | 2,570 | 1935 | 11,355,800 | 2,374 |
| 1929 | 20,363,700 | 2,889 | 1936 | 18,273,800(b) | 9,534(b) |
| Average Per Year for Seven Years | $13,859,500 | | Average Per Year for Seven Years | $ 7,125,700 | |

The number of shares of General Motors stock distributed as bonus awards for the years 1937 and 1940 are set forth on page 81 of the General Motors Corporation annual report for the year 1940 (Ex. 2-K) as follows:

| Year | Number of Bonus Awards | Number of Shares of Common Stock Awarded (a)— |
|------|------------------------|-----------------------------------------------|
| 1937 | 10,026 | 252,086(e) |
| 1938 | 4,211 | 77,930(e) |
| 1939 | 9,845 | 232,468(e) |
| 1940 | 10,400(f) | 226,190(f) |

The bonus participation of committee members of the Board of Directors (9 members) in the 1925 bonus fund was almost 23% and in the 1930 bonus fund was 17¾%. In 1936 this percentage was 14⅞% and for 1937 it was further reduced to 12.8% of the total fund.

▮ Any consideration of the amount of the bonus awarded to any individual for the years prior to 1930 is barred by the six-year New York Statute of Limitations. Goldstein v. Tri-Continental Corp., 282 N.Y. 21, 29, 24 N.E.2d 728; Pollitz v. Wabash R. Co., 207 N.Y. 113, 100 N.E. 721. If it were possible to review them, I would be inclined to hold that some of the bonuses to the principal executives were so large as to constitute a waste of the corporation's assets. A schedule of what each individual named as a defendant received by way of salary and bonus from 1918 through 1940 is set forth in Exhibit 31.

In the course of the trial a number of accounting issues were presented, concerning the calculation of the bonus. It is plaintiffs' contention that certain items were included in the "earnings" of General Motors Corporation which were no part of the Corporation's earnings and that certain items should have been included in the "capital employed" which were improperly excluded. Two important claims also developed in the course of the trial; one relating to a so-called equalization payment to the principal executives of General Motors Corporation in February 1931 involving 36,071 shares worth about $1,540,000, and the other to a transaction between Donaldson Brown and John J. Raskob involving 243,392 shares of General Motors common stock on which the Corporation is alleged to have lost $427,000 while Mr. Raskob and his associate, Mr. Pierre S. duPont, are alleged to have profited to the extent of over $4,000,000.

In this opinion I propose to discuss as briefly as possible the accounting issues and the other claims presented, my conclusions in respect thereto, and the reasons for those conclusions. But before doing so, a short statement concerning the most influential persons in the administration of the bonus in the General Motors executive group will assist in a better understanding of the facts and figures hereinafter discussed.

Some of the executives who benefited greatly from the administration of the bonus plans were very influential in the affairs of the Corporation. Individually they held large blocks of General Motors stock, either in their own names or in the names of private holding companies. Beginning with the adoption of the Managers Securities plan in November 1923 they became the controlling figures in the Managers Securities Company, which owned 2,225,000 shares of General Motors Securities Company stock, the equivalent share for share of General Motors common stock. General Motors Securities Company itself owned about one-fourth of the common stock of General Motors Corporation. When Managers Securities Company merged with General Motors Securities Company the same executives were directors and some were officers of the latter company.

In March 1930 General Motors Management Corporation was formed and acquired 1,375,000 shares of General Motors common stock from General Motors Corporation under the Management plan. The same group of prominent General Motors executives controlled the Management Corporation. In December 1938 the General Motors Shares Inc. was organized and General Motors Securities Company with General Motors Management Corporation were merged and consolidated in the new corporation. That corporation then became the largest stockholder of General Motors Corporation. Exhibit 22 lists the General Motors Corporation directors who, between 1918 and 1941, held offices or directorships in the various corporations just discussed.

The General Motors directors who had most to do with the preparation and adoption of General Motors bonus plans were Mr. Raskob, Mr. Smith and Mr. Sloan. The administration of the bonus plans was guided by Mr. Brown, Mr. Sloan and Mr. Bradley. Mr. Raskob has not received any part of the bonus awards since his Class A stock of Managers Securities Company was recaptured by General Motors Corpora-

tion in May 1929. Mr. Sloan has not participated in bonus awards since the termination of the General Motors Management plan at the end of 1936.

The administration of the bonus plans was under the jurisdiction of the Finance Committee until the Bonus & Salary Committee was created in the summer of 1937. Mr. Raskob was chairman of the Finance Committee from 1920 to 1928. Mr. Brown succeeded him as Chairman in 1928 and continued in that office until the Bonus & Salary Committee took over in 1937.

Mr. Bradley supervised the policy treatment of items going into the income account, reviewed the financial statements of the corporation, the general principles governing the method of bonus calculation and also the exclusions and inclusions. Mr. Bradley and Mr. Brown together submitted all questions of exclusions and inclusions in the bonus calculation to the Finance Committee. Mr. Bradley became a member of the Finance Committee in November 1933. Mr. Bradley was treasurer and a director of General Motors Management Corporation from the time of its organization in 1930 until it merged into General Motors Shares Inc. in December 1938. He was also a director of General Motors Securities Company.

Mr. Brown while chairman of the Finance Committee was also Treasurer and a director of Managers Securities Company. He was a director of General Motors Management Corporation during its corporate existence. He was a director of General Motors Securities Company from March 1918 to December 1938 when it merged into General Motors Shares Inc. at which time he became a director of that corporation.

Mr. Sloan has been a director of General Motors Corporation since November 1918 and was its president from 1923 until 1937, when he was elected Chairman of its Board of Directors. He was also President and a director of Managers Securities Company, and President and a director of General Motors Management Corporation, during the period those corporations functioned. He was a director of General Motors Securities Company from February 1931 to December 1938 and Chairman of the Board of Directors of General Motors Shares Inc. in December 1938.

Mr. Smith has been a director of General Motors Corporation since March 25, 1920. He was a director of Managers Securities Company, and President and a director of General Motors Management Corporation during their existence. He served as a director of General Motors Securities Company from February 1931 until December 1938, when he became President and a director of General Motors Shares Inc. He has been general counsel of General Motors Corporation since 1918.

The duPont Company was named as a defendant herein. I dismissed the complaint as against that Company on the merits at the end of the plaintiffs' case. The General Motors Bonus Plans were consistently supported by the duPont Company, the largest stockholder in General Motors, to promote the interest of the stockholders. Its attitude toward the plans and their administration was based solely on business judgment, gained in its own successful corporate experience, that such a compensation policy was an important factor for the success of General Motors and would benefit the stockholders. For this reason, the duPont Company supplied the block of shares necessary for the Managers Securities Plan. Certain of its officers and directors, as directors of General Motors and themselves General Motors stockholders, approved the plans, for the same reasons and in the exercise of an honest business judgment that such plans were reasonable and for the best interests of General Motors.

The duPont Company derived no profit from the sale of the block of stock to Managers Securities Company. The General Motors stockholders were given a like opportunity to supply stock at the same price, $15.00 a share. The proposed transaction was fully and frankly disclosed to the General Motors stockholders in advance and they approved it almost unanimously. General Motors Corporation lost nothing by the sale. It profited to this extent, however, that it was enabled to build up and retain over a period of years a staff of executives who greatly increased the business of General Motors to the profit of all General Motors stockholders, including the duPont Company.

The stock which the duPont Company sold to Managers Securities Company in November 1923 for $33,750,000, produced within six years twice the selling price in dividends and increased in value more than five fold. The 70 executives of General Motors who under the plan were participants in Managers Securities Company made these profits, not the duPont Com-

pany. That company had the right to sell any part of its holdings of General Motors Securities Company without the approval of General Motors Corporation. It made the sale of 30% of those holdings to Managers Securities Company in order to assist General Motors Corporation in setting up a special bonus plan for General Motors' executives. If the duPont Company had kept the stock, instead of selling it, these dividends and the increase in the value of the stock would have accrued to the duPont Company, not to General Motors.

■ For any conduct on the part of said directors, acting independently, in transactions to which the duPont Company was not a party and from which it derived no advantage, the duPont Company would not be liable even if General Motors Corporation sustained a loss as a result of these directors' acts.

From January 1930 to May 1937 inclusive, the Finance Committee consisted of fourteen members (except from November 6, 1933 to November 5, 1934, when there were fifteen). During this period, eleven members were not eligible for and did not receive supplemental compensation, namely, Messrs. Baker, Carpenter, H. F. duPont, I. duPont, L. duPont and P. S. duPont, Morgan, Mott, Prosser, Raskob and Whitney. These members were substantially interested as stockholders directly or through the duPont Company. Mr. Brown, Chairman of the Committee, Mr. Sloan, President of General Motors and Mr. Bradley, a Vice-President of General Motors, were members of the Finance Committee and were bonus recipients.

From and including the bonus year 1937, the bonus plan has been under the jurisdiction of the Bonus and Salary Committee of five directors ineligible for bonus, namely, Messrs. L. duPont, Carpenter, Pratt, Raskob and Whitney. All have been substantially interested as stockholders directly or through the duPont Company.

Many of the accounting issues were involved in the calculation of the bonus fund and in the making of the bonus awards for periods subsequent to October 1936 when the original complaint was filed herein and subsequent to October 1938 when the second amended consolidated complaint was filed. In fact these accounting issues were covered by evidence at the trial, for the entire period of bonus award for the calendar years 1930 to and inclusive of 1940, without the filing of any supplemental complaint and by consent of the parties during the trial. Rule 15(b) F.R.C.P. Towards the end of the trial (July 1, 1941) it was agreed that the second amended complaint was also a supplemental complaint and that it be deemed further supplemented to "include all acts and conduct of any officers or directors and of the defendants named herein in applying, carrying out or executing the bonus plan and making awards thereunder from the date of the said amended complaint down to the date the trial began" (May 7, 1941). The findings of fact and the conclusions of law therefore include the extended period.

### Compensation of Executives.

■ Among the issues presented by this litigation is the propriety of the total compensation, salary plus bonus, paid to certain executives and managers of General Motors Corporation, many of whom were directors. (Ex. 31-1 to 42.) I am of the opinion that for the years 1930 to 1940 inclusive, these amounts were not in excess of the value of the services rendered by those individuals, excepting from said amounts the alleged equalization payment of February 11, 1931. A large part of the record in this case consists of testimony concerning the nature, extent and importance of the services of the recipients in the various corporate positions they held. The responsibilities they assumed and the broad scope of their duties as active and efficient members of the staff of General Motors Corporation are all in the record.

I stated in an opinion, filed in August 1940 on the motion of the three of the defendants, Whitney, Morgan and Prosser, for summary judgment, that there were several of the years, to wit, 1930, 1935, 1936 and 1937, where the amounts awarded were so large that they required an investigation by a court of equity in the suit brought by plaintiff stockholders. Rogers v. Hill, 289 U.S. 582, 591, 53 S.Ct. 731, 77 L.Ed. 1385, 88 A.L.R. 744. This investigation has been had during the course of this trial and I am now satisfied that the compensation of these executives was not excessive as to those years also.

Concerning the compensation of executives, I have made the following findings, among others:

"There has always been keen rivalry for executives in the automobile industry. For example, General Motors lost to competi-

tors—Charles W. Nash, who became head of the Nash Motors Company; Walter P. Chrysler, who developed the Chrysler Corporation; and K. T. Keller, who is now President of the Chrysler Corporation. Offers were made by competitors to Messrs. Knudsen and Raskob. It was necessary for the Corporation to hold out attractive financial benefits to prevent the loss of valuable executives.

"From the end of 1922 through 1929, total assets of the corporation (less depreciation) increased 140%. Net sales for 1929 increased nearly 225% over 1922 and income available for dividends increased 355%. Net income for the period 1923-1929 equalled $1,185,000,000, an average return on stockholder capital of 29.45%. After payment of 61.6% of such net income as cash dividends to stockholders, more than $455,000,000 was reinvested in the business during that period and constituted 40% of the total assets (less depreciation) owned by the Corporation at the end of 1929.

"General Motors earned more in the decade of the thirties than in that of the twenties although almost a third of the period 1930-1940 was a time of severe economic depression. In 1930-1940 inclusive, it earned $1,500,000,000 upon net sales totalling more than $12,000,000,000. Return on stockholder capital averaged 14.3%, a performance equalled by few companies. Over this period General Motors increased its share of the total passenger car output from approximately 34% in 1930 to as much as 50% in 1941.

"A comparison of General Motors passenger car sales with those of the Ford Motors Company, the dominant automobile manufacturer in 1923, illustrates the growth in market strength of General Motors to the present day. In 1923, Ford's sales totalled approximately 1,773,000 units; General Motors sold about 774,000 cars, only 44% of Ford's sales. In 1940, General Motors sales totalled approximately 1,748,000 cars; Ford sold about 717,000 cars, only 41% of General Motors sales."

Is a $500,000 total of salary plus bonus for the chief executive of a corporation of this magnitude, in very prosperous years, so excessive that its payment should be legally condemned as a waste of corporate assets? Having heard all the testimony and considered the exhibits I am of the opinion that the directors are not chargeable with waste for having approved these payments. These executives have built up a great industry; managed it successfully; given employment to hundreds of thousands of skilled workers; earned tremendous profits for the stockholders and contributed largely to the prosperity of the nation. Although in certain instances, hereinafter discussed, some of them have taken advantage of their position of influence to the detriment of the corporation, there is no denying the competence of their business management or its value to the Corporation.

The plaintiffs offered nothing as a yardstick or comparison for determining the reasonableness of the salaries and bonuses. On the other hand the defendants have referred the Court to several reported stockholders' suits (Gallin v. National City Bank, 152 Misc. 679, 273 N.Y.S. 87; Id., 155 Misc. 880, 281 N.Y.S. 795; Epstein v. Schenck, Sup., 35 N.Y.S.2d 969; Heller v. Boylan, Sup., 29 N.Y.S.2d 653), in which it was held that compensation which was about twice the amount of the highest total compensation paid to any of these executives, was not excessive. In determining that the salaries and bonus allotments in the present case were not excessive, that they were earned by the recipients, I do not thereby hold that the amounts of the bonus were properly calculated under the various bonus plans.

The accounting methods and procedure followed in calculating the total bonus in which these defendants shared were, I believe, incorrect in certain particulars as hereinafter indicated. Further, I have concluded that the so-called equalization payment of 36,071 shares on February 11, 1931, in which many of these executives shared, was without any legal or moral basis whatsoever and constituted an illegal gift of corporate assets. Likewise, the reawarding of forfeited bonus stock was in violation of the terms of the bonus plan approved by the stockholders in August 1918. My ruling that the salaries and bonuses paid to the executives were not excessive means only that they rendered services worth what they received, subject to the limitations above mentioned.

*The so-called equalization payment of 36,071 shares of General Motors common stock, made February 11, 1931.*

Mr. Sloan in his letter of February 15, 1930, to General Motors common stockholders, briefly stated the purpose of the November 1923 Managers Securities plan as follows: "The purpose of Managers Securi-

ties Plan was to enable the more important executives of the Corporation—numbering at that time about eighty—to become substantial stockholders through the purchase of a block of General Motors Common stock at the then market price."

The purchase price was $33,750,000. The annual payments to Managers Securities Company by General Motors Corporation for the years 1923 to 1928 were as follows:

| | |
|---|---|
| 1923 — | $ 1,876,119 |
| 1924 — | 1,140,189 |
| 1925 — | 4,633,535 |
| 1926 — | 8,274,099 |
| 1927 — | 10,488,071 |
| 1928 — | 12,408,594 |
| | $38,820,607 |

To the above should be added the $10,-181,835 paid to Managers Securities by General Motors for 1929, making a total of $49,-002,442, a sum $15,252,442 in excess of the $33,750,000 cost price of the General Motors Securities Company stock. Through a temporary borrowing Managers Securities Company was able to cancel its bonds and retire its preferred stock prior to April 1927 (Ex. 7-25).

There were sixty-four participants in the Managers Securities Company at the end of 1929. Every year the plan continued the more unfair it became to the younger executives and managers, who with a greatly expanding business in the late 1920s were unable to participate in the Managers Securities plan. Every original November 1923 investment of $50,000 (a 1% interest) in stock of Managers Securities Company had yielded the older executives almost $700,000 in dividends and was worth as of December 31, 1929, a further sum of about $1,800,000 (Ex. 48-20). Under those circumstances General Motors Corporation had both the moral and legal right to terminate the plan at any time after 1928. It could have done this by recapturing the outstanding Managers Securities Company Class A stock from the participants, under the provisions of the plan itself. There were no intervening interests of third parties to prevent this. The General Motors Securities Company had been paid in full for the stock it sold to Managers Securities Company (Ex. 7-25). The assets of Managers Securities Company, in which its Class A stockholders had an interest, were at all times more than sufficient to pay its debts. In fact there was a surplus applicable to the Class A stock, over and beyond the debts and the par value of the Class A stock outstanding.

Mr. Raskob testified that the Managers Securities Company plan should have been terminated a year before December 31, 1929, that it should have ended with the year 1928. This would have enabled some of the successful younger executives to obtain a proper share of the bonus intended for the executives and managers.

In a letter to Mr. Raskob, dated December 3, 1929 (Ex. ZZZZ-1) which referred to the purpose of a meeting of the stockholders of Managers Securities Company to be held December 5, 1929, Mr. Brown stated:

"The plans that we have in mind have in view the following general features:

"(1) A termination as of January 1, 1930 of the contract existing between General Motors Corporation and Managers Securities Company, thus constituting Managers Securities Company as purely a holding corporation. The proposed termination of the contract one year ahead of its natural maturity presumably will require some form of suitable commitment on the part of the Corporation with the individual holders of Class A stock in the case of those who would not desire to waive what might be regarded as their rights in respect to the existing contract."

Apparently on December 3, 1929 there had been no determination that any commitment should be given. Mr. Brown merely expressed the opinion that the cancellation of the General Motors Corporation-Managers Securities Company contract a year ahead of its natural maturity (December 31, 1930) presumably would require some form of suitable commitment.

On December 10, 1929, Mr. Brown, as Secretary-Treasurer of Managers Securities Company, wrote to the stockholders of that Company on the letterhead of the company and discussed fully a plan for its reorganization. He stated that: "The fundamental purpose of a plan involving a continuation of the Company in changed form would be to assure the preservation of the block of General Motors Common Stock in consolidated form to prevent any undue influence which otherwise might be thrown into the market, having a depressing effect upon the market price of General Motors Common Stock. If this purpose can be served through a plan otherwise constructive, a combination of benefits should likewise result."

A tentative plan of reorganization of Managers Securities Company was submitted with the letter, together with certain balance sheets relating to the plan. Three pages of the letter are given over to a discussion of the plan of reorganization of Managers Securities Company, its tax advantages, liquidity and other aspects. The fourth and last page of the letter contains this statement:

"It has been further explained in the meetings in which this plan has been discussed that the General Motors Corporation desires to cancel the present contract with Managers Securities Company in order that a new plan of managers' compensation may be started at the end of this year instead of a year later. In consideration for the present holders of Class 'A' stock consenting to the cancellation of the Contract, the Corporation would be willing to agree that these holders of Class 'A' who remain in the employ of the Corporation at May 15, 1930 would during the ensuing year receive an amount of additional compensation in one form or another commensurate with what he would have received under the present contract. Furthermore, the termination of the contract at this time permits the development of a plan resulting in making the stocks of Managers Securities Company liquid."

It is upon the last quoted paragraph that the defendants base their contention that there was a commitment given by General Motors, which on February 11, 1931, resulted in the so-called equalization payments of 36,071 shares of General Motors common stock to forty-seven Class A stockholders of Managers Securities Company. But Mr. Brown's letter was not written as an official of General Motors Corporation. He was writing as Secretary and Treasurer of Managers Securities Company. He was never authorized to make any commitment for General Motors to the Management Securities Company Class A stockholders.

The earliest General Motors record relating to any such alleged commitment is in a report, dated December 30th, 1929, from Mr. Brown, as Chairman, to the Finance Committee of General Motors Corporation. To that report he attached a copy of a second Managers bonus plan, the General Motors Management Corporation plan, to take the place of the old bonus vehicle, the Managers Securities Company plan. Mr. Brown's report states:

"In the consideration of the plan it will be necessary for the Finance Committee to take specific action in respect to the following features:

"(1) Termination of existing contract with Managers Securities Company.

"This contract it is recognized has one more year to run, and calls for the payment to Managers Securities Company of 5% of the excess net earnings of General Motors Corporation over and above 7% on the capital employed. It is desirable to terminate this contract in view of the intended substitution of the General Motors Management Corporation, as concerns present existing participants. In this connection it is held to be desirable, as applying in cases of individuals who would not voluntarily waive their so-called rights in respect to the existing contract, for the Corporation to extend a commitment to the effect that for 1930 the extra compensation under the new plan will be not less than an amount which would have accrued in view of the continued holding of Class A stock of Managers Securities Company."

Six features or items were listed in the report.

The preparation of the new bonus plan had been left to the Operations Committee and the Brown report mentions the action taken by the Operations Committee at its meetings held December 5th and December 19th, neither of which contains any reference to any equalization payment to Class A stockholders of the Managers Securities Company.

Mr. Brown's December 30, 1929 report came before a meeting of the Finance Committee of General Motors Corporation on January 7, 1930. Although the Brown report stated that it would be necessary for the Finance Committee to take specific action in respect to the various items (features), the minutes of the meeting fail to disclose that any action was taken on item (1) as to the desirability of extending a commitment to certain Class A stockholders of Managers Securities Company. The minutes of the Finance Committee and of the Board of Directors, prior to the making of the equalization payment of 36,071 shares of General Motors common stock on February 11, 1931, contain no reference to any such commitment.

The wording of the Brown report of December 30, 1929, shows that prior thereto the Finance Committee had never authorized any such commitment and that any statements that Mr. Brown as Secretary and

Treasurer of Managers Securities Company made in his letter of December 10, 1929, to the stockholders of Managers Securities Company had not been authorized by either the Finance Committee or the Board of Directors of General Motors Corporation. If there had been any such prior authorization for a commitment, it is reasonable to assume that he would have referred to it in his report and he would not have asked the Finance Committee to take specific action in respect to a commitment. I am not satisfied that the discussions at any of the Finance Committee meetings ever authorized any such commitment.

The reference to "individuals who would not voluntarily waive their so-called rights in respect to the existing contract" in Mr. Brown's report to the Finance Committee of December 30, 1929 (Ex. 41) evidently had no real basis for the implication that some of them would. Mr. Brown testified that when he wrote and submitted the report he himself "did not expect to or offer to waive". On February 13, 1931 he drew down 1,155 shares of General Motors common stock, worth $49,338, plus the March dividend thereon, as his share of the equalization payment. At no time did he ever ask any of the Managers Securities Company participants to waive any of their so-called rights and he knew of none who would. He admitted that he was the one who originated the idea of voluntarily waiving. He testified that, "there was the contemplation that conceivably it might be possible that someone would waive". The waiver idea made more agreeable the suggestion that it would be desirable for the corporation to extend a commitment to those participants who would receive a smaller allotment under the new plan than under the old. Mr. Brown presided at the meeting of the Finance Committee (January 7, 1930) which considered his report of December 30, 1929. Mr. Brown and Mr. Sloan were both present at the meeting of the Board of Directors on February 6, 1930 (Mr. Sloan presiding) when the new Management Corporation plan was recommended to the stockholders of General Motors for their approval. Neither the minutes, nor the record of this trial, contain anything to show that either the Committee or the Board were informed that Mr. Brown and Mr. Sloan would refuse to waive any of their so-called rights under the old agreement. Mr. Sloan in February 1931 received, as his part of the 36,071 share equalization payment, 4,044 shares of General Motors

common stock worth $172,746 for his "so-called rights" under the old agreement. Neither the 36,071 share equalization fund nor any of the payments therefrom were ever reported to the stockholders at any stockholders' meeting or in any annual report or in any manner whatsoever.

When certain confirmatory action was sought from the Finance Committee at a meeting on July 14, 1930 (Ex. 40), the only thing ratified and approved was the cancellation of the Managers Securities Company contract. No approval was sought or given for any commitment to the Managers Securities Company participants. The officers of General Motors who were also participants in Managers Securities Company knew on July 14, 1930 that there had been no action of the Finance Committee specifically authorizing the cancellation of the Managers Securities Company contract. They must have examined the minutes of prior meetings, especially the meeting of January 7, 1930 (Ex. 43) to which Mr. Brown's report of December 30, 1929 (Ex. 41) had been submitted. I fail to see how those who were to benefit by the commitment could have overlooked the passage of some resolution in respect to it, at the January 7th or the July 14th, 1930 meetings. Mr. Raskob testified that this was most unusual, and said "I don't remember of a thing as important as that not being recorded" although he was of the opinion it must have been the Secretary's error.

Both sets of minutes of January 7th and July 14th, 1930 were later read by those who had attended the meetings and were signed by them. Mr. Smith, although not a member of the Finance Committee, was present at the meeting of January 7, 1930. He was the general counsel of the corporation. The same Secretary, Mr. Beardslee, recorded and signed both sets of minutes. Mr. Brown presided at both meetings. I have concluded that there was no error in recording the minutes and that no authorization to give any commitment, and no approval of any commitment already given, was any part of the action taken by the Finance Committee at either meeting.

Directors and officers who pay themselves large sums out of the corporate treasury for some extraordinary purpose should see to it that they are formally authorized to make the payment, if they expect to justify it at some future date. They make the record of what they do at the time it is done and the record should be specific, complete and un-

ambiguous, where their interests conflict with those of the Corporation.

The annual report to the stockholders of Managers Securities Company, for the fiscal year ending April 30, 1930 is dated July 18, 1930 (Ex. 11-E). The only reference in that report to the termination of the contract between Managers Securities Company and General Motors Corporation is the following "Although our contract with General Motors Corporation would not normally terminate until December 31, 1930, it has been agreed to cancel this contract as of December 31, 1929 in order that the General Motors Management Corporation might become operative during the year 1930". The report makes no mention of any commitment made to stockholders of Managers Securities Company by General Motors Corporation or of any equalization payment to come. The members of the Board of Directors of Managers Securities Company listed at the end of the report are Mr. Sloan, Mr. Brown, Mr. P. S. duPont, Mr. F. J. Fisher, Mr. C. S. Mott, Mr. J. L. Pratt and Mr. J. T. Smith. The officers listed are Mr. Sloan, President; Mr. Mott, Vice President; Mr. Brown, Secretary-Treasurer.

The minutes of the meeting of the board of directors of Managers Securities Company, held July 2, 1930, contain the following (Ex. JJJ):

"The Chairman stated that the officers of the corporation, with the approval of the officers of General Motors Corporation, had terminated as of December 31st, 1929, the agreement between General Motors Corporation and Managers Securities Company, dated November 27th, 1923, and requested that resolutions be passed ratifying and confirming the actions of the officers terminating said contract.

"Upon motion duly made and seconded, it was

"Resolved, that the actions of the officers and directors of Managers Securities Company, terminating as of December 31, 1929, the agreement between General Motors Corporation and Managers Securities Company dated November 27, 1923, be and the same hereby is in all respects ratified, confirmed, and approved.

"Be It Further Resolved, that the proper officers of the corporation be and they hereby are authorized to execute any and all agreements in connection with the cancellation of the said contract."

It does not appear that any documents in reference to the cancellation were executed by the officers of Managers Securities Company other than the general release from Managers Securities Company to General Motors Corporation executed December 29th, 1930 (Ex. 7-27).

On March 20, 1931, Mr. Sloan submitted to the Finance Committee a report (Ex. 39) "dealing with 1930 bonus distribution". After showing the sources from which certain General Motors stock (40,855 shares) would be available in addition to 115,535 shares of General Motors Management Class A stock, the report states:

"The above makes an aggregate of 156,390 shares of stock valued at $6,984,772 available for bonus distribution. Of this amount, 36,071 shares of stock valued at $1,540,830 was distributed to former Managers Securities participants under date of February 11, 1931 in order to bring their total supplementary compensation for 1930 up to what it would have been if the former Managers Securities contract had not been cancelled as of December 31, 1929. This is in accordance with the commitment made to these executives under date of December 10, 1929 to the effect that their total supplementary compensation during 1930 in one form or another would be commensurate with what would have been received by them if the Managers Securities contract had not been cancelled as of December 31, 1929.

"After making the above-mentioned settlement with former Managers Securities participants, there remains available for bonus distribution 120,319 shares of Class A stock of General Motors Management Corporation, valued at $5,443,942 or $45.25 per share. The aggregate awards which are being recommended by me amount to 120,319 shares of Class A stock. There will therefore be no part of the 1930 Bonus Fund carried over into 1931."

A share of Class A General Motors Management Corporation stock was the equivalent of a share of General Motors Corporation common stock.

The alleged commitment of December 10, 1929, was nothing more than the letter Mr. Brown, as Secretary-Treasurer of Managers Securities Company had sent to the stockholders of that Company under said date. It was not a commitment from General Motors.

Mr. Sloan's report of March 20, 1931 came before the Finance Committee on March 23, 1931. The minutes of that meeting (Ex. 26), after referring to the number

of shares available for bonus distribution, recite:

"Of this amount, 36,071 shares of General Motors common stock, valued at $1,540,830, was distributed to former Managers Securities participants under date of February, 11, 1931 in order to bring their total supplementary compensation for 1930 up to what it would have been if the former Managers Securities contract had not been cancelled as of December 31, 1929. This was in fulfillment of an agreement between General Motors Corporation and Class 'A' stockholders of Managers Securities Company in order that General Motors Management Corporation might commence as of January 1, 1930."

A resolution was then unanimously adopted, containing the following paragraph: "Resolved, that the delivery by the officers of the Corporation of 36,071 shares of the $10 par value common stock of General Motors Corporation to Class 'A' stockholders of Managers Securities Company, in full settlement of any and all claims which the Class 'A' stockholders of Managers Securities Company had or may have on account of the cancellation as of December 31, 1929 of the contracts between General Motors Corporation and Managers Securities Company dated November 27, 1923, and April 27, 1925, be and the same hereby are in all respects approved, ratified and confirmed, and that the bonus fund available for distribution be reduced by this number of shares and amount to 120,319 shares valued at $5,443,942, * * *."

When the Finance Committee approved on March 23, 1931, the action of the officers in distributing 36,071 shares of General Motors common stock as a so-called equalization payment to certain former Managers Securities participants they did not have before them any list of the beneficiaries of that distribution. No names or individual amounts were listed in Mr. Sloan's report of March 20, 1931 (Ex. 39) on which the Committee based its action. The report did not even state how many participants shared in the distribution. Only the total amount of shares distributed, 36,071, and their value, $1,540,830, were disclosed. There was the same lack of specific information when the Board of Directors came to pass upon this 36,071 share distribution, at the Board meeting May 6, 1931. It does not appear that the Board of Directors had anything before them except the action taken by the Finance Committee at its meeting of March 23, 1931.

Twelve directors of General Motors shared in the equalization distribution, receiving a total of 19,704 shares. Nine of the twenty-one directors who attended the meeting of the Board of Directors on May 6, 1931, and approved the distribution, received 15,829 shares thereof. The resolution adopted by the Board of Directors on May 6, 1931, reads as follows:

"Whereas, the Finance Committee, pursuant to the Corporation's Bonus Plan and upon the recommendation of the President has awarded bonuses, amounting in the aggregate to One hundred and twenty thousand, three hundred and nineteen (120,319) shares of the 'Class A' stock of General Motors Management Corporation, to certain employes for conspicuous services rendered during the year 1930, and has authorized the distribution of thirty-six thousand and seventy-one (36,071) shares of the Common Stock of General Motors Corporation to former participants in the Managers Securities Company in order to bring their total supplementary compensation for 1930 up to what it) would have been if the former Managers Securities contract had not been cancelled as of December 31, 1929; be it

"Resolved, that the action of the Finance Committee in making said awards and authorizing said stock distribution be and it is hereby in all respects approved, ratified and confirmed."

The statement in the preamble that the Finance Committee "has authorized the distribution" is more than inaccurate. It implies that before the 36,071 share distribution was made the Finance Committee had authorized it. That was not the fact. The officers had made the distribution to themselves and other executives on February 11, 1931 and the Finance Committee was not asked to ratify and approve it until March 23, 1931. The distribution was practically an accomplished fact before the Finance Committee was told about it. Their choice was narrowed and made difficult. To have ordered the forty-seven executives to return the stock would have required more courage than the Committee could muster under the circumstances.

All but two of the forty-seven participants received their shares of the equalization payment before the Finance Committee on March 23, 1931, approved the bonus calculation for the year 1930. The amount of the equalization payment depended upon the amount of the 1930 bonus. Was the approval of the bonus calculation by the Fi-

nance Committee a mere formality, bound to be given? The haste of the executives may be attributed in part to the fact that by issuing these 36,071 shares under date of February 11, 1931, the recipients would be listed as the owners of the shares before February 14, 1931, the date on which the books closed for the next dividend, payable March 12th. In that way those who received the 36,071 shares also collected a total of $27,053.25 in dividends. Even this sum was not overlooked by these participants, who had received the lion's share of the income and profits of Managers Securities Company, which in seven years amounted to $225,000,000.00, all made possible by the generous bonus provisions of the General Motors Corporation.

Defendants contend that it was proper that the 36,071 shares should carry the first quarterly dividend for 1931 because it had been the practice, pursuant to a general ruling adopted at a Finance Committee meeting in February 1919, to have bonus stock include the first quarterly dividend, even if the bonus was awarded at a later date. But the 36,071 shares were not given as a bonus. They were supposed to be in settlement of a claim. If the equalization payment was partly in lieu of what Managers Securities Company would have received under the old contract, that contract called for payments in cash, not stock.

It seems unnecessary to add that the stockholders were never told of the equalization payment, either before or after the event. It came to light during the trial of this action.

There were sixty-four participants in Managers Securities Company prior to the action of the Finance Committee in recapturing the Class A stock of eight participants on April 29, 1930. Nine of the remaining fifty-six received larger contract accruals for 1930 under the General Motors Management plan than they would have received under the Managers Securities Company plan. Forty-seven were given various amounts of the 36,071 share equalization distribution on February 11, 1930. Eleven of these received no participation in the General Motors Management Corporation plan and their A stock in Managers Securities Company should have been reacquired with the eight others on April 29, 1930. Of the remaining thirty-six, there were seven who received bonus stock in addition to their share of the equalization payment, and as to them it was not an equalization payment

at all. For the others it is argued that they would have received a bonus award but for the equalization payment. That is an unsupported assertion. If the equalization payment was intended as a bonus it would have been paid as a bonus. The testimony is to the effect that it was not a bonus, but the settlement of a claim.

The earliest subscription for allotments of stock in the General Motors Management Corporation was April 28, 1930 (Ex. 54). Nine such subscriptions were paid before May 1, 1930; only three were paid after May 15, 1930. Those participants in Managers Securities Company who were not to receive an allotment of stock in General Motors Management Corporation were known prior to May 15, 1930, when the option of General Motors Corporation to reacquire Managers Securities Class A stock expired. Their Class A stock should have been reacquired before May 15, 1930.

In the case of five of the participants the equalization payments over-shot the mark. Mr. Coyle, on top of his equalization payment and his interest in General Motors Management Corporation contract accruals, received an additional 255 shares of General Motors common stock valued at $11,538. Mr. Alfred Fisher likewise received an additional 736 shares valued at $33,301; Mr. Edward F. Fisher 737 shares valued at $33,346, and Mr. William A. Fisher 737 shares valued at $33,346. It appears that $100,000 was divided among these three members of the Fisher family. Mr. William S. Knudsen received an additional 2431 shares valued at $109,993. In those five cases the alleged commitment of Mr. Brown's letter of December 10, 1929 was exceeded at a cost to General Motors Corporation of $221,524, the value of the additional 4895 shares of General Motors common stock which they received as an extra bonus for the year 1930.

It should be said of Mr. Knudsen that he was a production executive. He had nothing to do with devising ways and means for the equalization payment, although he thought it was proper. Nor did he originate any of the accounting practices sanctioned by the financial executives which increased the amount of the bonus. He was not on the Finance Committee. Mr. Knudsen was worth the salary and bonus he received from General Motors and he rightly felt that he had earned it. But he was not entitled to the equalization payment.

At this point it should be noted that although the Managers Securities plan approved by the stockholders at the meeting of November 26, 1923 provided that the shares themselves were to be delivered to the participants on April 15, 1931, on the surrender of the depositary certificates (Ex. 7 and 7-7) the agreement of November 30th between General Motors Corporation and the participants (Ex. 7-12) provided for the delivery of the certificates of A and B stock to the participants on May 16, 1930.

The change in date from April 15, 1931 to May 16, 1930 was favorable to the Managers Securities Company participants, many of whom were the principal executives as well as directors of General Motors Corporation. If a change in date was desirable an amendment of the plan should have been submitted to the stockholders for their approval. No approval of the change was sought by these executives from either the Finance Committee or the Board of Directors, although the Board of Directors adopted an amendment to the plan on another point on May 13, 1926.

The agreement with the Managers participants (Ex. 7-12) was signed on behalf of the General Motors Corporation by its president, Mr. Sloan, who became the largest participant (8%) under the Managers Securities Company plan. He was also a director and President of the Managers Securities Company. The agreement between Managers Securities Company and General Motors Corporation dated November 27, 1923 (Ex. 7-10), which contains a recital that "the plan pursuant to which said Managers Company has been formed has been duly approved by the directors and stockholders of General Motors", was signed by Mr. Sloan, as President of Managers Securities Company and by Mr. Brown as Vice-President of General Motors Corporation. Mr. Brown became a 4% participant in Managers Securities Company and was also one of its directors. Mr. Smith, another participant of Managers Securities Company was the general counsel for the General Motors and the Managers Securities Company and was a director of each. These facts emphasize the dual capacity in which these officers and directors of General Motors Corporation acted in the preparation and execution of the agreements with Managers Securities Company and with the participants of Managers Securities Company. Their obligation to refrain from entering into agreements which modified the Managers Securities plan to their own advantage was clear.

Exhibit 7-27 is a general release, dated December 29, 1930 from Managers Securities Company to General Motors Corporation which, in addition to the usual general language as to the nature of the claims released, specifies claims "on account of a contract between the parties dated November 27, 1923, and an agreement supplemental thereto, dated April 25, 1927, and the cancellation thereof as of December 31, 1929." It was signed on behalf of Managers Securities Company by John T. Smith, Vice-President and acknowledged December 31, 1930.

General Motors Corporation received general releases from forty-seven Managers participants between February 13th and March 28, 1931. These releases (Ex. VVV, 1 to 47) were all in the same form and recited the consideration as "$10 and other valuable consideration paid" by General Motors Corporation. Each release ran to "Managers Securities Company and/or General Motors Corp.", their officers, directors and trustees. The claims released were those "on account of the cancellation as of December 31, 1929 of the contract between General Motors Corporation and Managers Securities Company dated November 27, 1923 and amended as of April 25, 1927". It is urged that the releases were given as part of the settlement of the claims of these forty-seven participants. True, that formality was followed, but the release could not lend validity to an unjust claim or excuse the dereliction of those who paid it. The equalization payment was a gift of corporate assets to these participants, of whom eleven were directors of the corporation and others were officers and executives. The true character of the payment was not changed, either by the wording of the general releases or by the resolutions of approval given after the event.

The Managers Securities Company participants, as stockholders, executives and managers of General Motors Corporation, had read Mr. Sloan's letter of February 15th, 1930 to the General Motors stockholders, in which he stated that the Managers Securities Company plan could be terminated on December 31, 1929, a year ahead of time, "with perfect equity to all concerned". That meant—with perfect fairness to all concerned. The letter itself pointed out why it was the fair thing to do.

The letter also stated that "an important contributing factor in the expansion of busi--

ness and earnings" which the corporation had enjoyed "during the past few years" i. e., just prior to 1930, was the infusion of new blood into the organization. The General Motors Management plan was to give these younger executives proper recognition in the bonus plan for managers and executives. The efforts of the younger men had contributed greatly not only to the increased earnings but to the bonus based thereon, of which a large part had gone to the older executives and managers under the Managers Securities plan. The letter indicated that the younger men were not getting a fair share of the bonus under the Managers Securities plan and that it was not possible to readjust these inequalities under that plan. Many of the older executives were getting too much. There was nothing inequitable therefore in terminating the Managers Securities plan a year in advance so as to give the younger men a proper share of the bonus under a new plan, even if certain older executives received less.

The defendants argue that the statement— "This can be done with perfect equity to all concerned" evidenced an intention to make some settlement with participants under the Managers Securities plan. It does not bear that construction. It did not advise the stockholders that participants under the 1923 Managers Securities Company plan, who might have their participation reduced by the earlier substitution of the new plan, would receive a million and a half dollars or any sum whatsoever. It disclosed nothing of the kind. To this situation the argument of Mr. Justice Stone, in his dissenting opinion in Rogers v. Guaranty Trust Co., 288 U. S. 123, at page 143, 53 S.Ct. 295, at page 302, 77 L.Ed. 652, 89 A.L.R. 720, is especially applicable:

"We need not conjecture whether, if the directors had had the hardihood to disclose in advance the benefits which they were to award to themselves, the stockholders would nevertheless have given their approval. Nor is it important that these directors have successfully managed the corporation and that under their direction it has earned large profits for its stockholders. Their business competence did not confer on them the privilege of making concealed or unauthorized profits or relieve them of the elementary obligation which the law imposes on all corporate directors to deal frankly and openly with stockholders in seeking their consent to benefit personally by reason of their relationship to the corporation."

If older executives intended to insist on their "so-called rights" and demand an equalizing payment from the General Motors Corporation they should have declared themselves to that effect before the stockholders were asked to vote the new plan (the General Motors Management Corporation plan) and the stockholders should have been so informed by Mr. Sloan in his letter of February 15, 1930. There should have been a full disclosure of any "gentlemen's agreement" that certain Managers Securities Company participants were to receive an equalization payment. An extra sentence in Mr. Sloan's letter could have covered it.

Directors who act for a corporation cannot justify the payment to themselves and other executives of $1,540,830 in Treasury stock on the basis of a "gentlemen's agreement" which they have made with themselves. Such conduct violates the standards of rectitude implicit in their position as fiduciaries. A director has the obligation "if he becomes a party to a contract with the company, to candor and fair dealing" and this obligation "is increased in the precise degree that his representative character has given him power and control derived from the confidence reposed in him by the stockholders who appointed him their agent". Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 590, 23 L.Ed. 328; Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281. Any such agreement "is viewed with jealousy by the courts, and may be set aside on slight grounds". Twin-Lick Oil Co. v. Marbury, supra. As stated by Mr. Justice Miller in the last cited case, this "is a doctrine founded on the soundest morality".

Even a stockholder, who is not a director, in making a contract with his corporation is "held to a larger measure of candor and good faith than if he were not a stockholder". The participants who shared in the 36,071 share equalization payment controlled a corporation, Managers Securities Company, which owned a 30% interest in General Motors Securities Company, the largest stockholder of General Motors Corporation. The record indicates that the shares owned by General Motors Securities Company were not voted against the General Motors Management Corporation plan, which superseded the Managers Securities Company plan. As directors the most influential participants had unanimously approved the new plan, which required a termination of the old plan a year in advance of

its expiration date. Concededly, the two plans could not be operative at the same time, by the very terms thereof. No one was supposed to collect under both plans. If any directors thought they were to be so favored they should have told the stockholders about it in advance.

I am not impressed by the argument of the defense that the equalization payment was necessary "in order to maintain the morale" of the forty-seven executive participants who received it.

For the year 1930 Mr. Brown received a salary of $100,000; plus $750.00 directors fees; plus $148,058 in contract accruals under the new Management Corporation plan; plus the equalization payment of 1,155 shares of stock, valued at $49,338; a total of $298,146.

During the seven years in which the Managers Securities plan was in effect (1923 to 1929 inclusive) Mr. Brown received a total of $552,500 in salary and his participation in the Managers Securities Company yielded him cash dividends of $2,391,600. Some of his Class A stock was redeemed for $120,000. His remaining A and B stock participation had a net worth of about $7,214,400 on December 31, 1929. Mr. Brown had paid $220,392 for his Class A and B stock of Managers Securities Company. Thus, the General Motors bonus plan, through Managers Securities Company as a vehicle, had enabled him to make a net gain of $9,505,608. Nevertheless he testified that if the General Motors Corporation had not given him his $49,338 part of the so-called equalization payment he would not have believed that he had received "fair treatment" from General Motors Corporation.

For the year 1930 Mr. Sloan received a salary of $120,000; plus a "living allowance" of $30,000; plus $600 directors fees; plus $222,088 in contract accruals under the new Management Corporation plan; plus an equalization payment of 4044 shares of stock valued at $172,746; a total of $545,434.

Mr. Sloan's interest in the Managers Securities Company, during the seven years that the plan was in effect, was 8%. His participation therein had yielded him $4,749,200 in cash dividends. Some of his A stock had been redeemed for $420,392, but his remaining A and B stock were worth on December 21, 1929 about $14,428,800. In addition, in the seven years of 1923 to 1929 inclusive, Mr. Sloan had received a total of $795,000 in salaries from General Motors Corporation, plus $199,627 for "living allowance", whatever that means. It cannot be urged seriously that he required the extra $172,746, represented by his 4,044 share allotment of the equalization payment in February 1931 in order to feel that he had been treated fairly or to maintain his executive morale at a proper degree of efficiency.

What I have written about the financial advantages resulting from Mr. Brown's 4% interest and Mr. Sloan's 8% interest in Managers Securities Company applies to the other participants, according to their respective interests. The director members of the Fisher family had the following percentages in Managers Securities Company acquired January 23, 1925: Charles T. Fisher 4.3%; F. J. Fisher 4.3%; L. P. Fisher 2.2%; W. A. Fisher 2.2% (A. J. and E. Fisher, who were not directors, but each had a 1½% interest in Managers Securities Company). Mr. Kettering had a 3% interest; Mr. Knudsen 3%; Mr. R. S. McLaughlin 1½%; Mr. DeWitt Page 2%; Mr. John L. Pratt, 2%; Mr. A. H. Swayne ½%, acquired February 3, 1926. All of these directors received substantial parts of the 36,071 share equalization payment in February-March 1931.

Each defendant director of General Motors Corporation, who is now before this Court, and who received any part of the 36,071 shares of General Motors common stock, which constituted the so-called equalization payment, is severally liable to General Motors Corporation for the value of the stock received by him (at $42.71 per share) plus the March 1931 dividend thereon, together with interest on both from the date they were received. In this group are Mr. Sloan and Mr. Brown. All the defendant directors who as members of the Finance Committee or as members of the Board of Directors voted to ratify the acts of the officers in paying out these 36,071 shares valued at $1,540,830, or who later signed and approved the minutes containing the resolution of approval, are jointly and severally liable to the corporation for the full amount thereof, together with the $27,053 of March 12th, 1931 dividends thereon, with interest on both amounts from the date of said approval. The ratification and approval of the Finance Committee was given March 23, 1931; that of the Board of Directors, May 6, 1931. The defendant directors thus jointly and severally liable are Mr. Brown, Mr. Morgan, Mr. Mooney, Mr. Prosser, Mr. Sloan, Mr. Smith and Mr. Whitney.

980

The claims against these directors are not barred by the New York Statute of Limitations. The six-year statute would apply to the claims against the defendants Brown and Sloan for what they severally received from the equalization payment. The six-year statute would also apply to the claim against the directors who breached their fiduciary duty and approved and ratified the payments, but did not participate therein. Potter v. Walker, 276 N.Y. 15, 11 N.E.2d 335; Goldstein v. Tri-Continental Corp., 282 N.Y. 21, 24 N.E.2d 728.

*Non-operating profit of $10,057,599.48 on sale of 1,375,000 shares of General Motors common stock to General Motors Management Corporation on April 30, 1930.*

In 1931 there were divergent opinions among accountants concerning the proper treatment of transactions in Treasury stock. If a profit on the sale of Treasury stock were included in the income of General Motors Corporation for the year 1930, as a result of the honest exercise of business judgment by disinterested executives, the Court would not surcharge the defendants with the 10% of the profit that went into the bonus fund.

But there are compelling reasons why the alleged $10,057,599 profit on the sale of 1,375,000 shares of General Motors common stock to General Motors Management Corporation in March 1930 should not be included as income of General Motors Corporation for 1930 in calculating the bonus base for 1930. The manner in which blocks of Treasury stock of General Motors Corporation could be and were transferred from other accounts on the books of General Motors Corporation into the Second Managers Securities account, in which the 1,375,000 shares were accumulated, and later transferred to still other General Motors accounts, and the prices at which these transactions could be and were recorded arbitrarily in the Second Managers Securities Account, all indicate that a large part of these transactions were not market transactions but intra-company bookkeeping entries, completely under the control of executives who could build up the Second Managers Securities account to suit themselves. These executives were the likely participants in any second Managers Securities Company that might acquire the stock in that account. The prices at which stock owned

by General Motors was transferred into this Second Managers Securities Account was frequently fixed in the interest of the prospective participants, at a sum far below the then value of the stock. If the real value of the stock had been used at the time of the transfer of certain large blocks into this account, the cost price of the stock to the account would have been much higher, as hereinafter indicated.

Much of the stock was never earmarked. Many of the transfers were bookkeeping entries. There is no way of identifying large blocks of the shares themselves. It was testified that the security cards which recorded the open market purchase of General Motors common stock are no longer available.

Mr. P. S. duPont, as Chairman of the Board of Directors, sent a letter to the General Motors common stockholders, dated April 11, 1927 (Ex. 8-4), in reference to the inauguration of a tentative Second Managers Securities plan to take the place of the first Managers Securities plan when it expired at the end of 1930. A notice dated April 9, 1927, informed the stockholders that this matter would come before them at the annual stockholders meeting to be held on May 11, 1927. The Chairman's letter ended with these two paragraphs:

"To make possible the inauguration of such a plan it is advisable for General Motors Corporation to arrange for the purchase of $35,000,000. of its common stock before the close of 1930. This stock will be purchased gradually, the amount accumulated being available for sale to a second Managers Securities Company to be formed along such lines as in the judgment of the Board of Directors seems desirable and for the best interests of the stockholders of General Motors Corporation; provided, however, that the stock shall not be sold at a price less than the net cost thereof. In determining this net cost, there shall be added to the actual price paid for the stock 6% interest, compounded quarterly, and all dividends shall be credited thereto.

"The directors of your Corporation have approved the plan and recommended its acceptance in principle to the stockholders, with the understanding that the final plan if and when formulated, will be submitted to the stockholders for approval."

At the meeting of the stockholders on May 11, 1927 this letter was read and or-

dered spread upon the minutes and the Second Managers Securities plan, as described in the letter, was approved in principle with the understanding that the final plan if and when formulated would be submitted to the stockholders for their approval. (Ex. 8-5)

It should be noted that the letter stated that the stock for the Second Managers Securities plan "will be purchased gradually". That clearly implied that none of the stock for the plan had as yet been purchased. The purchase price of the stock would be its value on the date it was actually acquired, i. e., at some date subsequent to May 11, 1927.

The letter did not state that General Motors at the instance of the Finance Committee had theretofore acquired in June and July of 1926 blocks of General Motors common stock for this second plan, and that a 50% stock dividend thereon had been received September 11, 1926. Nor did the letter state that additional shares had been purchased early in December 1926 and in January and February 1927. (Ex. 56) The stock thus purchased had cost $14,519,087.-50 and, together with the stock received as a dividend, was worth about $20,812,-500, at the date of the letter April 11, 1927. The stockholders should have been told about these purchases and of the effect of applying thereto the interest and dividend formula mentioned in the letter. There was a duty of full and frank disclosure imposed on the executive-directors who were to benefit so handsomely by making the authorization retroactive. The stockholders should have been told that the Second Managers Securities account already showed a profit of $6,713,000.

The cheaper the price at which the stock was put into the Second Managers Securities account, the greater the number of shares that could be bought with the $35,000,000 fund and the more shares there would be for the prospective participants. The greater the number of shares in the account, the greater the amount of dividends they could apply to the reduction of the minimum price at which the stock could be sold to the participants. The lower the cost price, the smaller would be the interest charge thereon.

By not using as the purchase price of the previously acquired stock its market value as of the date the stockholders authorized its acquisition, the prospective participants were presented with a profit

of over $6,700,000. Further, since a cost price, $6,700,000 less than the May 1927 market was used, the interest chargeable under the formula, for the period from May 11, 1927 to December 30, 1930, was about $1,458,000 less than it should have been, applying defendant's formula for calculating the profit. A correct cost price of this stock, plus interest thereon would have increased its total cost by $8,158,000.

The authorization to the officers at the stockholders' meeting of May 11, 1927 was to expend $35,000,000 for the purchase of General Motors common stock before the close of 1930. Exhibit 56 shows that the following purchases were made for the Second Managers Securities Account.

| Year | Number of shares of General Motors common purchased | Cost |
|---|---|---|
| 1926 | 330,000 | $ 7,276,725.00 |
| 1927 | 232,500 | 7,142,362.50 |
| 1928 | 125,000 | 7,459,587.50 |
| 1929 | 389,800 | 16,364,500.00 |
| | 1,077,300 | $38,243,175.00 |

In these purchases more than $35,000,000 had been expended. But the officers did not limit themselves to purchases of General Motors common stock for this account. They acquired also Class A and Class B stock of Managers Securities Company, with the approval of the Finance Committee. Nor did they limit themselves to $35,000,000 as Exhibit 56 shows. Representations to stockholders as to how the purchase would be made; the approval by the stockholders of a limit in the amount to be expended and of the type of stock to be purchased, were disregarded by those who undertook to accumulate the stock for the Second Managers Securities plan.

General Motors Corporation recaptured 1200 shares of Managers Securities Class B stock from three participants under the first Managers Securities plan on April 30, 1926, at a settlement payment of 10,595 shares of General Motors common stock (of the type then issued) having a book value of $1,378,276.38, which was close to its real value on that date. (Ex. GGG-1) The 1,200 shares of Class B stock were transferred to the Second Managers Securities Company plan on November 1, 1927 at the April 30, 1926 price of $1,378,276. (Ex. 56) On October 31, 1927, Class B Managers Securities Company stock, based on the then market value of its underlying General Motors stock, had a value of $5,146 per share. The value of the 1200 Class B

982

shares at the time of their transfer to this Second Managers Securities account was $6,175,236, not $1,378,276. By this transaction a profit of $4,796,960 belonging to General Motors Corporation was presented by the financial executives to the fund in which they would probably share when the Second Managers bonus plan became operative. The interest charge on that amount from November 1, 1927 to December 30, 1930 would be about $911,000.

The 1200 Managers Securities Company Class B shares, on the merger of Managers Securities Company and General Motors Securities Company in December 1930 produced 115,368 General Motors common stock (Ex. ZZZ) which at the then market of $34.25 a share had a value of $3,951,-354. The difference between the $1,378,076 (the price at which the 1,200 Class B shares were booked in the Second Managers Securities Plan account on November 1, 1927) and the $3,951,354, the price at which they were exchanged in December 1930 is $2,-573,279 and is part of the alleged profit of $10,057,559 on the 1,375,000 share sale to General Motors Management Corporation in March 1930. If the actual value of the 1,200 Class B stock on November 1, 1927 ($6,175,236) had been used in figuring the profit or loss on this transaction, there would have been a loss of $2,213,882 when this item of the account was closed out December 30, 1930, instead of a profit of $2,-573,278.

On November 1, 1927 there were transferred into the Second Managers Securities account from the General Motors Miscellaneous account 3,090 shares of Class A Managers Securities Company stock, together with the aforementioned 1,200 Class B stock at a total cost for the A and B stock of $1,798,389. Of that total $1,378,-276 represented the value at which the Class B stock was transferred into this account and $420,113 the value at which the 3,090 shares of Class A stock were thus transferred. Of the 3,090 shares of Class A stock, 2,190 shares were transferred at a cost price of only $19, 052. (Ex. GGG-1) It appears that these 2,190 shares had been acquired for $620,402 cash by General Motors Corporation from three participants in the Managers Securities Company on April 30, 1927. In the year 1927 $601,350 in dividends had been paid on all the Class A shares owned by General Motors Corporation. (Ex. GGG-1) The executives in charge of the transfer of the 2,190 shares

to the Second Managers Securities Account reduced the cost price by the amount of these dividends, which in effect was a gift of the dividends to this account. On January 5, 1928 Managers Securities Company redeemed 2,060 of these Class A shares for $710,700 (Ex. 56). The profit went into the Second Managers Securities account. It should have been General Motors. The interest saved on this sum from January 5, 1928 to December 30, 1930 was about $127,000. There was no valid reason for the 2,190 Class A share transaction. Those on the inside, who were high officials of both Managers Securities Company and General Motors, were in a position to know in November 1927 that the Class A stock of Managers Securities Company would be redeemed in great part within a short time. The redemption took place two months after the transfer of the Class A stock into this account.

The remaining 130 Class A shares of the above mentioned lot of 2,190 shares were exchanged for 8,624 shares of General Motors common stock, on the merger of Managers Securities Company into General Motors Securities Company on December 30, 1930. The ratio of exchange was 66.34 shares of General Motors common for each share of Class A stock of Managers Securities Company. (Ex. ZZZ) The 8,624 shares of General Motors common in the Second Managers Securities account had a value of $295,372 at $34.25 a share. Thus the Second Managers Securities account realized $710,700 plus $295,372 on the 2,-190 shares of Class A Managers Securities Company stock, transferred into the said account at a cost of $19,052. (Ex. GGG-1) The profit of $987,020 on the 2,-190 Class A share transaction became part of the $10,057,599 in question.

Another understatement of the cost price in the Second Managers Securities. Account (Ex. 56) is the transaction by which 2,920 shares of Managers Securities. Class B stock was brought into that account on May 1, 1927 in exchange for 55,447 shares of the then General Motors. common stock (equal to 277,235 shares of present General Motors common stock). The 2,920 shares Class B stock are entered. in Exhibit 56 as having a value of $6,-955,596. Their actual value on May 1,. 1927 at $3,622 a share was $10,576,240. The 55,447 shares of the then General Motors common stock had a value on May 1, 1927 of about $190.00 a share so that

the General Motors stock given in exchange also had a value of $10,675,240. While the one total offsets the other, the entries incorrectly state the cost of the Class B stock on May 1, 1927 and the then market value of the General Motors common stock given in exchange.

The same is true of the entries of December 31, 1930 indicating the exchange of 243,392 shares of General Motors common stock for 2,400 shares of Class B Managers Securities Company stock (the Raskob transaction). The values stated for both blocks of stock in Exhibits 56 and ZZZ are $9,636,493.84. They should have been stated at $12,169,600.00.

Exhibit 56 contains several examples of how blocks of stock transferred into this Second Managers Securities account could be arbitrarily selected from other accounts on the books of General Motors Corporation at cost prices either above or below the market price as of the date of the transfer. On January 3, 1930, 46,306 shares General Motors common stock were transferred into the Second Managers account from "regular account 1-G" at about $65.80 a share when the market price was 40⅝ a share. On the same day, January 3, 1930, there were transferred into the Second Managers Securities Account, at $48.28 a share, 95,000 shares previously acquired in the open market to purchase the Winton Engine Cc.

There also appear in Exhibit 56 instances of stock transferred out of this Second Managers Securities Account to other accounts on the books of General Motors Corporation, at prices that did not represent the then market price of General Motors common stock. On April 1st, 1930 there was transferred out of the Second Managers Account to "regular account 1-G" 45,765 shares General Motors common stock at $41.04 a share when the market was 49¾ a share. On April 30, 1930 there was sold to General Motors Management Corporation out of this Second Managers Securities Account 32,517 shares at $43.21 a share when the market price was 46⅞ a share.

There were a number of accounts on the books of General Motors Corporation in which it carried General Motors common stock, which it had purchased from time to time in the market. These shares were transferred from one account to another as those in charge directed. The men who either made or recommended these transfers later participated in the bonus benefit of the General Motors Management plan. Most of the stock that went into this Second Managers Securities account was neither acquired nor booked in the manner indicated to the stockholders in Mr. P. S. duPont's letter of April 11, 1927.

The principal executives of General Motors Corporation were also officers, directors and participants in Managers Securities Company. They held both Class A and Class B stock in that company. They recommended the transfer at cost into the so-called Second Managers Securities account of certain Class A and Class B Managers Securities Company stock, owned by General Motors Corporation, at a price that was only a small fraction of its real value. It does not appear that the real figures on these transactions were ever submitted to the Finance Committee or to the Board of Directors.

Before concluding an analysis of the transactions listed on Exhibit 56 the following should be noted. The exhibit lists the acquisition of blocks of stock by way of open market purchases through J. P. Morgan & Co. in the Fall of 1929—On October 30th, 140,000 shares for $6,326,000 at an average price of $45.18 a share; on October 31st, 4,800 shares for $214,-320 at an average price of $44.65; on November 1st, 4,600 shares for $205,390 at an average price of $44.65 and on November 4th, 600 shares for $26,790 at an average price of $44.65. Exhibit FFF-3 shows that Managers Securities Company in the Fall of 1929 made the following purchases of General Motors common stock through J. P. Morgan & Co.—On October 30th, 81,700 shares for $3,265,630 at an average price of $39.97; on October 31st, 11,100 shares for $445,665 at an average price of $40.15; on November 4th, 900 shares for $36,135 at an average price of $40.15 a share. A comparison of these prices discloses that for the shares purchased on October 30th General Motors Corporation paid $5.21 a share more than Managers Securities Company; and that for the shares purchased October 31st and November 4th General Motors Corporation paid $4.50 a share more than Managers Securities.

General Motors Corporation sold to General Motors Management Corporation 1,375,000 shares of General Motors common stock plus the $1,031,250 March 12,

1930 dividend thereon, for $55,000,000. The authorization of the stockholders at the meeting of March 5, 1930 specifically provided: "the said shares (1,375,000) to carry the dividend payable March 12, 1930". That dividend was payable to stockholders of record February 15, 1930. Unless that provision was included in the authorizing resolution of March 5, 1930 the dividend of $1,031,250 would have gone to the General Motors Corporation. Allowing the purchaser the dividend was in effect discounting the sales price by a corresponding amount. Hence in figuring a profit on the sale, the proper sales price would be $55,000,000 less the $1,031,250 dividend.

Defendants argue that for this right to the March 12, 1930 dividend of $1,031,250 the participants, i.e., the executives and managers who subscribed for common stock of General Motors Management Corporation, were charged interest on their subscription price. The total of their subscriptions was $3,890,000. The total interest charged them was about $30,500. This would be a small sum to pay for the right to the $1,031,250, March 12, 1930 dividend.

The stockholders in agreeing to a formula of cost plus interest less dividends were told that it was for the purpose of fixing a minimum price for the stock on its transfer to the prospective Second Managers Securities Company. They were not told and they did not agree, either expressly or impliedly, that the same formula was to be used in determining the cost of the stock to General Motors as the basis for calculating any profit on the transaction. The fact that a profit thus improperly calculated may have been included in the annual report for 1930 does not bind the stockholders or absolve the directors. There was nothing to show how the profit was calculated. Mr. Sloan's letter of February 15, 1930 to the stockholders in reference to the inauguration of the General Motors Management Corporation bonus plan simply stated that the stock had been acquired at a cost to General Motors of approximately $33.00 per share. This would convey the impression that $33.00 was the average price General Motors Corporation paid for the stock as accumulated in the market. The letter did not state that the cost of the stock to General Motors was the price paid plus interest less dividends. The stockholders

were not alone in their lack of details as to how the figure of $33.00 a share was arrived at. Many of the directors and members of the Finance Committee did not know the facts concerning the entries in the Second Managers Securities plan account, although they may have known the formula that was to be the basis for determining the minimum sales price of the stock under the Second Managers Securities plan.

In a report to the Finance Committee dated April 8, 1930 (Ex. CCCCC-2) Mr. Brown, the Chairman stated: "There is carried in the Treasury Stock Account of the Corporation 867,602 shares of General Motors common stock purchased in various amounts from time to time since May 11, 1927, in order that there might be available a second block of stock for the purpose of creating a second 'Managers Securities Plan.'"

That statement was not true. As Exhibit 56 shows, most of that stock had been acquired before May 11, 1927, the date of the stockholders' authorization.

On September 10, 1934, Mr. L. duPont in a letter to the stockholders referred to the alleged profit on the sale of 1,375,000 shares of General Motors common stock by General Motors Corporation to the General Motors Management. He stated: "The second plan was entered into in 1930 upon the termination of the previous one. Preparatory to its inauguration the Corporation acquired in the market over a period of time, under authorization from the stockholders granted at a special meeting held on May 11, 1927, 1,375,000 shares of General Motors Common stock at a cost of approximately $33 per share. In accordance with the authorization by a special meeting of stockholders held on March 5, 1930, these shares were sold in 1930 to the major executive group, numbering approximately 250 individuals, through the instrumentality of General Motors Management Corporation, organized for the specific purpose. The price at which the shares were sold was $40 per share, being approximately the market price at the time the transaction was effected. There resulted to General Motors Corporation a non-operating profit of $9,482,861, which was set forth in detail in the annual report for 1930." (page 636)

This letter, like Mr. Sloan's letter of February 15, 1930, would give the impression that the 1,375,000 shares had

been acquired in the market over a period of time after the stockholders on May 11, 1927, had authorized the acquisition and that the average market price paid was $33.00 a share. This was not the fact.

The non-operating profit on the 1,375,000 share deal was stated in the annual report for 1930 (Ex. 2-A) on the page entitled "Summary of Consolidated Income" as $10,057,599. In a paragraph marked "Earnings" under the heading "A Financial Review" (page 5) there appeared the statement: "The earnings stated for 1930 do not include a non-operating and non-recurring profit of $9,482,861 after taxes, etc., which resulted principally from the sale to General Motors Management Corporation of 1,375,000 shares of common stock of General Motors Corporation, as authorized by the stockholders at a meeting held March 5, 1930". A defendant's witness, an assistant to the Treasurer, testified at the trial that the "etc." meant bonus. In other words the idea that there was taken out of this non-operating profit a 10% bonus, in which Executive and Manager participants would share, was conveyed to the stockholder by the abbreviated term "etc.".

The credit of $4,827,964 in dividends on the General Motors common stock in this Second Managers Securities account was improper in figuring profit. Further, this practice in effect included in General Motors' income for 1930, dividends on the corporation's own stock held in a special account. "The treatment of such dividends as income results in an inflated showing of earnings inasmuch as the earnings from which dividends are paid have already been included in income or surplus either during the current or prior accounting periods". (SEC release #5, Accounting Series, dated May 10, 1938, Ex. 104)

If the Class A and Class B Managers Securities Company stock owned by General Motors Corporation and included in this second Managers Securities account be considered as the equivalent of General Motors common stock, the same argument would apply to the credit of $4,530,960 in dividends on the Class A and Class B stock in this Second Managers Account against the cost of such stock. Considering the Class A and Class B stock as stock of another corporation held in the treasury of General Motors Corporation and transferred to this Second Managers Securities Company Plan account, practically all of

the dividends on the Class A and Class B stock of Managers Securities Company shown on Exhibit 56 were in fact received by General Motors Corporation in the years 1927 to 1929 inclusive. The effect of crediting the dividends on this Class A and Class B stock against the purchase price of the stock, in determining the profit, was to make those dividends part of the income of General Motors Corporation in 1930, although, if income, they should have been included in the income of prior years.

The duty of full and frank disclosure of all pertinent facts affecting a transaction of this magnitude, where directors and officers have a personal interest opposed to that of the corporation is predicated upon moral considerations. Where directors seek the approval of the stockholders for a transaction in which the directors stand to profit at the expense of the corporation, every item of possible profit to the directors and all information that would enable the stockholders to form a correct estimate of the benefit accruing to the directors must be disclosed, if the approval of the stockholders is to be any protection to the directors. In reviewing the various letters sent to the stockholders in 1927 and 1930 concerning the acquisition of General Motors common stock for a second Managers Securities plan and the sale of the stock to General Motors Management Corporation, I have concluded that the stockholders were not informed of the most essential and significant details of the transaction. Upon those members of the Finance Committee or the Board of Directors who were to benefit from these transactions there rested the obligation "to deal frankly and openly with stockholders in seeking their consent to benefit personally by reason of their relationship to the corporation". Mr. Justice Stone's dissenting opinion in Rogers v. Guaranty Trust Co., 288 U.S. 123, at page 143, 53 S.Ct. 295, at page 302, 77 L.Ed. 652, 89 A.L.R. 720.

I believe that the defendant directors who did not participate in both Managers Securities plan and the General Motors Management plan should not be held liable for the amount by which the bonus was increased in 1930 by reason of the inclusion of the alleged profit on the stock sold to General Motors Management Corporation. Mr. Bradley, Mr. Brown and Mr. Sloan had most to do with the handling of this account and should be held jointly

and severally liable to General Motors Corporation for the $1,005,755.90 by which the 1930 bonus was increased through the inclusion in earnings of the $10,057,599 alleged profit on the sale of 1,375,000 shares to Management Corporation.

Mr. Bradley submitted to the Finance Committee a report dated March 5, 1931 (Ex. III-1) on the subject of the "Final 1930 Earnings" which contained the item of "non-operating profit resulting from sale of common stock to General Motors Management Corporation". Mr. Sloan made the report to the Finance Committee on March 20, 1931, recommending the bonus distribution for the year 1930. (Ex. 39) Mr. Brown presided at the meeting of the Committee. All three of them knew of the transfer of Managers Securities Class A and Class B stock into this account. They knew of the value of that stock. As stockholders of Managers Securities Company they were in a better position to know the background of the most important items in that account than Haskins & Sells.

The amount of the alleged profit was included in the annual report certified to by Haskins & Sells. The other directors were justified in relying on the amount stated. I do not feel that it was the duty of these other directors to examine the second Managers Securities Account and audit the items contained therein in order to decide if the amount of the profit was correctly stated. If Haskins & Sells actually made an audit of that account, its details were not reported either to the Committee or the Board. This was not a question of the Committee's duty to fix a policy or establish a rule on which bonus calculations would be based. In this instance the outside accountants assumed some independent responsibility.

 The Finance Committee held its meetings in New York City. To that Committee the Bradley and Sloan reports were submitted. All important items of inclusion in income for bonus calculations were discussed and reviewed by Mr. Brown and Mr. Bradley here in New York. It was there that the bonus for 1930 was approved. This improper item of a $10,057,599 non-operating profit was included in earnings on which the bonus was calculated. Mr. Brown and Mr. Sloan voted for the bonus at the Finance Committee meeting held in New York City on March 23, 1931. The cause of action against Mr. Sloan, Mr. Brown and Mr. Bradley arose in New York. They are jointly and severally liable. The distribution in bonus of 10% of the $10,057,599 was a waste of corporate assets. Potter v. Walker, 276 N.Y. 15, 11 N.E.2d 335; Goldstein v. Tri-Continental Corp., 282 N.Y. 21, 24 N.E.2d 728. The six-year New York Statute of Limitations applies. These suits were started in October 1936. The claim is not barred by the Statute of Limitations. The $1,005,759 claim carries interest from March 23, 1931.

*Alleged Profit of $352,514.49 on sale of 10,508 shares of Treasury stock on March 11, 1931.*

The summary of consolidated income for the year 1930 shown on page 18 of the annual report for that year (Ex. 2-A) lists as a non-operating profit, $10,410,073.97. A note states that this figure includes a profit of $10,057,599.48 from the sale of the 1,375,000 shares of General Motors common stock to General Motors Management Corporation. That alleged profit has heretofore been discussed in this opinion. The difference between these two profit figures is $352,514.49. At the trial it was testified that this latter figure was the profit on the sale of 10,508 shares of General Motors common stock to General Motors Management Corporation for use in the 1930 bonus distribution.

Two of the long schedules in Exhibit ZZZ contain items referring to this block of stock. One schedule entitled "Special Account of Second Managers Securities Company, December 31, 1930" contains an entry under date of April 30, 1930, "Special Account—Held for bonus requirements, 10,508 shares of General Motors common, Average price $32.685+, cost $343,458.30." Another schedule, in said exhibit, is entitled "To record Liquidation of Managers Securities Company and sale of Stock to General Motors Management Company". It contains an item as follows: "To transfer shares held for Special Bonus Account at $32.685+ per share average price per schedule, showing calculation of profit (J. V. 12); 10,508 shares, amount $343,458.30; Profit $352,514.49; Held for General Motors Management Corporation, shares 10,508, amount $695,972.79."

The above entries would indicate (1) that the 10,508 shares came from the Second

Managers Securities Account at an average price of $32.685+ per share and (2) that they were being held for the General Motors Management Corporation at a price ($66.-23 a share) that would make the block worth $695,672.79. On these assumptions the book profit would be $352,514.49, according to a defendant's witness.

On Exhibit Z, a graph showing the source of the bonus fund for the year 1930, there is listed an item indicating that the 1930 bonus fund was credited with the "Carry-over from 1929 Fund ........ 10,508 shares".

At the Court's request a schedule was prepared "showing the source and method of determining the 10,508 shares of General Motors common stock included in 1930 distribution". Various items relating to the 1929 bonus distribution are therein set forth and calculations are made, all resulting in a line that reads "Leaving a Remainder Undistributed and Carried Over of $696,013." Beneath that is a paragraph—

"Which, in Accordance with Finance Committee Resolution of February 3, 1931 (quoted in notes) was stated in terms of Shares of Stock at the January 2, 1931 Average Cost of Regular Account Stock of $66.23 Per Share—10,508 Shares (See Exhibits Z and 39) at $66.23 Per Share" (The date January 2, 1931 should be 1930)

The resolution of the Finance Committee, February 3, 1931, reads as follows:—

"*Bonus Reserve Account

"Upon motion, the following resolutions were unanimously adopted:—

"Resolved, that the carry-over in the Bonus Reserve from 1929 amounting to $696,013.00 be stated in terms of General Motors Common Stock on basis of $66.-2326596 per share, average cost of stock in Regular Treasury Stock Account January 2, 1930, or a total of 10,508 shares.

"Further resolved, that these 10,508 shares Common Stock be delivered to the Management Corporation and added to the subscription of General Motors Corporation to Class 'A' stock of the Management Corporation—the price to be used by the Management Corporation to be the average cost of General Motors Common stock acquired for 1930 Bonus purposes."

Exhibit 39 is a report from Mr. Sloan to the Finance Committee dated March 20, 1931 dealing with the subject of the 1930 Bonus Distribution. The report refers to the fact that under the terms of the General Motors Management Corporation contract, General Motors had subscribed for 115,535 shares of General Motors Management Class A stock under date of March 10, 1931 at a price of $4,935,249. (At the rate of 42.72+ per share.) Mr. Sloan's report then states that "in addition to the above, there is available for bonus distribution the following: 'On account of the bonus reserve carried over from 1929, 10,508 shares valued at $696,013.'" Other items are also listed. The Finance Committee at a meeting held March 23, 1931 considered this report and resolved that the above item of 10,508 shares and two other items "be credited to the bonus fund for the year 1930". The transfer of these shares to General Motors Management Corporation had already been made, March 11, 1931.

Defendants assert that the figure of $66.23 per share was placed on the stock, because that was the average cost per share of General Motors common stock in the Regular Treasury Stock Account on January 2, 1930. Why the year 1930 should be selected when the committee was acting in 1931 is not clear. Further, and what is more important, the stock used was not taken from the Regular Treasury Stock Account; it came from the Second Managers Securities Account. General Motors Corporation had many accounts on its books in which it carried purchases of its own stock. The average cost varied with the different accounts. The Committee did not select the accounts from which the stock was to be taken for bonus purposes, as Mr. Sloan's letter of March 20, 1931 shows. Those who were most interested as participants in the bonus fund made the selections, and they credited this alleged profit to the year 1930 although the transaction from which it is supposed to have resulted took place in 1931.

These rather involved and inconsistent records of the various book transfers of this 10,508 share item and the use at times of arbitrary figures higher than those justified by other records of the corporation have convinced me that the alleged

---

" *Difference of $40 from figure shown above ($696,013) represents fractional share".

$352,514.49 profit included in the item of $10,410,073 should be disregarded. When this stock was in the Second Managers Securities Plan Account in December 1930 it was stated as having an average price or cost to General Motors Corporation of $32.685 per share. It was arbitrarily moved from that account at an asserted per share value of $66.23 on December 31, 1930 to a Special Bonus Account, where it was to be held for General Motors Management Corporation. But it could not have been transferred to General Motors Management Corporation at $66.23 per share because the resolution of the Finance Committee of February 3, 1931 provided that the price to be used by the Management Corporation was to be the average cost of General Motors common stock acquired for 1930 Bonus purposes. That average cost was $42.72 a share. (See Ex. 39, first paragraph) This would mean a profit of about $10.02 a share (the difference between $32.685 and $42.72). The profit on the 10,508 shares would be $105,290 not $352,-514. Of course, if General Motors Corporation actually considered the 10,508 shares as the equivalent of $695,972.79 ($66.23 a share) there would be no profit at all in selling them for $42.72 a share or in selling them at $66.23 a share.

Defendants' difficulties in reconciling these conflicting records are the result of an attempt to match dollars from one fund and shares from another, where the two had no relation to each other. What was left over in the 1929 bonus fund was dollars, $695,972.79. The excess stock in the Second Managers Securities Account, over the 1,375,000 shares required for the Management Corporation March 1930 contract, were shares, with a book value of $32.-685 + per share. If the total amount of undistributed dollars in the 1929 bonus fund had been used to buy the correct number of shares in the Second Managers Securities Account (at $32.685 + per share) for the 1930 bonus distribution, the number of shares acquired from said Account would have been slightly more than twice the 10,508 shares actually acquired and there would have been no book profit in the transaction.

█ As I review these records, having in mind that very few (if any) of the General Motors common shares in the various accounts were earmarked, the 10,-508 share transaction appears to have been dollars or shares, as seemed most desirable at the time, and the price thereof was fixed at different amounts, regardless of prior entries. Because of the arbitrary action by which 10,508 shares of stock costing $343,458.30 ($32.68 a share) was declared to have a cost price of $696,013 ($66.23 a share) there was a difference of $352,-514.49 "to be accounted for and this profit (or excess of award value over cost) was credited to Account 12B, Profit or Loss." (Letter of defendants' attorney to the Court, dated November 13, 1941. Stipulation of December 23, 1941.) Thus the alleged profit was only a bookkeeping entry. It was not a genuine profit. A proper entry would have recorded the fact that only $343,458.30 of the 1929 fund had been used in the transfer of the 10,508 shares from the Managers Account to the Management Account. The balance of the 1929 fund, $353,514.49 could have remained as it was or, if the entire fund was to be closed out, the balance could have been transferred to surplus. The alleged profit had no place in "net earnings" on which the bonus was to be calculated.

This alleged profit is open to the further objection that it is based on a cost price of $32.685 + per share for stock in the Second Managers Securities Account. That account is unreliable, as has been shown in the discussion of the alleged $10,-057,599 profit on the sale of the 1,375,000 shares to General Motors Management Corporation in March 1930.

The bonus fund was increased by $34,345 through the inclusion in earnings of this alleged profit on the 10,508 shares. Mr. Sloan, Mr. Brown and Mr. Bradley are jointly and severally liable to General Motors Corporation for the $34,345 plus interest thereon from March 23, 1931. For the reasons stated in the discussion of the alleged profit of $10,057,599 the cause of action on this claim arose in New York and the six-year New York Statute of Limitations applies. The claim is not barred by the statute.

*Prices at which shares of General Motors Corporation common stock were awarded under the 1918 Bonus Plan.*

█ For the years 1919 to 1929 the award value was approximately the cost price of the stock to General Motors Corporation. In 1918 the total award value was about $248,000 in excess of cost. A comparison of (1) the average daily closing market value during the year for which the bonus was awarded, (2) the closing

market prices on the date of the award by the Finance Committee and (3) the award value (the price at which the stock was awarded), shows that in some of the years the award value was greater and in others it was less. The respective totals, on the three basic values above indicated, for the years 1918 to and inclusive of 1929 are as follows: award value, total $64,119,481; value based on average daily closing market value during the years, total $66,013,279; value based on closing market price on date awarded by Finance Committee, total $70,227,910. The greatest differences were for the calendar years 1925 to 1929. The above totals relate to the stock awards of the bonus under the 1918 plan. The 5% bonus paid to Managers Securities Company for the years 1923 to 1929 was *in cash* and was not affected by the market value of the General Motors common stock.

For the period 1925 to 1929 inclusive, ten of the individual defendants received bonus awards in stock under the 1918 plan. During this period the Managers Securities plan of November 1923 was in effect. Of the ten, only four received awards which, over that period, respectively were at an award value that was in excess of the market value at the date of the award. The allotments the ten received in that period were only a very small percentage of the total. Nearly all of the awarded stock went to plant managers and subordinates who were not directors or officers of General Motors Corporation.

For the years 1930 and 1931 bonus awards were in Class A stock of General Motors Management Corporation. During those two years General Motors payments to the Management Corporation were in cash. Management Corporation itself purchased such stock as is required for bonus purposes. Each share of Management Class A stock had behind it a share of General Motors common stock. In the year 1932 there was no bonus.

For the years 1933 to 1936, inclusive the average daily market price for the year was used as the award value of the stock for the 5% bonus. The stock thus used was taken from General Motors treasury. It had cost less than the award value. The other 5% was paid to the Management Corporation in cash. For 1937 and subsequent years the full 10% bonus was awarded in General Motors common stock at an award value per share equal to the average daily market value for the

year. The stock used for the bonus awards came from the treasury. It had been acquired at a price less than the award value.

For the years 1933 to 1940 inclusive the bonus stock awarded had the following basic values: The total award value was $55,640,966; the total cost $37,116,719; the average daily closing market value during the bonus year, $56,543,319; the closing market price on the date the award was made by the Committee, $54,321,350. Over the entire period of 1918 to 1940 inclusive the total value of bonus stock awarded, based on the closing market price on the date of the award, was only 3% in excess of the total price fixed by the Committees for the bonus stock awarded. On the figures thus summarized from the schedules [Exs. 122 and 122(a)] it cannot be charged that the Finance Committee and the Bonus and Salary Committee in fixing an award value for the bonus stock were either negligent or wasteful of the corporate assets. They had to select some method of determining the award value. They honestly exercised their best judgment in fixing the award value of the bonus stock.

*Inclusion of Treasury Stock Increments in the Bonus Base.*

In discussing the alleged profit of $10,057,599 on the sale of 1,375,000 shares of General Motors common stock to General Motors Management Corporation in April of 1930, I referred to the fact that in the year 1930 there was a divergence of opinion among accountants as to the proper way in which to treat the gain derived by a corporation on the resale of its own stock. Some corporations dealt in their own stock, buying it on the market, holding it in the treasury for a while and then re-selling it to the public. The profit thus made was treated by some accountants as income, by others it was classified as a part of surplus, either capital surplus or earned surplus.

Under date of January 21, 1932, the Committee on Stock Listing of the New York Stock Exchange sent a letter to corporations whose stock was listed on the Exchange to advise them of the Committee's general attitude on various accounting matters, including the manner in which the corporation should record on its books the "difference between cost and subsequent retirement or resale of the Company's own stock". (Ex. 95) The Committee stated

that it preferred that "such differences be reflected directly to the Capital Surplus account". The letter of the Committee mentioned the fact that among accountants there was a difference of opinion as to whether the credit should go to earned surplus or capital surplus. The following is quoted from the Committee's letter:

"Listed corporations are generally under agreement to submit future statements to stockholders in the same form as those contained in the listing application. Where it has been the practice of such corporations to reflect any so-called profits arising from these transactions through the Capital Surplus account, this Committee feels that it would be a violation of the agreement in question should any change in the practice be made. Until further consideration of the matter, however, no objection will be made if corporations whose practice in this respect is not affected by the agreement to publish in the same form should follow the advice of their accountants upon this point, provided full disclosure of the source of such additions is given and that the transactions are included directly in the Surplus Account and not in the Income account."

It is evident from the above quotation that the Committee was insisting that the transaction should be included "directly in the Surplus Account and not in the Income account".

Opinion among accountants steadily crystallized between 1932 and 1938 against the inclusion of gains on the resale of Treasury stock in the income account of a corporation, thus supporting the recommendation of the Listing Committee of the New York Stock Exchange.

A Committee on "Statistical Reporting and Uniform Accounting for Industry" in August of 1934 reported to the Business Advisory and Planning Council for the Department of Commerce that "losses and gains on reacquired stock of the company are surplus items and preferably will be accounted for through capital surplus". Mr. Pierre S. duPont, a member of the Finance Committee of General Motors Corporation in 1934, was a member of the aforementioned Committee on Statistical Reporting and Uniform Accounting and signed its report.

On May 10, 1938, the Securities and Exchange Commission issued Accounting Series Release No. 6 in which it quoted

from a report of its Chief Accountant as follows: "It is recognized that when capital stock is reacquired and retired any surplus arising therefrom is capital and should be accounted for as such and that the full proceeds of any subsequent issue should also be treated as capital. Transactions of this nature do not result in corporate profits or in earned surplus. There would seem to be no logical reason why surplus arising from the reacquisition of the company's capital stock and its subsequent resale should not also be treated as capital." (Ex. 96)

On April 8, 1938, a Committee on Accounting Procedure of the American Institute of Accountants made a report to its Executive Committee. The sub-committee stated:

"This committee has had under consideration the question regarding treatment of purchase and sale by a corporation of its own stock which was raised during 1937 by the New York Stock Exchange with the Institute's special committee on cooperation with stock exchanges."

\* \* \* \* \*

"The special committee on cooperation with stock exchanges continued and concluded its report with the following statement:

" 'Accordingly, although your committee recognizes that there may be cases where the transactions involved are so inconsequential as to be immaterial, it does not believe that, as a broad general principle, such transactions should be reflected in earned surplus (either directly or through inclusion in the income account.)' "

The Committee on Accounting Procedure agreed with the conclusion of the Special Committee on Cooperation with Stock Exchanges. The Executive Committee directed that the report be "published and distributed to the members of the American Institute of Accountants, without approval or disapproval of the Committee".

However, in September 1939 the American Institute of Accountants adopted and published as its own the report of its subcommittee which had been issued in May of 1938.

In 1931 there was no profit from the sale by General Motors Corporation of Treasury stock. In 1932 there was no bonus.

The January 12, 1932 letter of the New York Stock Exchange had some effect on the General Motors accounting treatment

of profits on the resale of Treasury stock, but not that intended. In calculating the 1933 bonus there was credited to income to items of profit on the sale of Treasury stock. (Ex. KKK) The first was a profit of $485,423.90 "on the sale of stock to General Motors Management Corporation". (Schedule 1) The other item, $522,016.07, is shown in Schedule 2 of the 1933 bonus calculation "as profit on sale of Treasury stock". Exhibit 107 recites that these profits represented "the excess value at which G. M. $10 par value common stock was transferred to the Savings and Investment Fund and the Employees Bonus Fund over the cost thereof". These two items were credited to Account 12-B, "Special Profit and Loss". The total of the two items, $1,007,439.97 was included as income for the year 1933 in calculating the net earnings of General Motors Corporation on which the bonus was figured and the bonus was increased by 10% of that amount. It was shown in Mr. Bradley's report to the Finance Committee on the Final 1933 earnings. (See footnote to Schedule III-4) But these profits were not disclosed in the summary of consolidated income for the year 1933 published in the annual report of General Motors Corporation. (Ex. 2-D, page 26). Only the internal records of the company showed their inclusion in income, on which the bonus was calculated. The fact that General Motors was not complying with the suggestion of the Stock Exchange in respect to profit on Treasury stock could not be ascertained from its published Consolidated Income Statement for the year 1933.

In 1934 the Treasury stock used for bonus awards consisted of "shares reverting to the corporation in connection with the operation of the Employees Investment Fund, which were picked up at the average value during the year", (Ex. 87-3) so that was no profit thereon. But there was a profit of $298,543 "realized from the sale in market of reverting investment fund stock and recapture of Management Corporation stock". That profit was transferred to a reserve account and was not included in corporate income on which the bonus base was calculated for the year 1934. (Ex. 58, p. 8) Although this treatment of the profit on Treasury stock did not transfer the profit to surplus (only to a reserve) it did not directly include the profit in income for the year 1934.

In 1935 "the stock used for bonus awards was taken principally from stock reverting to the corporation in connection with the operation of the Employees Investment Fund. As this stock reverting to the Corporation was carried in treasury at the average daily closing market price for the year (the value used for bonus awards), the cost of stock used was approximately the same as the award value". (Ex. 87-3) In fact, the cost was more than the award value and the difference $105,638 "was charged to a reserve created from the profits of $298,543" set up in 1934. This treatment of the loss on the use of Treasury stock for bonus purposes in 1935 was similar to the treatment of the profit in 1934.

In 1936 the profit on the Treasury stock used in payment of the bonus fund was $3,017,410.16 (See schedule attached to Exhibit 87-3 and Schedule 14, page 3 of Exhibit KKK) Mr. Bradley's report to the Policy Committee, dated January 7, 1941 (Ex. 87-3) discusses profits on Treasury stock used in payment of bonus awards in various years. In considering the source of that stock for the bonus year 1936 the report states: "The stock used for bonus award was taken from the highest cost stock held in treasury. This consisted principally of stock received from the General Motors Management Corporation in 1936 as part payment of their indebtedness to General Motors Corporation and stock reverting to the Corporation in connection with the Employees Investment Fund". The 5% bonus fund distributed to employees amounted to $9,136,915 for the year 1936. This was paid in General Motors common stock at an award value of $65.74 a share (i. e. average daily market price during the year 1936). In paying that bonus the corporation used Treasury stock acquired at an average per share cost of $43.39. (See schedule annexed to Ex. 87-3) This resulted in a gain of $3,017,410 on the Treasury stock thus used. This gain was referred to in the 1936 annual report's summary of consolidated income as "excess of bonus stock award value over cost", but in Exhibit KKK it is set forth as "profit on Treasury Stock" in the year 1936. To include it in income in the internal records of the corporation for calculating the bonus, it was called a profit. For public consumption it was given a more involved designation in the annual report. The 1936 accounting treat-

ment of the item of profit on Treasury stock was a complete reversal of the policy followed in 1934 and 1935. The large amount involved meant the addition of $301,741 to the bonus fund for 1936.

In the year 1937 the total 10% bonus amounted to $13,450,257. It was all paid in General Motors common stock taken from the treasury at an award value of $53.36 per share (i. e. average daily market price during the year 1937). The average per share cost of the stock used for this purpose was $36.61. The gain on the Treasury shares thus used was $4,725,186. The cost of the employees bonus was stated at the net figure of $8,725,071.79 in the summary of consolidated income on page 68 of the annual report for 1937. The gain of $4,725,186 on the Treasury stock is not listed under any designation in the 1937 summary of consolidated income, although in 1936 a similar gain appeared under the descriptive term—"excess of bonus stock award value over cost". Exhibit KKK described the 1936 item as "Profit on Treasury stock" (Schedule 14, page 3) but describes the 1937 item of $4,725,191.64 as "Constructive Savings thru use of stock" (Schedule 14, Sheet 11). Of course, its essential character did not change no matter what descriptive term was used. As a "constructive saving" it was included in income in calculating the bonus for 1937 and resulted in the addition of $472,518 to the very generous bonus fund for that year.

For the year 1938 the gain on Treasury stock used for bonus purposes was only $34,611, due to the fact that the stock was available in the treasury at a cost practically equivalent to the average daily closing market price of the stock for the year 1938. (See Ex. 38, pp. 7 and 8) The addition to the bonus fund was $3,461. In Exhibit KKK this item was called a constructive saving—but it was included in the bonus calculation nevertheless. The annual report contained only the net figure as in 1937, with the additional statement— "based upon cost of stock distributable as bonus", which conveyed no idea of a profit.

For the year 1939, according to Exhibit KKK, the "constructive saving" in using Treasury stock to pay the bonus was $3,714,867. It was included in income in calculating the bonus for that year and increased the amount of the bonus by $371,486. The 1939 annual report adopted a new method of showing the item of gain on Treasury stock. The following is quoted from page 60 of the Annual report for 1939:

| | "Year Ended December 31, 1939 | Year Ended Dec. 31,1938 |
|---|---|---|
| Employes bonus: | | |
| Employes bonus (distributable in stock on basis of average daily market price of stock) | $11,272,357.77 | $3,293,619.93 |
| Less excess of award basis over cost of treasury stock distributable as bonus | 3,714,867.09 | 34,610.84 |
| Net cost of employes bonus distributable in cash | $ 7,557,490.68 | $3,259,009.09" |

Even those figures did not inform a stockholder that the Corporation was making a profit on the use of Treasury stock and that the profit was included in income on which a bonus would be paid.

When the calculations were made for the 1940 bonus it was estimated that in using Treasury stock at cost, in paying the bonus of approximately $12,162,000, there would be a "constructive saving" of about $8,-000,000 (Ex. 38). The Bonus and Salary Committee considered the matter at a meeting held January 21, 1941. The following is quoted from the minutes of that meeting:

"The chairman directed the attention of the Committee to the portion of the Chairman's report (Secy. No. 32), referring to the use of average daily closing market prices of Common Stock of General Motors Corporation as the basis for determining the number of shares of Common Stock to be distributed to bonus participants and in that connection the profit resulting from the use of Treasury Stock at book cost.

"After discussion, and upon motion duly offered, seconded and unanimously adopted, it was

"Resolved, that the Committee approves the use of the average daily closing market price of Common Stock of General Motors Corporation as the basis of determining the number of shares of Common Stock to be distributed to bonus participants, and that the profit on Common Stock of General Motors Corporation realized from using such stock as is owned by the Corporation at its book cost be excluded from the General Motors Bonus Fund for 1940;".

For the year 1940, a gain of $7,004,-057.47 was finally determined as resulting from the transfer of Treasury stock to the

Bonus Fund for that year. This was treated in the Consolidated income statement in the annual report in practically the same way as in the 1939 annual report. But the $7,004,057.47 was excluded from the Bonus Base of net earnings and not included in the calculation of the bonus, by the express ruling of the Bonus and Salary Committee at its meeting held January 21, 1941. (Ex. 82-1)

This was a complete change of policy. I believe that it should have been the policy of the Committees in all the years involved herein. There was no new good reason for the change in 1940 that was not present in 1939 as well, and in earlier years. The unsoundness and injustice of the old policy were so emphasized by the seven million dollar figure in 1940, which would have resulted in an increase of $700,405 in the bonus fund for that year, that the Bonus and Salary Committee finally called a halt. But even then the Committee did not face the issue squarely and eliminate the seven million dollars from income as well as from the calculation of the bonus base. It held to the theory that the gain on the resale of Treasury stock is income, but excluded it from earnings in calculating the bonus base.

This half way measure, however, answers one of the reasons advanced by the defendants for including profit from Treasury stock in calculating the bonus base. Defendants' witnesses testified it had been the practice to put all items of gain through the income account (1934 and 1935 to the contrary notwithstanding) and in that way these profit items got into the bonus calculations. The Bonus and Salary Committee in 1940 showed how they could do the one without doing the other.

Another reason given for including these profits in income was that it served to inform the stockholders of the profit in the annual statement. The tendency of the annual reports was just the opposite from 1936 on. For the purpose of disclosing the profit in the annual reports the item could have been designated as a profit, with a notation that the profit had been credited to Surplus directly, without passing through the income account.

Defendants argue that the inclusion of profits on Treasury stock in the income or earnings of the General Motors Corporation was within the sound discretion of the Finance Committee and later of the Bonus and Salary Committee. There were four-teen members of the Finance Committee for the years 1930 to 1936. Seven of the fourteen were also members of the Board of Directors of the duPont Company and another was an officer of that Company. The Bonus and Salary Committee of General Motors Corporation took over the supervision of the bonus fund in August 1937. Three of the five members of that Committee also served on the Board of Directors of the duPont Company until 1940. Under the practice and policy of the duPont governing committees profits on Treasury stock were not included in income or earnings of the duPont Company and did not enter into the determination of the bonus base of its own bonus plan. In the duPont Company "discretion" and business judgment in the treatment of profits on Treasury stock were exercised in that Corporation's interests. In the General Motors Corporation, profits on Treasury stock were treated as income and included in the calculation of the bonus base. A different kind of discretion and business judgment was exercised, contrary to the true interests of General Motors Corporation to the extent of a million and a quarter dollars.

Mr. Brown and Mr. Bradley originated this policy of including in income the gain on the use of Treasury stock in the payment of the bonus. Mr. Bradley reported to Mr. Brown, his superior. The Finance Committee in the years 1933 and 1936 followed the policy suggested by Mr. Brown and Mr. Bradley, with knowledge of the fact that it would increase the amount of the bonus fund and that Mr. Brown and Mr. Bradley were regular participants in the annual bonus awards. The Finance Committee knew of the letter of the New York Stock Exchange dated January 21, 1932. They knew that the annual statements to stockholders either did not disclose this profit or else gave it a designation which was indefinite and not in accord with that used in the bonus calculations. The same is true of the Bonus and Salary Committee and the inclusion of similar items in the bonus calculations for the years 1937, 1938 and 1939. In fact the annual reports for those years were even more misleading than the reports for prior years in their treatment of the profit on the use of treasury stock for bonus purposes.

Mr. Morgan, Mr. Prosser and Mr. Whitney either attended the meetings of the

Finance Committee or signed the minutes, making the bonus awards for the years 1933 and 1936. Mr. Whitney is the only member of the Bonus and Salary Committee who is a defendant now before this Court. He attended the meetings which approved the calculations for the bonus awards and made the awards for the years 1937, 1938 and 1939.

Mr. Sloan regularly reported on the bonus awards to both the Committees for all the years. His recommendations for bonuses were based on the bonus calculations made by Mr. Bradley and supervised by Mr. Brown, for which they had originated the policy of including Treasury stock profits in earnings on which the bonus was based.

■ Mr. Sloan, Mr. Brown, Mr. Bradley, Mr. Morgan, Mr. Prosser and Mr. Whitney are jointly and severally liable for the amount by which the bonus awards were increased for the years 1933 and 1936 through the inclusion of profits on Treasury stock in the income account and in the earnings of the Corporation on which the bonus was calculated. The liability includes interest on the amount of the said increases for each year, from the date of the awards.

Mr. Sloan, Mr. Brown, Mr. Bradley and Mr. Whitney are likewise jointly and severally liable for similar increases in the bonus awards for the years 1937, 1938, 1939, with interest.

■ The committees held their meetings in New York City. The offices of Mr. Sloan, Mr. Brown and Mr. Bradley were in New York City. The acts which give rise to these claims took place in New York City. The six-year New York Statute of Limitations applies. The claims are not barred.

*The inclusion of Treasury stock in capital employed and of their dividends in earnings for 1931 and prior years, and their exclusion for 1933–1940 was proper, in calculating the bonus base.*

"Net capital employed" was defined in the agreement between General Motors Corporation and General Motors Management Corporation, dated March 12, 1930 (Ex. 8-11), as constituting "the aggregate sum total of issued and outstanding preferred, debenture and common stock plus surplus as set forth in the annual statement of Assets and Liabilities of General Motors as of December 31st, of the year preceding the calendar year in which the earnings were realized, together with etc."

General Motors had made a practice of purchasing in the market shares of its common stock for various purposes, such as the acquisition of other related businesses, and for bonus and employees' investment and savings fund purposes. The stock thus purchased was kept in the Treasury of General Motors until used. It was not purchased for retirement, nor was it actually retired. It still remained issued stock. Some of the plaintiffs argue that while it was in the treasury it was also stock "outstanding" and that in calculating the amount of net earnings available for bonus purposes, a sum equal to 7% on Treasury stock should have been deducted. Defendants answer that the Treasury stock was not "outstanding" and that it was properly eliminated from "net capital employed" in figuring the bonus base.

The record herein indicates that for the years 1930 and 1931 the Treasury stock was included in capital employed and the dividends thereon were included in net earnings. The net effect of that procedure was to reduce the amount of the bonus fund for those two years, by $140,000.

In 1932 the New York Stock Exchange recommended to all listed corporations that dividends on Treasury stock should be excluded from earnings. Up to that time there were two schools of thought on the propriety, from an accounting viewpoint, of including dividends on Treasury stock as part of the earnings of the corporation. There was no bonus distribution for the year 1932.

For the year 1933 and thereafter General Motors Corporation excluded dividends on Treasury stock from earnings and also excluded Treasury stock from "capital employed" in calculating the annual bonus. This operated to reduce the bonus fund for the years 1933 to 1940 by approximately $540,000. Certain of the plaintiffs contend that it was proper that the dividends be thus excluded from earnings but that the Treasury stock should have been included in capital employed.

The Treasury stock was not "issued and outstanding" while retained, by General Motors Corporation in its treasury. The shares of stock "did not get that quality until some one received and held them as

enforceable obligations". (See, Bankers Trust Co. v. Denver Tramway Co., 233 N.Y. 604, 135 N.E. 936, 937, where the question was thus answered in respect to mortgage bonds held for the issuing corporation by a custodian.) In Borg v. International Silver Co., 2 Cir., 11 F.2d 147, the Circuit Court of Appeals for this Circuit had before it the question of the status of Treasury stock—whether it was issued and outstanding. Judge Learned Hand, writing for the Court, said (page 150 of 11 F.2d):

"It is clear, from the way in which it treated the shares in 1908 and afterwards, that the defendant did not suppose the shares were retired, or were to be. If so, it would not have carried them as treasury stock for 15 years. We can construe the balance sheets in no other way. The shares should not have appeared in the sheets at all, or, if they did, only as held for retirement. To mark them as held 'in treasury' was to ticket them as treasury shares; it could mean nothing else. The original note on the sheet for 1908 does not say anything to the contrary; they were not 'outstanding,' because they were held by the defendant; to be 'outstanding,' they must be effective obligations against it."

The fact that the annual statement contained a figure showing a total of common stock issued, which included the Treasury stock, would not make the Treasury stock "issued and outstanding". Even if the accountants incorrectly included the Treasury stock in the total of issued stock or tagged it as "issued and outstanding", that would not make the Treasury stock in fact "issued and outstanding". The Corporation's own stock, purchased in the market and held in its treasury for future use, was not "issued and outstanding" and under the bonus plans was not "capital employed" on which 7% had to be deducted in calculating the bonus base.

*Exclusion of current reinvested earnings from "Capital Employed" in calculating the bonus base.*

Although the expression "capital employed" was not defined in the original bonus plan of August 1918, it was defined in the agreement between General Motors Corporation and Managers Securities Company, dated November 27, 1923, in connection with the Managers Securities Plan of November 1923, and in the agreement between General Motors Corporation and General Motors Management Corporation dated as of March 12, 1930, under the Management plan of March 1930. Managers Securities plan was carved out of the original bonus plan, in that it related to one-half of the total bonus under the 1918 plan. There would be no point in having "capital employed" mean one thing under the 1918 bonus plan and another under the Managers Securities plan of 1923. The same may be said of the Management plan of 1930, the successor to the Managers Securities plan, and with greater emphasis, because for two years Class A stock of the General Motors Management Company was used as the medium for distributing the entire 10% bonus to both the so-called executives group and the employees group. The Management plan expired by limitation December 31, 1936 and the original 1918 plan then became operative as to the full 10% bonus. The last definition of "capital employed" is found in the General Motors Management Corporation agreement of March 1930. That definition may thereafter be applied to "capital employed" as used in the original bonus plan of 1918.

It is clear from the definition of "capital employed" in the agreement between General Motors Corporation and Managers Securities Company, dated November 27, 1923, (Ex. 7-10) which implemented the Managers Securities Plan of that date, that earnings of General Motors Corporation currently reinvested in the business of the corporation, in the course of any calendar year, were not "capital employed". (See footnote # 1)

The General Motors-Management Corporation agreement of March 12, 1930 (Ex. 8-11) in its definition of "net capital employed", is similar to the definition in the Managers Securities agreement except that to the words "any new capital or surplus arising from the sale of secur-

---

1 Extract from Agreement between General Motors Corporation and Managers Securities Company, dated November 27th, 1923.

2. General Motors Hereby agrees, on or before April 1st in each year, commencing with April 1st, 1924, and ending April 1st, 1931, to pay to the Managers Company 5% of the net earnings of General Motors for the preceding calendar year after deducting from said net earnings 7% on the capital employed during said year. Capital employed shall constitute the aggregate sum total of issued and

ities" there are added the words "or otherwise". (See footnote # 2) Plaintiffs claim that "or otherwise" includes current reinvested earnings. The defendants argue that "or otherwise" must be interpreted as additions to capital or surplus of the same kind, class, or nature as that arising from the sale of securities. They state that the principle of "ejusdem generis" should be applied. It is not necessary to apply that principle in construing this provision of the Management agreement, in order to decide the issue. The definition of "net capital employed" expressed in the Management agreement of March 12, 1930, does not include current reinvested earnings.

The pertinent part of the definition of "net capital employed" is the following: "together with any new capital or surplus arising from the sale of securities or otherwise". One of the important words to be considered in construing this provision is the word "new" which modifies both the word "capital" and the word "surplus". We are dealing with "new capital" and "new surplus". The word "new" differentiates capital or surplus acquired during the calendar year from the capital and surplus as "set forth in the Annual Statement of Assets and Liabilities of General Motors as of December 31st of the year preceding". In the first part of the definition "capital" means "the total of issued and outstanding preferred debentures and common stock * * * as set forth in the Annual Statement of the preceding December 31st". Current earnings reinvested in the business could not properly be classed as "capital".

"New surplus" would mean an actual addition to the surplus account. A premium realized on securities sold would become part of surplus just as the face amount of the securities would become part of capital, at the date of their sale.

Are the corporate earnings currently reinvested in the business new surplus of General Motors Corporation? I believe the answer is in the negative. Mr. Justice Brandeis in Edwards v. Douglas, 269 U.S. 204, at page 214, 46 S.Ct. 85, at page 88, 70 L.Ed. 235, stated: "The word 'surplus' is a term commonly employed in corporate finance and accounting to designate an account on corporate books. But this is not true of the words 'undivided profits.' The surplus account represents the net assets of a corporation in excess of all liabilities including its capital stock. This surplus may be 'paid-in surplus,' as where the stock is issued at a price above par; it may be 'earned surplus,' as where it was derived wholly from undistributed profits; or it may, among other things, represent the increase in valuation of land or other assets made upon a revaluation of the company's fixed property. See La Belle Iron Works v. United States, 256 U.S. 377, 385, 41 S.Ct. 528, 65 L.Ed. 998. * * * By most corporations the term 'undivided profits' is employed to describe profits which have neither been distributed as dividends nor carried to surplus account upon the closing of the books; that is, current undistributed earnings."

At the end of a calendar year part of the net earnings might be set up as a reserve for some specific purpose. Net earnings, if not carried into the surplus account on the closing of the books, would not be surplus within the definition of the term "net capital employed" as used in

outstanding preferred, debenture and common stock plus surplus as set forth in the published annual statement of General Motors as of December 31st, of the year preceding the calendar year in which the earnings were realized. In the event that in addition to the amount set forth in the published statement any new capital or surplus arising from the sale of securities shall be employed by General Motors subsequent to December 31st, it shall be added to the amount of capital for the purpose of said computation during the period while so employed.

2 Extract from Agreement between General Motors Corporation and General Motors Management Corporation, dated March 12, 1930.

The expression "net capital employed" shall be deemed to constitute the aggregate sum total of issued and outstanding preferred, debenture and common stock plus surplus as set forth in the annual statement of Assets and Liabilities of General Motors as of December 31st, of the year preceding the calendar year in which the earnings were realized, together with any new capital or surplus arising from the sale of securities or otherwise, allowance being made for the period of such employment; except that the term "net capital employed" shall not include the investments of General Motors in subsidiary and/or affiliated companies when the earnings of such companies shall not have been included pursuant to Paragraph 1 herein.

the Management agreement of March 1930. I have therefore concluded that current earnings reinvested in the business in the course of a calendar year were properly excluded from "net capital employed" in calculating the bonus base for that year.

In their reports on "the basis and calculation of the bonus fund" for the years 1937 to 1940 inclusive Haskins & Sells stated: "It will be noted that, with the exception of transaction related to exempted investments, no effect has been given to increases and decreases in capital employed during the year arising from operating and investment profits and dividends paid."

From this plaintiffs argue that the members of the Bonus and Salary Committee were put on notice that current net earnings reinvested in the business during a bonus year should have been included in the capital employed on which 7% was deductible in calculating the bonus and that the Committee should have made a ruling that this be done. Assuming that this was the purpose of the above quoted paragraph of the Haskins & Sells report, I do not agree with their interpretation of the provisions of the bonus plans relating to capital employed. Evidently, the Bonus and Salary Committee did not so interpret the bonus plans and therefore took no action on the Haskins & Sells suggestion but properly continued to exclude currently reinvested net earnings from capital employed in calculating the bonus.

*Dividends and interest received from General Motors Management Corporation were properly included in General Motors earnings.*

 Interest on the unpaid balances of the $50,000,000 of General Motors Management Corporation indebtedness to General Motors Corporation, while the Management plan was in effect, was properly included in General Motor's earnings. It was interest on a debt representing the balance of the purchase price of the 1,375,000 shares of General Motors common stock sold to General Motors Management Corporation by General Motors Corporation under the March 12, 1930 agreement, executed April 30, 1930.

At the time General Motors Corporation sold that block of its own stock to General Motors Management Corporation for the purposes of the Management plan, General Motors Corporation subscribed and paid for $5,000,000 of common stock of General Motors Management Corporation. A large part of this stock ($3,880,000) General Motors resold to about 250 of the executives and managers of General Motors Corporation, pursuant to the Management plan, and General Motors' holdings of common stock of General Motors Management Corporation varied between 22% and 39% during the period of 1930 to 1937, while the Management plan was in effect. On General Motors Corporation's investment in the common stock of General Motors Management Corporation dividends were paid by Management to General Motors in some of the years.

The total of interest and dividends ($16,825,446.38) credited to General Motors Corporation income for the years 1930 to 1938 on its total combined investment ($287,858,539.00) for said period in both the debentures and common stock of General Motors Management Corporation, represented an average yearly return of about 6%. Since 7% was the charge against the "capital employed" under the bonus plan, the result was that General Motors Corporation received as income credited to earnings, in calculating the bonus, a sum that was less than the 7% charged against capital employed. The amount available for bonus was not increased by this method of accounting.

A large part of the dividends paid to General Motors Corporation on its investment in General Motors Management Corporation common stock came from dividends which General Motors Management Corporation itself received on that corporation's holdings of General Motors Corporation common stock—the 1,375,000 shares sold to the Management Corporation April 30, 1930. Plaintiffs' counsel argue that when the dividends General Motors received from Management Corporation were included in General Motors' earnings and used in calculating the bonus base, they were then being used a second time for that purpose, having been used as part of General Motors' net earnings available for dividends on General Motors common stock, before they became a part of Management's surplus.

It has been held that dividends paid to a subsidiary on stock of the parent corporation, owned by the subsidiary, should not be included a second time in the earnings of the parent corporation, when they come back to the parent corporation by way of a

dividend declared on the subsidiaries stock. In this case General Motors Management Corporation was not a subsidiary of General Motors Corporation, although it was affiliated with it. About 250 individuals owned the majority of the stock of General Motors Management Corporation. Further, the Management bonus plan contemplated that General Motors Corporation should make this investment in the common stock of General Motors Management Corporation. It is reasonable to assume that it was understood that General Motors Corporation would receive on such stock as it might own from time to time in Management Corporation, the same rate of dividend as any other stockholder of Management Corporation.

In three of the years, 1931, 1932 and 1933, General Motors received no dividends from Management Corporation. In one year, 1930, it received a return of 4% on its investment in Management Corporation common stock; in another year, 1934, 5%; in 1935, 7½%, in 1938, 6.4%. In two of the years it received large dividends. In 1936 the return totalled 16½%. In 1937 only a .9% return is traceable to cash dividends on General Motors common stock owned by General Motors Management Corporation, the other 62.4% ($1,-428,983) resulting from profits on the sale of General Motors common stock owned by Management Corporation. If we disregard that large item, the average return received by General Motors Corporation for the nine years on its holdings of General Motors Management Corporation common stock would be about 4.4% (39.4 divided by 9) which would be more than offset by the 7% charge against the investment of General Motors Corporation in General Motors Management Corporation common stock, as "capital employed".

The facts in relation to the $1,428,983 stock dividend are covered by a letter to the Court, dated December 10, 1941, included in the record herein by stipulation of counsel, dated December 23, 1941. I quote from the letter as follows:

"How much of the $1,428,983.51 dividend in kind (Ex. 121) represented profit by Management on the sale of General Motors common stock?

"Inasmuch as all net income is credited to surplus and then no longer earmarked and dividends are paid out of surplus without distinction as to source, it is of course impossible to tag the $1,428,983.51 with the source from which it came. However, we made the statement that this dividend was derived principally from profits realized on the sale of stock because Management realized total profits of $3,678,804.50 from the sale of General Motors stock in 1936 and 1937. It distributed 70,000 shares of General Motors common stock as dividends in kind, which stock had cost $2,800,000 ($40 a share) and charged the latter sum to surplus. General Motors received 27,-293 shares having a market value when received of $1,428,983.51 as dividends upon its holdings of Management common stock. The 27,293 shares distributed to General Motors represented a charge to surplus on Management's books of $1,091,720 out of the total charge of $2,800,000.

"The profit realized by Management on the sale of General Motors stock did not remain in cash. Management used the total proceeds realized from the sale of stock for reduction of its indebtedness. In so reducing its indebtedness Management Corporation earned out additional shares of General Motors common stock. The only practical way, therefore, in which the Management Corporation could pass on to its stockholders the profit realized on the sale of its stock was by the declaration of a dividend in kind of General Motors common stock."

It is apparent that on no theory consistent with equitable principles and with the provisions of the General Motors Management Corporation bonus plan, can the accounting treatment of General Motors income from Management Corporation be successfully attacked. That income was properly included in earnings in calculating the bonus base.

*The December 31, 1932 adjustment of surplus and idle real estate, plant and equipment was authorized by the Finance Committee and thereafter annual depreciation was properly not taken thereon.*

In view of the damaging effects of the national depression on the automobile manufacturing industry in 1931-1932 the Finance Committee of General Motors on February 6, 1933, directed that the gross book value of surplus real estate, plant and equipment, when designated as surplus and idle, be written down to estimated realizable value; that the difference between the gross book value and the estimated realizable value be charged against the reserve

for depreciation; that any subsequent profit or loss upon disposal be also absorbed by the depreciation reserve; and that effective January 1, 1933 the Corporation cease providing depreciation currently on the surplus and idle real estate, plant and equipment, thus written down to estimated realizable value. Plaintiffs complain about the last clause and contend that depreciation should have been taken annually on the surplus and idle real estate, plant and equipment. The depreciation would have been a charge against earnings, effecting a reduction in the bonus.

A careful study of General Motors' surplus and idle real estate plant and equipment and a report thereon to the Finance Committee preceded the action of the Committee. Accordingly the gross book value of General Motors' real estate plant and equipment was reduced as of December 31, 1932 from $592,694,766 to $499,-982,231 and the difference of $92,712,535 was charged to the reserve for depreciation which had been created in prior years by charges against earnings. The readjustment was described in the corporation's annual reports for 1932 and 1933.

The corporation set up a system of checks in order to insure that properties transferred to surplus and idle account were actually no longer needed in the corporation's business. The property transferred to the account was later reduced by sale or retransfer to the active account. The net reduction in annual depreciation, due to the creation of the surplus and idle property account for the years 1933–1940 totaled about $19,000,000. While this had the effect, to the extent of 10% of said amount, of increasing the bonus over that period, that was not the purpose of the adjustment. The depreciation in a lump sum was charged to a liberal reserve which had been set up out of earnings of prior years, when the amount of the bonus was reduced to the extent of 10% of the reserve thus created. It was a prudent provision made possible by the foresight of the management in more prosperous years.

*Bonus not deducted as an expense in calculating bonus.*

Defendants' contention on this point may be stated as follows: "While bonus constitutes a reduction in earnings for the purpose of reporting final net income available for stockholders, it is not a deductible item of expense in the calculation of the bonus under the profit sharing formula approved by the stockholders".

The original bonus plan of August 1918 provided: "1. Bonus Fund. The corporation will establish a bonus fund to which shall be credited yearly an amount equal to 10% of the net earnings of the corporation after deducting 6% on the capital employed in the business of the corporation; it being intended that this fund shall be invested in stock of the corporation."

In 1922 the amount to be deducted on capital employed was increased from 6% to 7%.

The Managers Securities plan of November 1923 provided that "(b) Upon the part of General Motors Corporation that in consideration of the premises the General Motors Corporation shall, on or before April 1st in each year, commencing with April 1, 1924, and ending April 1, 1931, pay to the Managers Securities Company 5% of the net earnings of the General Motors Corporation for the preceding calendar year after deducting from said net earnings 7% on the capital employed during said year."

The 5% of the net earnings mentioned in the Managers Securities plan, was one-half of the 10% of the August 1918 plan, so that the latter plan was reduced to that extent while the Managers Securities plan was in operation. "Net earnings" were not specifically defined in either of these plans or in any of the agreements that implemented the Managers Securities plan.

In March 1930 the stockholders approved what became known as the General Motors Management plan. It provided that General Motors would pay to the Management Corporation: "A sum equal to 5% of the net earnings of General Motors during the preceding calendar year after deducting 7% on its capital employed."

The agreement between General Motors and General Motors Management Corporation, dated March 12, 1930 (Ex. 8-11) contained a definition of "net earnings". It stated: "1. The expression 'net earnings' in this agreement shall mean the balance of the yearly gross earnings of General Motors remaining after payment or provision for expenses, reserves, taxes and all other charges, as set forth in the annual official statement of Profit and Loss of General Motors as of December 31st in each year, except that the equity of General Motors in the earnings of its subsidiary and/or affiliated companies, which have a separate employes' profit sharing and/or bonus plan, or whose earnings shall not be consolidated

with those of General Motors, shall in the discretion of General Motors be excluded from the net earnings as herein defined."

Under the August 1918 bonus plan as amended, a bonus declared on the earnings of any year was payable in four equal installments: one quarter when the bonus was declared, usually in the month of March following the bonus calendar year; a second installment in December; a third at the end of the following year and the last at the end of the third year.

The definition of "net earnings" in the March 1930 agreement may properly be employed for the purposes of this law suit. The agreement had the approval of the Finance Committee and the Board of Directors. In a report to the Finance Committee dated January 21, 1936 (Ex. T) Mr. Bradley stated: "In submitting the original and revised Management Plans to the stockholders, it was pointed out that copies of these contracts were available for inspection at the office of General Motors Corporation in Wilmington, New York and Detroit". There is nothing ambiguous in the definition. It contains no expression of intention to include bonus as an item of expense of General Motors in calculating the net earnings. In the absence of a specific provision to that effect, I think it was reasonable not to include in the course of the calculations the very item to be determined. This conclusion is fortified by a consideration of the occasion for the use of the words "net earnings", in the March 1930 plan and agreement.

The General Motors bonus plans were profit-sharing plans. It is contrary to the concept of profit-sharing to have any part of the bonus charged against the recipients' share of the profits. Mr. Sloan and Mr. Lammot duPont in letters to the stockholders dated February 15, 1930 (Ex. 8-9) and September 10, 1934 (Ex. 9-4) referred to the Management bonus plan as a profit-sharing plan. The plan was intended as an incentive to the managers and executives to make large profits which, after certain specified deductions, were to be shared 10% to the executives, managers and selected employees and 90% to the stockholders. The stockholders were asked to approve the Management plan at the meeting of March 6, 1930, with Mr. Sloan's explanation of February 15th before them.

"Considered in the light of ordinary practical business experience" it would be unrea-sonable "in ascertaining the amount of net profits", or net earnings, to include the bonus beneficiaries' share "as part of the expenses of the concern". Selz et al. v. Buel, 105 Ill. 122, 130; Briggs v. Groves, 56 Hun 643, 9 N.Y.S. 765, affirmed 132 N.Y. 545, 30 N.E. 865; Homes v. James Buckley & Co., 165 La. 874, 116 So. 218, 221.

In two recent decisions in the New York Supreme Court, Mr. Justice Valente approved a practice of not deducting percentage compensation from earnings, in determining the percentage compensation. Epstein v. Schenck, Sup., 35 N.Y.S.2d 969; Gottlieb v. Schenck[3]. The judge commented on the fact that the practice had "long continued" and was not "inherently unfair".

One of the issues presented to the United States Supreme Court in Rogers v. Hill, 289 U.S. 582, 53 S.Ct. 731, 735, 77 L.Ed. 1385, 88 A.L.R. 744, was the validity of a by-law under which certain officers were awarded bonuses. The Court held the by-law valid but ruled that the payments under the by-law had "by reason of increase of profits become so large as to warrant investigation in equity in the interest of the company". In discussing plaintiff's argument that the by-law was invalid because it violated the charter, the Court stated that the compensation of an officer whether fixed or contingent was deductible from earnings in ascertaining net profits. At first glance it would seem to be a ruling that in bonus plans based on net profits or net earnings, bonus was an expense to be deducted when calculating bonus. But when consideration is given to the issue before that court and when the statement is read in its context it is apparent that it was limited to the "meaning of 'profits' as used in the by-law". Page 590 of 289 U.S.; page 734 of 53 S.Ct., 77 L.Ed. 1385, 88 A.L.R. 744. The court held that as there defined there was no "conflict between the charter and the by-law" and that the by-law was accordingly valid.

The different meanings which have been attached to the term "net earnings" in decisions of various courts are collated by Judge Gardner in Iowa Southern Utilities Co. v. Cassill, 8 Cir., 69 F.2d 703, 707. In discussing the meaning of the term "net earnings" as used in an Iowa State Statute, Code Iowa 1931, § 6134-d2, he wrote: "The words in bookkeeping language mean a balance, or what remains after something has been deducted. What the deduction shall be, or

---

[3] No opinion for publication.

what it shall include, must be determined from the occasion for the use of the words, or from the context, and we think the definition contained in the contract does no violence to the statute".

In the present case the practice of not including bonus as an expense in calculating the amount of the bonus has been followed since the bonus plan of August 1918 became effective. Although there had been no specific ruling by the Finance Committee to that effect, the Committee knew of the practice, had discussed it and had told Mr. Bradley, who attended their meetings, that bonus was not to be deducted as an expense in calculating the bonus. Against this practice of years standing we must judge the reasonableness of the Committee's interpretation of the definition of "net earnings" in the March 1930 agreement. If one of the purposes of that definition was to change the existing practice it may be assumed that the definition would have contained a specific statement that the amount of the bonus was to be deducted as an expense in calculating the bonus. No change was intended and none was expressed.

The definition of "net earnings" in the March 1930 agreement contains a reference to "the annual official statement of Profit and Loss of General Motors as of December 31st in each year", and seems to tie in that document as part of the definition. However, there is no corporate document or statement which would completely satisfy that description. The Summary of Consolidated Income in the annual reports is the nearest thing to an official "profit and loss" statement. The summary was a copy of practically all of the entries appearing on a Schedule (Ex. LLLLL-1) bearing the same title, which was part of a large binder inscribed "General Motors Corporation— Work Sheets—Consolidated Balance Sheet —Balance Sheet and Income Schedules— Balance Sheet Schedules". This was prepared under the supervision of the Deputy Comptroller, Mr. Sarason, in the following manner:

The income statements of all the subsidiaries and of the central office were spread out on working papers. Various intermediate figures were arrived at, which were then carried forward until a figure could be put on the schedule which would be the figure of net profit from operations and investment. In 1930 that figure was $176,-922,650. It represented the net full income and expenses of General Motors Corpora-

tion. A non-operating profit figure was added and a total net profit figure of $187,-332,724 was then transferred to the 1930 bonus computation schedule. (Ex. KKK) From that net profit figure on Exhibit KKK the following deductions were taken: The Employees' savings and investment fund net; the special payment to employees under stock subscription plans; the minority publicly held interest in the corporation's earnings from subsidiaries; the excluded income items; 7% on invested capital. In that way a figure was obtained which represented the net earnings available for bonuses before taxes. By the use of algebraic equations a simultaneous computation was made which deducted taxes before bonus and bonus before bonus. The tax figure, and the bonus figure, developed in Exhibit KKK, were then inserted in the summary of consolidated income and that schedule (Ex. LLLLL-1) was then complete. This procedure or method of calculation was followed in all the years Mr. Sarason was with General Motors Corporation, from 1926 to date. He carried on as his predecessor had, in the years prior to 1926.

In the first week of March in every year Mr. Bradley, who supervised the final calculation of the bonus fund, submitted to the Finance Committee a statement of the net earnings of the preceding year, setting forth in considerable detail General Motors sources of income, the amounts thereof, and certain items of expense, reserves and charges. Among the items thus shown was the cost of the bonus based on the net earnings of the calendar year. Bonus cost appeared as an expense of the corporation in arriving at the Corporation's net income. The statement did not represent or state that the bonus cost had been deducted as an expense of the business before calculating the amount of the bonus. In fact the bonus cost could not have been calculated from the figures on that statement. It would have been necessary to obtain other figures to make the bonus calculation—such as the amount of capital employed, the subsidiary investments excluded and the subsidiary earnings included.

The members of the Finance Committee were reminded in an annual report of Mr. Bradley's dated January 21, 1936 (Ex. T) that "the decision of the Finance Committee as to the amount of the Corporation's earnings to be credited to the Bonus Fund * * * and the amount of stock deliverable thereunder shall be final, conclusive and binding upon all parties"; that this general

1002

provision was in the 1918 plan and was continued in the subsequent plans submitted to the stockholders. He then stated: "There has never been any detailed definition as to capital or earnings, but the basis originally adopted by the Corporation for capital employed, and followed consistently, has reflected total capital stock and surplus, including good will, and has been modified only by the treatment of certain special items as set forth in this report."

When the Finance Committee considered Mr. Bradley's report on January 31, 1936, a member of the Committee suggested that the Committee have outside auditors make a separate calculation and report on the Bonus Fund for the year 1935, a copy of which should be submitted to the Committee. Mr. Prentis, Mr. Proctor and Mr. Bradley were advised of this request (Ex. 81-2). On February 28, 1936, the report of Haskins & Sells "relating to the basis and calculation of the 1935 bonus fund", (Ex. 73-1) was submitted to the Committee.

The report stated that pursuant to instructions Haskins & Sells had "reviewed the basis and method and have verified the computation used by the corporation in establishing the 1935 bonus fund available for distribution". It clearly showed that in the bonus calculation, the bonus was not deducted as an expense or charge before arriving at "General Motors Corporation's proportion of consolidated net income". Beginning with the 1935 bonus fund the Finance Committee had before it all the details of the bonus calculation. It cannot be asserted that the Committee members were negligent in not knowing that the amount of the bonus was not deducted as an expense in calculating the bonus.

The Haskins & Sells report made specific reference to the provision of the bonus plan that the decision of the Finance Committee "as to the amount of the corporation's earnings to be credited to the Bonus Fund and the distribution thereof shall be final, conclusive, and binding", and concluded with the statement "On the basis employed by the corporation, as set forth above, the amount of the 1935 bonus fund, $11,721,785.68, in our opinion, is correct".

The following year Mr. Bradley in a report to the Finance Committee on the "basis for determining the amount of the total General Motors Bonus Fund available for distribution for 1936", stated: "As was done a year ago, a report will be submitted by our auditors, Messrs. Haskins & Sells, veri-

fying the calculation of the Bonus Fund for 1936, on the basis approved by the Finance Committee". The Finance Committee accordingly received Haskins & Sells detailed report on the calculation of the bonus for the calendar year 1936.

After these lawsuits were started, the Bonus and Salary Committee was established, holding its first meeting August 2, 1937. I have read the minutes of the meetings of that Committee and also the reports it received from Haskins & Sells on the calculation of the bonus fund and from Mr. Sloan recommending that certain awards be made from the bonus fund. The Haskins & Sells reports all showed clearly that the bonus cost was not included as an item of expense in calculating the amount of the bonus. No members of the Bonus and Salary Committee were eligible to share in the bonus fund. For the year 1937 and subsequent years Mr. Sloan, at his own request was not included in the bonus awards. The minutes of the Bonus and Salary Committee are full and complete. So were the reports submitted to the Committee. Only one member of the Committee is now before this Court as a defendant served in these actions. I have concluded that the Bonus and Salary Committee were not negligent in excluding bonus cost as an expense in determining the net earnings of the corporation for bonus purposes. There was no breach of their fiduciary obligations in that respect.

Plaintiffs have argued that the Finance Committee had before it only the total figure of the bonus for the bonus years 1930 to 1934 inclusive and that the Committee did not know that the bonus cost was not deducted as an expense in calculating the bonus. While it is true that the Finance Committee did not receive a detailed statement of the bonus calculations until the bonus year 1935 was up for consideration, I am satisfied from the testimony of the Committee members that the matter was discussed by the Committee and instructions were given by the Committee to Mr. Bradley to exclude bonus as an expense in the bonus calculations. The Finance Committee was not negligent in this respect and its members did not breach their fiduciary duty in approving a bonus thus determined.

In its income tax returns for 1930 through 1940 General Motors deducted annually the cost of the bonus, as an expense or charge of the business for that year. Exhibit 108 is a schedule of these deductions for the years 1930 to 1939 in-

clusive. For income tax purposes, the first quarter of the bonus, which was delivered at the time of the award was related back to and valued at December 31st of the previous year; dividends on undelivered bonus stock were deducted as compensation; the payment to the Management Corporation, applicable to its common stock, was taken as a deduction in the year for which the payment was made. Except for 1930-33, when consolidated returns were filed, bonuses paid to employees of subsidiaries, were taken as a deduction by the subsidiaries themselves in their income tax returns. With the above noted exceptions the bonus was taken as a deduction, as supplemental compensation, in the year in which the participant earned out and received his installment of bonus stock. The deductions thus taken were pursuant to the Regulations of the Bureau of Internal Revenue. It was the duty of the Corporation's officers to see that they were taken. The total of these deductions for the years 1930 to 1936 inclusive was $50,716,756; the total for the years 1937 to 1939 inclusive was $19,634,879.

If the amount credited to the bonus fund in the years 1930 to 1940 inclusive had been deducted in toto as an expense in calculating the bonus for each calendar year for which the bonus was declared, the total amount of the bonus for that period would have been decreased by $8,093,891. If the cash paid and the award value of stock actually delivered out as a bonus in the years of 1930 to 1940 inclusive had been deducted as an expense in calculating the bonus for those years, the amount of the bonus would have been decreased by $9,146,677. These figures indicate the amount involved in determining this issue. The record of the trial shows that the members of the Committees, in deciding that bonus should not be considered as an expense in calculating bonus, exercised their own best judgment with knowledge of all the requisite facts, that they exercised their judgment honestly, and that the decision was supported by a disinterested majority of the Finance Committee and by all the members of the Bonus and Salary Committee, none of whom shared in the bonus awards. It may be that others, lawyers, accountants or judges, reviewing the matter years later and from a distance, would conclude that the Committees should have made the bonus participants bear one-tenth of the bonus award. But when it is considered that the bonus was based on the net earnings of a specific calendar year, that under the bonus plans it was not payable in that year but either in the following year or over a period of years, that the bonus plans were profit sharing arrangements, that many judicial decisions support the Committees' conclusion, it is apparent that the Committees' action should not in all fairness be branded as unreasonable, negligent, or taken in bad faith.

*The reawarding of forfeited bonus stock.*

The original bonus plan mailed to the stockholders prior to the August 27, 1918 stockholders' meeting is Exhibit 6. The plan provided (par. 7) that if a bonus beneficiary left the service of the corporation "that portion of his bonus represented at the time by the debit balance of his account shall revert to the corporation". The plan also contained the provision (par. 4) that any undistributed balances of the bonus fund should be carried forward from year to year. The two provisions are distinct and separate and the specific provisions (par. 7) as to the reversion of so-called forfeited stock to the corporation must be given effect.

In the bonus plan, as in effect January 17, 1929, (Ex. 6-A) there is a provision that the so-called forfeited stock "shall revert to the Bonus Fund". (par. 5) This change was made by the Board of Directors on March 25th, 1920. The bonus plan as in effect November 1936 (Ex. 6-B) contains this same provision in paragraph 6 thereof. It also appears in the same paragraph of the bonus plan as in effect March 19, 1938 (Ex. 6-C). None of these amended bonus plans were mailed to the stockholders nor were the amendments set forth in the annual reports.

Defendants assert that the Board of Directors had the right to amend the bonus plan, in respect to forfeited stock, under two resolutions adopted at the stockholders' meeting of August 27, 1918. These resolutions are as follows:

"Further Resolved, that said Bonus Plan shall be subject, from time to time, to alteration, modification or repeal in whole or in part, by the Board of Directors of said Corporation except as to awards theretofore granted.

\* \* \* \* \*

"Resolved, that Section 10 of Article III of the By-Laws of General Motors Corpo-

ration be and the same hereby is amended by adding thereto a new subdivision to read as follows:

" '5. To adopt and from time to time to alter, amend or repeal, a bonus plan for granting special compensation to such of the corporation's employees, including employees who are also directors, and employees of subsidiary companies, who in the judgment of the directors, or of any committee thereof, or committee appointed thereby and vested with authority in that regard, have contributed in a special degree to the ·success of the corporation by their inventions, ability, industry and loyalty; provided, however, that no employee, who is also a director, shall receive a bonus unless the same is recommended by the President and the recommendation is approved by a committee of at least four directors not receiving bonuses that year.' " (ibid., p. 370).

The first resolution embodies the thought contained in paragraph 11 of the plan submitted to the stockholders (Ex. 6) which reads as follows: "11. While the Corporation purposes the granting of awards annually, the Directors shall have the right to modify or entirely repeal the plan, from time to time, or to discontinue new allotments of bonuses either temporarily or permanently, provided, however, that no modification of this plan shall operate to annul a bonus once granted hereunder without the consent of the beneficiary." (Ex. 6-A, Bonus Plan, in effect Jan. 17, 1929; Ex. 6-B; Ex. 6-C)

The control given to the Board of Directors under the first resolution above quoted and paragraph 11 of the Plan was to be exercised in limiting or suspending entirely the operation of the bonus plan as approved by the stockholders. The purpose of that authorization apparently was to prevent any employee or participant from asserting that he had a right to demand that an annual bonus be awarded. It limited his rights to such bonuses as were actually awarded to him.

Defendants argue that under the second resolution above-quoted, amending Section 10 of Article III of the by-laws, the Directors had the power to amend the Bonus Plan of August 1918 so as to provide that the forfeited bonus stock should revert to the bonus fund and be reawarded later, instead of reverting to the Corporation itself.

The real purpose of the by-law amendment is clear when the circumstances leading up to its adoption are reviewed. The first notice of the Special Meeting of stockholders was dated August 15, 1918. It gave notice of "a proposal to increase the capital stock of the Corporation" in certain particulars and also advised the stockholders that a further purpose of the special meeting was "to pass upon a bonus plan, copy of which is enclosed herewith, of distributing stock of the Corporation as a reward to its employees including employees of its subsidiary companies who have contributed to its success in a special degree by their invention, ability, industry, loyalty or exceptional service". The bonus plan mailed to the stockholders and the notice of August 15, 1918 said nothing about directors being eligible to participate in the bonus plan as employees. A further notice was therefore sent to the stockholders under date of August 20, 1918, advising them that at the special meeting to be held August 27, 1918, a resolution amending Section 10 of Article III of the by-laws would be submitted for their consideration. This proposed amendment is the one adopted at the meeting and quoted above. It specifically stated that the bonus plan might include "employees who are also directors".

The minutes of the Special Meeting of the stockholders held August 27, 1918 indicate that, after approving the proposed changes in the capital stock, the meeting considered the proposed bonus plan and a long resolution was adopted containing two Whereas clauses. The first referred to the bonus plan as adopted by the Board of Directors July 26, 1918 (a copy of which had been mailed to the stockholders with the first notice of the meeting) "for the purpose of rewarding exceptional services of employees." The second Whereas Clause recited: "Whereas it is contemplated that members of the Board of Directors shall be eligible to participate in such bonus awards." Then followed a resolution dealing with the manner in which the bonus plan was to be put into effect. Next in order, the meeting adopted the resolution amending the by-laws.

If the second notice, relating to the proposed amendment to the by-laws, had not been mailed to the stockholders in advance of the special meeting, some question might have arisen as to the right of directors to participate in the bonus awards. It was to obviate that difficulty that the

second notice was sent. Even that second notice and the resolution were not clear as to who was to have the power of amendment. Unless a stockholder had a copy of Article III of the by-laws, showing that it related to the Board of Directors, he could not tell who was given the power under the proposed amendment.

The stockholders had the right to assume that the directors would honestly and disinterestedly exercise their delegated power of amendment and that they would not alter the specific provision that forfeited stock should revert to the corporation and provide in place thereof that it should revert to the Bonus Fund. Such a change would be to the detriment of the stockholders and to the profit of the bonus participants, of whom several influential directors were the most favored. The legal principle stated in the dissenting opinion of Justice Stone in Rogers v. Guaranty Trust Co., 288 U.S. 123, 141, 53 S.Ct. 295, 301, 77 L.Ed. 652, 89 A.L.R. 720, appears to be applicable to the situation here presented. Mr. Justice Stone wrote:

"They [the stockholders] were entitled to read the proposal [the bonus plan was submitted to the stockholder] in the light of the fundamental duty of directors to derive no profit from their own official action, without the consent of the stockholders, obtained after full and fair revelation of every circumstance which might reasonably influence them to withhold their consent."

Mr. Justice Cardozo, in joining the dissent, wrote: "Consent will not protect if reason and moderation are not made to mark the boundaries of what is done under its shelter."

To change within a year and a half a specific provision of the plan, so as to bring into the bonus fund in which directors participated great blocks of forfeited stock, did not meet the standards set for these fiduciaries in the exercise of their power of amendment.

The directors' amendment, in respect to the forfeited stock, was never reported to the stockholders, either at any meeting or in the annual reports. The only stock mentioned in the annual reports as awarded in any year was the stock that was part of the bonus for that year, based upon the earnings of that year. In this respect the annual reports differed from the bonus awards shown in the reports of Mr.

Sloan to the Finance Committee and to the Bonus and Salary Committee. (Ex. RR) Mr. Sloan specifically included the forfeited stock in the amount of the awards set forth in those reports, but not in the annual reports to the stockholders.

Changing the provision that forfeited bonus stock should revert to the bonus fund instead of to the stockholders had the same effect as an increase in the bonus percentage. It increased the amount of the bonus distributable annually in the year in which forfeited stock was added to the 10% distributed.

A large part of the reawarded forfeited bonus stock had been part of a bonus award made several years prior thereto. The men who originally received the award were given their share of the 10% net earnings which they had helped to create. Those who received the forfeited bonus stock, when it was later reawarded, either had nothing to do with the creation of the earnings in the year for which the bonus stock had been awarded, or if they did contribute to those earnings they had received their proper share thereof in the bonus awarded to them for that year. There does not appear to be any equitable basis for this amendment of the bonus plan.

This point finds support in Mr. Sloan's report of March 3, 1941 (Ex. PP) in respect to the 1940 bonus award. Mr. Knudsen had left the employ of the Corporation to take up his duties in charge of defense production in the O. P. M. Mr. Carmichael had done the same thing for the Canadian Government. A bonus award in stock to both these executives for part of the year 1940 was under consideration. Mr. Sloan urged that if the bonus stock was not actually awarded to them, it should be held in reserve and not awarded. The reason he advanced was as follows: "In view of the fact that the services for which these awards would be made were rendered by these two individuals, these amounts should not be distributed to others in the Corporation."

The earliest acquired stock owned by any of the present plaintiffs was bought May 27, 1929. In this action this Court cannot adjudicate or grant any relief in respect to the shares of bonus stock which had been forfeited and reawarded prior to that date, Rule 23(b) F. R. C. P., regardless of the Statute of Limitations. However, it should be noted that for the years 1920 to 1923 inclusive 121,464 shares of common-old, no

par value, forfeited bonus stock were re-awarded. These 121,464 shares became 30,366 shares of new no par value stock in 1924, on a one for four basis. By reason of a stock dividend of 50% in September 1926 and subsequent split-ups, the 30,366 shares increased to 227,745 shares (new $10.00 par value common stock) which in March and April 1929 (at $85.00 a share) had a total value of $19,358,325, in the hands of those who then owned the stock.

The practice of rewarding forfeited bonus stock persisted after 1923 but not to the extent it was availed of in the early 1920s. The total rewarded for the years 1930 to 1940 was 11,482 shares, having an award value of $489,206. This forfeited stock was mingled with other stock declared available for bonus purposes. It was not earmarked. There is no way of telling who got it. But that does not prevent a determination of the question of liability for this loss of $489,206.

Fourteen directors, including Mr. Smith, were present at the meeting March 25, 1920 (Ex. 3-1). All of them voted for the forfeited stock amendment. Eight of these directors were Vice-Presidents of General Motors Corporation. (Ex. 1-C) As employee-directors they were eligible to share in bonuses awarded under the plan.

Of the defendants now before the Court in this litigation, only two were directors on March 25, 1920, Mr. Sloan and Mr. Smith. The latter was elected a director that day and thereupon took his place at the meeting and voted for the amendment in respect to forfeited stock. He had been the general counsel for the Corporation for some years before that. Both Mr. Sloan and Mr. Smith continued as directors, at least through 1940. These two directors, Mr. Sloan and Mr. Smith, who were also prominent executives and closely associated with the operation of the bonus plan, are jointly and severally liable to the corporation for all forfeited stock later rewarded, to the extent that such stock was rewarded, in March 1931, for the year 1930 and in the following years, inclusive of the bonus year 1940.

There can be no accretion of legality to the annual rewarding of forfeited stock where the real basis for such action is an amendment adopted by a Board of Directors, where the majority voting for it were eligible to benefit from their action. Each year that Mr. Sloan, in his report on the bonus, stated that certain forfeited stock was available for bonus purposes, his re-assertion of that unauthorized principle of distribution, contrary to the specific provisions of the bonus plan approved by the stockholders, was a new violation of his duties and fiduciary obligations as a director. Each such annual recommendation gave rise to a new cause of action against him, in favor of the Corporation. The same is true of Mr. Smith, who, as a director, voted for the original amendment in March 1920 and has consistently approved each subsequent award of forfeited stock as a member of the Board of Directors and as the General Counsel for the Corporation. This litigation was instituted in October 1936. The meetings of the Finance Committee and the Board of Directors were held in New York. The six-year New York Statute of Limitations applies. The claim, to the extent of forfeited stock rewarded on March 23, 1931 and in subsequent years is not barred by the Statute. Potter v. Walker, 276 N.Y. 15, 11 N.E.2d 335.

In respect to the other defendant directors, who are now before this Court, the argument is made that Mr. Whitney and Mr. Morgan were not directors in 1920 and did not become directors until 1925. It is also contended in their behalf that they never participated in any bonus of any kind under any plan; that they were not familiar with the circumstances under which the amendment to Section 10 of Article III of the by-laws was adopted in 1918 and that they were justified in assuming that the March 1920 amendment of the bonus plan, in respect to forfeited stock, was adopted by the Directors in the honest exercise of what was assumed to be properly delegated authority. Mr. Prosser became a member of the Board of Directors in July 1920. He never received any bonus and did not hold any position as an executive or manager. His situation was similar to that of Mr. Whitney and Mr. Morgan. Although Mr. Brown and other defendant directors sharing in the bonus voted for the award of forfeited stock in later years, they did not vote for the original amendment to this bonus plan which gave their later action the semblance of legality. I have concluded that the defendant directors, now before this Court, other than Mr. Sloan and Mr. Smith, are not liable to the Corporation for forfeited bonus stock later rewarded.

Defendants state that in 1938 there was charged against the Bonus Fund a sum of $184,775, the amount of a judgment recovered by Mr. Coats for alleged illegal forfeiture of certain bonus stock at one time awarded to him. From that fact defendants argue that the amount of forfeited stock actually reawarded for 1937–1940 should be considered as reduced by the amount of the Coats' judgment. The fact is, however, that the Coats stock was forfeited in 1927 and if the judgment he recovered years later may be charged against any reawards of forfeited stock, it should be for the year 1927 or the two following years, when practically all the 1927 forfeited stock was reawarded. (Ex. 18) Rule 23(b) (2) F. R. C. P. and the New York Statute of Limitations prevent this Court from granting relief for bonus stock reawarded for those years. If Mr. Coats' stock was illegally forfeited, it was reawarded during a period beyond the reach of any judgment in this action.

*The exchange on June 4, 1930 of 243,392 shares of General Motors common stock for 2400 Managers Securities Class B shares, owned by the Regent Corporation, in which John J. Raskob had a 78% interest and Pierre S. duPont a 22% interest.*

For many years prior to August 1928 Mr. Raskob had been Chairman of the Finance Committee of General Motors Corporation and one of its most important executives. He then assumed the Chairmanship of the National Committee of the Democratic Party to further the campaign of its candidate for President of the United States. This caused considerable discussion among the directors of General Motors Corporation as to the propriety of Mr. Raskob's continuing as Chairman of the Finance Committee of the Corporation. It was finally decided that Mr. Raskob should resign as Chairman of the Finance Committee of General Motors Corporation and devote all his time to the 1928 political campaign. Mr. Brown was chosen Chairman of the Finance Committee of General Motors, to succeed Mr. Raskob.

Later Mr. Raskob resumed his duties as a member of the Finance Committee and as a member of the Board of Directors of General Motors Corporation. He did not again become Chairman of the Finance Committee. In view of the fact that his position with General Motors Corporation had altered and pursuant to the provisions of the agreement between General Motors Corporation and the participants in the Managers Securities Company, it was decided that Mr. Raskob's holdings of 600 shares of Class A stock of Managers Securities Company should be acquired by General Motors Corporation for cash under its option to recapture the same and that the corporation should waive its right to recapture his 2,400 shares of Class B Managers Securities Company stock. That action was taken at a meeting of the Finance Committee on May 6, 1930.

Immediately thereafter Mr. Raskob expressed the view that since his Class A stock had been reacquired by the General Motors Corporation, the corporation should also take over his 2,400 shares of Class B stock in Managers Securities Company so that he would be out of Managers Securities Company entirely. In the early part of May 1929 General Motors stock was quoted at about $84 a share. On May 15, 1929 Mr. Raskob wrote Mr. Brown and offered to exchange his 2,400 shares of Class B Managers Securities Company stock for its equivalent in General Motors common stock and to allow General Motors Corporation a discount of $500,000 on the deal. The 2,400 shares of Managers Securities Class B stock had a value at the time of almost $20,000,000 in terms of General Motors common stock.

Mr. Brown considered Mr. Raskob's offer and submitted a report to the Finance Committee dated June 28, 1929, which came before the Committee for consideration on August 5, 1929. Mr. Brown did not recommend acceptance of the offer. In fact he raised the question "whether we should effect an exchange of this kind with Mr. Raskob without giving others the opportunity of converting a part of their holdings of Class 'B' stock up to the limit of General Motors common which we hold available for the purpose on a pro rata basis". (Ex. WWWW-2)

At that time General Motors common stock had a market value of about $72.00 a share. On August 5, 1929 the Finance Committee formally adopted a resolution advising its Chairman that in their opinion the offer submitted by Mr. Raskob should not be accepted. On August 7, 1929 Mr. Raskob offered a discount of $500,000 to General Motors Securities Company and to the duPont Company on a proposal that they give him in exchange for his 2,400

shares of Class B of Managers Securities Company, the equivalent in General Motors common stock. No action was taken by these two companies on Mr. Raskob's offer.

On December 3, 1929, Mr. Brown, as Chairman of the Finance Committee of General Motors Corporation, wrote to Mr. Carpenter, Vice-President of E. I. duPont de Nemours & Co., concerning a plan for the conversion of Managers Securities Company stock into General Motors stock, as follows:

"Assuming that Du Pont Company, Managers Securities Company, and General Motors Securities Company are agreeable to a partial liquidation applying in the case of General Motors Securities Co. and of Managers Securities Co., and assuming that the stockholders of Managers Securities Co. not participating in such partial liquidation approve such course, there is no reason why the situation could not be handled in the following manner, which possesses the advantage of simplicity:

"(1) The holder of stock of Managers Securities Co. surrenders the same to Managers Securities Co., together with an amount of cash representing the proportionate net indebtedness of Managers Securities Co., and takes from Managers Securities Co. General Motors Securities Co. stock representing a corresponding percentage of the aggregate of General Motors stock (or its equivalent) held by Managers Securities Co.

"(2) The same individual then surrenders to General Motors Securities Co. the General Motors Securities Co. stock and takes from General Motors Securities Co. the corresponding percentage of the aggregate of General Motors stock held by General Motors Securities Co.

"General Motors Corporation holds some Managers Securities Co. stock recaptured from former executives. We will no doubt be desirous of converting this stock into General Motors common stock in order to have the latter available for sale to the proposed Second Managers Securities Co. If Mr. Raskob is desirous of converting his Managers Securities Co. stock into General Motors stock in this way, I see no reason why he should not be given the opportunity, provided it is agreeable to the Du Pont Company. As far as we have gone in sounding out the other stockholders of Managers Securities Co.,. it seems quite clear that they will almost without exception be desirous of continuing stock of Managers Securities Co. without converting it into General Motors stock." (Ex. XXXX)

In his letter Mr. Brown asked Mr. Carpenter to take the question up with the duPont Company and the General Motors Securities Company. This letter apparently produced some results because at a meeting of the duPont Company's Finance Committee, December 16, 1929, the principle of the plan was unanimously approved, the details to be worked out and to be later presented to the Committee. At the following meeting of the duPont Committee, on December 30, 1929, the approval of the plan for delivery of General Motors common stock to stockholders of General Motors Securities Company (other than duPont) was conditioned upon General Motors Securities Company receiving such indemnification as would protect General Motors Securities Company and the duPont Company against any tax claims resulting therefrom. Managers Securities Company as a stockholder of General Motors Securities Company was not seeking the privilege of partial liquidation of General Motors Securities Corporation for itself but only for such of the stockholders of Managers Securities Company (including General Motors Corporation) as might wish to obtain General Motors common stock for their Managers Securities Company stock, through the partial liquidation of both Managers Securities Company and General Motors Securities Company.

Exhibit 38-C, prepared December 7, 1929 and sent to the stockholders of Managers Securities Company with Mr. Brown's letter of December 10, 1929 (Ex. 38) shows the projected condition of Managers Securities Company as of December 31, 1929 and the proposed reorganization of that Company "after the retirement of 17.6% of Class A and B stock". A footnote states:

"*The adjusted balance sheet* reflects the retirement of 17.6% of Class 'A' and 'B' stock, through the exchange of 1,760 shares of Class 'A' and 7,040 shares of Class 'B' Stock for 781,283 shares of General Motors Common Stock. It will be necessary for the retiring stockholders to pay the Managers Securities Company $3,102,210 for the retirement of loans in the ratio of the Capital Stock retired to the total Capital Stock."

On December 31, 1929 General Motors Corporation held, in an account of stock acquired for a second Managers Securities Company plan, 1,160 Class A shares and 4,640 Class B shares. It also owned other Class A stock held in a Miscellaneous Investment Account, which included 600 Class A shares repurchased from Mr. Raskob on May 15, 1929. Evidently the projected balance sheet and plan of reorganization contemplated the retirement of Mr. Raskob's 2,400 shares of Class B stock, which together with the 4,640 Class B stock held by General Motors would bring the total of Class B stock to be retired up to the 7,040 mentioned in Exhibit 38-C. If these 2,400 Class B shares of Mr. Raskob were matched against the 600 shares of his Class A shares which General Motors had acquired in May 1929 and held in a Miscellaneous Account, this would bring Motors 1,160 Class A shares in the Second Managers Securities Account up to the 1,760 shares of Class A mentioned in Exhibit 38-C. Apparently the 17.6% of Class "A" and "B" stock covered both Mr. Raskob's and General Motors Corporation's interest, to the extent above indicated.

On January 3, 1930, Mr. Raskob, pursuant to an arrangement he made with Mr. Brown, forwarded to Mr. Brown 2,400 shares of Managers Securities Class B stock, together with a check for $1,679,036.-68 to cover the claims coming ahead of the B stock, and received from Mr. Brown 278,397 shares of General Motors common stock owned by General Motors Corporation. At the time of the exchange Mr. Raskob did not give any indemnity against tax claims, such as the duPont Company indicated would be required by General Motors Securities Company before it would exchange General Motors common stock for General Motors Securities Company stock. By reason of the transaction of January 3, 1930, General Motors Corporation, instead of Mr. Raskob, would have been faced with the requirement of the tax indemnity. No record of the receipt of the check for $1,679,036.68 from Mr. Raskob was made in any book, paper or document of General Motors Corporation nor was the check deposited in the bank. No records were made of the delivery out of the 278,397 shares of General Motors stock or the receipt of the 2,400 shares of Managers Securities Company Class B stock.

Shortly after this exchange was made Mr. Brown was advised by Mr. Smith, General Counsel of General Motors Corporation, that a tax indemnity agreement should be required from Mr. Raskob. A request for such indemnity was made, but Mr. Raskob and his counsel declined. Thereupon Mr. Raskob's 2,400 shares of Managers Securities Class B stock and his check were returned to him and Mr. Raskob returned to General Motors the 278,397 shares of General Motors common stock which he had received on January 3rd.

Mr. Raskob and Mr. Brown wrote each other on the 9th and 10th of January 1930 and agreed that the arrangement for the exchange of stock should remain as stated in their correspondence, unless it was "mutually agreeable to alter same along such lines as may develop as a result of a further study of the matter during the next few weeks". The negotiations between Mr. Brown and Mr. Raskob leading up to the January 3rd, 1930 exchange of stock, the transaction itself, and the January 9th and 10th understanding to keep the prospective deal open, were never reported to the Finance Committee or the Board of Directors of General Motors Corporation. Meanwhile, on April 30th, 1930, the agreement for the sale of 1,375,000 shares of General Motors common stock to General Motors Management Corporation was signed by the two corporations. The stock that had been used on January 3rd came from a block of stock, in the so-called Second Managers Securities Account, accumulated for the purpose of the April 30th sale. When the January 3rd Raskob-Brown transaction was rescinded, the 278,397 shares of General Motors common stock were returned to that account.

Concerning the transaction of January 3, 1930, Mr. Brown testified that " * * * the basis of that transaction was, Mr. Raskob held what amounted to 6 per cent of the outstanding B stock of Managers Securities Company and the basis of this transaction was that Mr. Raskob would pay to General Motors an amount of cash representing 6 per cent of the combined indebtedness of Managers Securities Company and the underlying equities as represented by Class A capital stock and surplus, and that then General Motors would deliver to Mr. Raskob 6 per cent of the shares of General Motors common stock representing 6 per cent of the equivalent of General Motors common as represented by the aggregate holdings of General Motors Securities Company stock held by Managers Securi-

ties Company. At the time of entering into this transaction in General Motors itself, at least my purpose and contemplation was that upon receiving the 2400 shares of Managers Securities Company stock, we could immediately, as soon as the stockholders of Managers Securities Company acted, submit those shares of Managers Securities Company in the course of the partial liquidation of that company, taking therefor General Motors Securities Company stock and then, in turn, surrendering General Motors Securities Company to General Motors Securities Company, taking General Motors common". (page 3684 of record)

If General Motors could do what Mr. Brown stated he planned to do after receiving Mr. Raskob's 2,400 shares of Class B stock, Mr. Raskob could have done the same thing for himself. He did not have to own Class A stock in order to exchange his Class B stock, if the plan Mr. Brown outlined was in the making. He could have awaited its fruition, instead of leaving with General Motors the risk of its failure to materialize. The plan contemplated in January 1930 never did materialize. That in itself should have been a warning against any renewal of negotiations between Mr. Raskob and Mr. Brown five months later.

It does not appear that anything was done between January 10, 1930 and June 2, 1930 to revive the Brown-Raskob transaction for the exchange of 2,400 shares of Managers Securities B stock for their equivalent of General Motors common stock. However, on June 2nd the subject of a tax indemnity agreement was again discussed by Mr. Brown and Mr. Smith with Mr. Raskob and his counsel, Mr. Smith advised Mr. Brown that in his opinion this tax indemnity was unnecessary. Mr. Brown thereupon abandoned the suggested requirement for such an agreement. Arrangements were then made to complete the transaction.

The terms of the exchange were based on the value of General Motors common stock on June 4, 1930, which was $50.00 a share. Instead of a check, plus 2,400 shares of Managers Securities stock being given on the so-called gross formula basis of exchange, Mr. Raskob delivered the 2,400 shares of Class B stock and received on a net basis formula 243,392 shares of General Motors common stock. Under the net basis formula, the claims ahead of the Managers Securities B stock, including the capital and surplus of the A stock, were first ascer-

tained. The number of shares of General Motors common stock, which were the equivalent of the 2,400 shares of Class B stock of Managers Securities Company was next determined. The claims ahead of the B stock were then computed in terms of General Motors common stock at the market price of $50.00 a share and the number of shares representing those dollar claims was deducted from the number of shares of General Motors common stock, otherwise deliverable for the 2,400 shares of Managers Securities Company B stock. The net amount of the General Motors shares thus computed as deliverable on June 4, 1930 was 243,392 shares of General Motors common stock.

Mr. Brown gave instructions in New York City that the requisite number of shares of General Motors common stock be taken from a General Motors safe deposit box in New York City and sent to Wilmington, Delaware, where they were exchanged for the 2,400 shares of Class B Managers Securities stock then held by the Regent Corporation, owned and controlled by Mr. Raskob and Mr. P. S. duPont. The physical exchange of the stock took place in Wilmington, Delaware, for the purpose of saving stock transfer taxes that would have been payable on the transaction if the exchange had taken place in New York. The negotiations for the exchange took place in New York and the terms of the exchange were there agreed upon.

In arranging to obtain the General Motors common stock from the safe deposit box in New York City and in getting the computation of the net amount of shares of General Motors stock to be given on the exchange, information concerning the transaction was necessarily given to the following: To Mr. Breech, the general assistant treasurer in charge of the treasurer's office in New York; to Mr. Bradley, in charge of its financial department; to Mr. Howe, the assistant to the treasurer of General Motors in Detroit; to Mr. Hull, the transfer agent and to Mr. Beardslee, the assistant secretary. No record of the transaction was entered upon the books of General Motors Corporation. The so-called Second Managers Securities Account in which was listed the stock involved in the sale to General Motors Management Corporation, continued to show the holding by General Motors Corporation of the 243,392 shares and failed to show their exchange for the 2,400 shares of Class B Managers Securities Company stock.

Regent Corporation was a personal holding company organized in Delaware on January 13, 1930, under the name of Durasko Corporation, the name of which was changed to Regent Corporation on April 3, 1930. The sole stockholders of Regent Corporation on June 4, 1930 were John J. Raskob and Pierre S. duPont, both of whom were at the time directors of General Motors and members of its Finance Committee. 78% of the stock of Regent was beneficially owned by Mr. Raskob and 22% by Mr. Pierre S. duPont. The 2,400 shares of Managers Securities Class B stock received by General Motors in the exchange of June 4, 1930 had been acquired by Mr. Raskob on December 20, 1923 under the Managers Securities plan established by General Motors Corporation. The 2,400 shares of Managers Securities Class B stock were owned by John J. Raskob until he transferred them to Radelco Corporation on January 14, 1930. Radelco Corporation was a wholly owned personal holding company of Mr. Raskob, organized on January 13, 1930. On May 15, 1930 Radelco transferred the 2,400 shares of Class B, Managers Securities Company stock to Regent Corporation.

Concerning the status of plans for the reorganization of Managers Securities Company in the summer of 1930 the following extract from the minutes of the meeting of the Board of Directors of Managers Securities Company held July 2, 1930, is informative.

"The question of whether any plan can be evolved whereby stockholders who wish to liquidate their holdings may receive their pro rata share of General Motors common stock was discussed.

"The question of converting Class 'A' to Class 'B' stock was also discussed.

"It was the unanimous opinion that no conversion of Class 'A' stock should be made at this time, and that the matter of any plan having in view the liquidation of the Company, or any part thereof, be deferred indefinitely."

Mr. Brown and Mr. Sloan were at the meeting. It would appear that the original plan for a partial liquidation of Managers Securities Company had been abandoned. This fits in with Mr. Brown's testimony that in June 1930 when he completed the Raskob transaction, he had abandoned the purpose of converting the Raskob Class B stock into General Motors common stock. Instead Mr. Brown "had come to the con-clusion that it was more in the interest of General Motors Corporation to take in the Class B stock of Mr. Raskob and to hold it in the earmarked account for the purpose of the second Managers Securities Company". He further testified:

"* * * we were then holding the 600 shares of Class A stock we captured from Mr. Raskob the year before in this earmarked account for the purposes of delivery of General Motors common stock to General Motors Management Corporation on account of the commitment that had been made with the General Motors Management Corporation in March, or at least in line with the authority granted by the stockholders at its meeting in March.

"At June 1930 the number of shares of General Motors common into which this Class A stock of Managers Securities Company might ultimately be convertible, was not exactly determinable. The 600 shares of Class A stock representing 6% of the outstanding Class A stock of Managers Securities Company, and the 2400 shares of Class B stock represented 6 per cent of the outstanding Class B stock of Managers Securities Company, and if we in taking into the treasury of General Motors Corporation and into this earmarked account for General Motors Management Corporation, we took this Class B stock in and matched it against the 600 shares of Class A stock that had previously been recaptured, then thereby we determined exactly the number of shares of General Motors common stock that ultimately would be derived from the conversion of Managers Securities stock held in this special account." (page 3688 of record)

\* \* \* \* \* \*

"It was determinable at that time but at June in 1930 we had begun figuring on other plans of the reorganization of Managers Securities Company that, as affecting the interests of all concerned, might be more advantageous than proceeding along the lines of partial liquidation of the Managers Securities Company and in turn of General Motors Securities Company. During the months in the latter half of 1930 there was a great deal of consideration given to the plans, and most advantageous method of accomplishing the objectives in view. These plans were not brought around to a final state of determination until, I think, in December, 1930. The ultimate plans that were determined upon and made effective in December, 1930, departed

from this course of resorting to partial liquidation of Managers Securities Company and in turn of General Motors Securities Company in favor of a plan which undertook the merger of the Managers Securities Company with General Motors Securities Company. As a result of that merger between the Managers Securities Company and General Motors Securities Company, the holders of the Managers Securities Company stock came into possession of stock of General Motors Securities Company." (page 3689 of record)

Counsel for Mr. Brown argues that there was nothing wrong in the Raskob transaction and that what was done in June 1930 in giving the Regent Corporation shares of General Motors stock in exchange for Class B Managers Securities Company stock was in effect what had been done for other such Class B stockholders. In 1928 and prior thereto it had been the practice of the Finance Committee to exercise its option to acquire depositary certificates of Class B stock from members of Managers Securities Company who were severing their official connection with General Motors. This was done in each case through the specific authorization of the Finance Committee of General Motors, given in the usual formal way. But in the Spring of 1929 and thereafter the Finance Committee pursued a different policy and instead of exercising the option and giving shares of General Motors common stock in exchange for the depositary certificates of Class B stock of Managers Securities Company, the holders of such Class B stock depositary certificates on severing their relations with General Motors Corporation were given definitive certificates of Class B stock and the option of General Motors to acquire their Class B stock was waived. A holder of definitive certificates of Class B stock of Managers Securities Company could not expect to receive in exchange any General Motors common stock, unless and until there was at least a partial liquidation of both Managers Securities Company and General Motors Securities Company. When that would happen and on what conditions rested with the duPont Company, which controlled the General Motors Securities Company, and with the chief executives and managers of the General Motors Corporation who as the principal participants in Managers Securities Company could bar any liquidation of the latter company.

It is also asserted in Mr. Brown's defense that when he made the exchange with Mr. Raskob in June 1930, he had at least implied authority to do so because the obstacle to the transaction which prompted the Finance Committee to reject the proposal had been removed. Defendant's argument assumes that the Finance Committee rejected the Raskob proposal because the exchange he requested could not be accorded to other stockholders of Managers Securities Company who held B stock "alone", i. e., to those whose A stock had been acquired by General Motors Corporation and who had been given definitive certificates for their B stock.

There appears to be no basis for that assumption, as the August 5, 1929 resolution of the Finance Committee clearly indicates. The resolution made no distinction between different groups of holders of B stock. The preamble of the Resolution recited that "the Corporation is not at this time in a position to make a similar offer to other members of the Managers Securities Company" and that "it is probable that with the termination of the Managers Securities Plan next year (1930) there will be a number of persons who will want to effect a settlement by taking General Motors stock". The Raskob offer was accordingly rejected, the Finance Committee formally resolving "that the Chairman of the Finance Committee be advised it is the opinion of this Committee that the offer submitted by Mr. Raskob should not be accepted".

Nor am I persuaded by the testimony of certain witnesses that the discussions at the meeting of August 5, 1929 could form a solid basis for such implied authority. If that had been the purpose of those who attended the August 5, 1929 meeting the resolution would have so provided. Mr. Brown did not attend that meeting. He testified (Record 3675): " * * * I was not present at this meeting, but subsequently I was informed that the finance committee had voted to reject the offer, and the reason for rejection was, as recited in the resolution adopted, that the corporation was not at that time in a position to make a similar offer to other members of the Managers Securities Company."

Mr. Raskob did attend that meeting and very properly did not vote on his own proposal. I think it is clear that Mr. Raskob had no misunderstanding of what the Finance Committee intended by its res-

olution. Two days later, August 7, 1929, he wrote to General Motors Securities Company and its directors setting forth the request he had made to the General Motors Corporation for the exchange of stock, and stated: "The Finance Committee of the General Motors Corporation felt that it was not advisable to do this unless the Corporation was in position to make a similar offer to the other Managers Securities Company stockholders, as it was felt important to treat everyone alike. Discussion developed the fact that if the duPont Company was willing to dissolve the General Motors Securities Company, delivering its assets consisting wholly of General Motors Corporation common stock to the stockholders, then the duPont Company and the Managers Securities Company would both hold common stock of the General Motors Corporation and the Managers Securities Company would then be in a position to deliver General Motors stock to its stockholders, should they so desire."

Mr. Raskob also offered the duPont Company and General Motors Securities the same discount which he had offered General Motors Corporation, but the duPont interests controlling both those corporations took no action on the offer. Further proof of Mr. Raskob's understanding of the discussion at the August 5, 1929 meeting of the Finance Committee of General Motors Corporation is found in a letter which he wrote Mr. Brown December 9, 1929, in which Mr. Raskob stated: "Inasmuch as the Finance Committee of General Motors stated unanimously that it would favor distributing General Motors stock to me in exchange for Managers Securities Company stock were it possible to make the same offer to all Managers Securities Company stockholders when they came in possession of their stock and inasmuch as the duPont Company has signified its willingness to make this possible, I can see no reason for further delay in settling my case."

The argument that on June 4, 1930, when Mr. Brown gave Mr. Raskob 243,392 shares of General Motors stock for Mr. Raskob's 2,400 shares of Class B stock of Managers Securities Company, represented by definitive certificates, the General Motors Corporation then had on hand enough shares of General Motors common stock to do the same thing for some sixteen others who in April 1930 held definitive certificates of Class B stock is beside the point and overlooks an important date, May 16, 1930.

All Managers Securities Class B stockholders were entitled on May 16, 1930 to their certificates of Class B stock free of any depositary restrictions, under the provisions of General Motors November 30, 1923 agreement with the Managers Securities participants (Ex. 7-12). Presumably some of them made that exchange with reasonable promptness and held definitive shares of Class B stock on June 4, 1930 in addition to the sixteen others who held definitive certificates for Class B stock prior to May 16, 1930. At any rate, they had the right to demand and receive the shares on that date.

The argument of implied authority for the Raskob exchange from what transpired at the meeting of August 5, 1929 and the contention that Mr. Brown acted under that implied authority when he made the exchange with Mr. Raskob on June 4, 1930 is further weakened by other happenings in the intervening ten months. There had occurred the stock market crash of October and November 1929. On December 30, 1929, the Finance Committee of the duPont Company acting on the advice of Mr. Carpenter, its Vice-President and General Counsel, voted to favor a plan for partial liquidation of General Motors Securities Company, provided General Motors Securities and the duPont Company could be properly indemnified against any taxes they might have to pay because of the liquidation. If General Motors Corporation acquired Mr. Raskob's Class B Managers Securities Company stock, it could not obtain full surrender value of the stock from General Motors Securities Company without furnishing indemnity. Both Mr. Brown and Mr. Raskob knew that. Even though Mr. Smith, General Counsel for General Motors Corporation, was of the opinion that there would not be any tax claim growing out of the liquidation of General Motors Securities Company, that question had not been ruled on officially at the time. Mr. Smith's opinion later proved to be correct, but the actual condition faced by all on June 4, 1930 was that regardless of Mr. Smith's legal opinion, General Motors Securities Company intended to exact the indemnity pending a final determination of the tax question by

the proper authorities. Mr. Raskob would not give the indemnity. General Motors had to leave with General Motors Securities as such indemnity 20% of the General Motors common stock it received December 30, 1930, when it turned in the 2,400 shares of Class B, Managers Securities Company stock for General Motors common stock.

Another vital change in the situation between August 5, 1929 and June 4, 1930 was the sale of the stock in the Second Managers Securities Account to General Motors Management Corporation on April 30, 1930. The General Motors shares delivered to Mr. Raskob on June 4, 1930 came from the stock in that account. Mr. Brown, in a receipt given the Management Corporation on April 30, 1930, had stated that General Motors was holding the certificates for 1,375,000 shares of General Motors common stock subject to the order of General Motors Management Corporation. We may properly conclude that the Finance Committee of General Motors, in view of that fact, would have very emphatically rejected for a third time the proposed exchange with Mr. Raskob, if it were submitted to the Committee for approval after the April 30, 1930 sale to Management Corporation.

The by-laws of General Motors Corporation in effect January 17, 1929 (Article IV, Section 1) required that all actions by the Finance Committee should be "reported to the Board of Directors at its meeting next succeeding such action". In that way the Board of Directors knew that on August 4, 1929 the Finance Committee rejected Mr. Raskob's proposal. By failing to re-submit the matter to the Finance Committee after that Committee had twice rejected it and by failing to report it to the Finance Committee after the transaction was effected, no record of the transaction appears in the minutes of the Finance Committee and consequently no record of it ever came before the Board of Directors, through that channel.

When the contract between General Motors Corporation and General Motors Management Corporation was executed on April 30, 1930 for the sale of 1,375,000 shares of General Motors common stock, plus the March 15th dividend, at a price of $55,000,000, the new Management bonus plan went into effect as of January 1st, 1930, to supersede the Managers Securities plan which was terminated as of December 31, 1929. Any rights of General Motors

to recapture either Class A or Class B stock under its contract with the Managers Securities Company participants expired May 15, 1930 and those participants became entitled to receive definitive shares of Class A and Class B stock for the depositary certificates which they then held for the stock in escrow. On May 16, 1930 the Managers Securities plan insofar as it concerned General Motors and the participants in the Managers Securities Company was completely at an end. Thereafter any agreement by General Motors to purchase the stock of any participant in Managers Securities Company would be a separate contract between General Motors Corporation and the individual. If the individual was a director, then under Section 9, Article III of the by-laws the contract for the purchase had to receive the approval of a majority of the disinterested members of the Board of Directors. The Finance Committee in and of itself could not authorize any such contract. The authorization required was that of the Board itself.

Mr. Brown made the exchange with Mr. Raskob on June 4, 1930 without authority of any kind, express or implied, and contrary to the explicit direction addressed to him as Chairman by the resolution of the Finance Committee dated August 5, 1929. Mr. Brown violated his legal obligations as a fiduciary, as a director of General Motors Corporation. So did Mr. Raskob and Mr. Pierre S. duPont who directly benefitted by the exchange. Mr. Smith was also derelict in countenancing and assisting in the transaction.

Mr. Raskob was a director and a member of the Finance Committee of General Motors Corporation. He had been Chairman of that Committee. Mr. Brown was a director, a member of the Finance Committee and Mr. Raskob's successor as Chairman of the Finance Committee. Mr. Pierre S. duPont was a member of the Finance Committee and of the Board of Directors. Mr. Smith was a director and the general counsel for the corporation.

Mr. Raskob and Mr. Pierre S. duPont, through their Regent Corporation, profited at least to the extent of $4,261,000 by having the exchange made at the June 4, 1930 price of General Motors common stock ($50 a share) instead of the December 30, 1930 price ($34.25 a share), which was the price at which other Managers Securities Company, Class B stockholders,

including General Motors Corporation, could exchange their shares on December 30, 1930.

On that date General Motors was entitled to receive 12,486 fewer shares of General Motors common stock for the 2,400 shares of Managers Securities Company B stock than it had given Mr. Raskob for the B stock on June 4th, 1930. The 12,486 General Motors shares, at $34.25, a share, were worth $427,645.50 on December 30, 1930. General Motors actually lost that amount on the Raskob transaction. The stock it did receive was used by General Motors to fulfil its April 30, 1930 contract with General Motors Management Corporation. It was replaced in the account from which the 243,-392 shares had been taken on June 4, 1930.

In Exhibits 56 and ZZZ, the transaction by which Mr. Raskob was given 243,392 shares of General Motors common stock in exchange for 2,400 shares of Class B Managers Securities Company stock is entered as though it involved only $9,636,493.84. That would mean a per share value for General Motors common stock of $39.59. The actual value of General Motors common stock on June 4, 1930 was $50.00 a share, which was the basis on which it was calculated that the 2,400 shares of Managers Securities B stock were the net equivalent of 243,392 shares of General Motors common stock. The entry of the transaction was not made until December 31, 1930. At that time General Motors common stock was valued at $34.25 a share. The value of $39.59 a share used in making the entry of $9,636,493.84 on Exhibit 56 on December 31, 1930 represented neither the value of General Motors common stock on that day nor its value on June 4, 1930. It is supposed to represent the average cost price to General Motors Corporation of the 243,392 shares of common stock taken from the stock General Motors was holding for the Management Corporation subject to its order, according to Mr. Brown's receipt of April 30, 1930. The actual market value of the General Motors common stock given to Mr. Raskob in the exchange of June 4, 1930 was $12,-169,600.00.

Between October 30, 1929 and November 15, 1929 Managers Securities purchased 239,800 shares through J. P. Morgan & Co. for a total price of $9,567,482.50. (Ex. FFF-2) On December 31, 1929 Managers Securities Company sold 239,800 shares to General Motors Corporation for $9,592,000

at $40.00 a share. But these were not the same shares, although Exhibit FFF-2 would convey that impression.

According to Exhibits ZZZZ-3 and ZZZZ-5, Managers Securities Company owed J. P. Morgan & Co. on November 30, 1929, on notes payable $25,903,592, consisting of two notes one for $16,500,000 and the other for $9,403,592. On January, 2nd, 1930, that indebtedness had been reduced to $16,500,000, plus accrued interest of $338,491. The note of $9,403,592 to J. P. Morgan & Co. was paid off evidently with the money Managers Securities Company received from General Motors Corporation on the sale of 239,800 shares of General Motors common stock.

Exhibit FFF-2 is entitled "Calculation of profit on sale of 239,800 shares of General Motors common stock to General Motors at December 31, 1929". It indicates the sale price of the stock to General Motors for $9,592,000 (at $40 a share) and the cost to Managers Securities of $9,567,961.-50 plus transfer tax of $479.60 with a resulting profit to Managers Securities Company of $24,037.90. These Exhibits FFF-1, 2 and 3 were submitted to prove that Managers Securities Company made a profit of $24,037.90 on this particular transaction. It appears, however, from Exhibit ZZZZ-5, a letter from Mr. Brown to Mr. Raskob, dated January 2, 1930, and from the schedules thereto annexed, that the stock delivered to General Motors Corporation was not the 239,800 shares purchased by Managers Securities Company in the Fall of 1929, but was stock taken from an old investment account of Managers Securities Company in General Motors common stock, which had cost Managers Securities Company $59.76 a share.

The annual report of Managers Securities Company for the fiscal year ended April 30, 1930 (Ex. 11-E) lists (page 10) as an asset of Managers Securities General Motors the 239,800 shares at $39.90 a share, $9,567,482.50, purchased in the Fall of 1929. Page 5 of said exhibit contains the following statement: "During the latter months of 1929, 239,800 shares of General Motors common stock were purchased at an average cost of $39.90 per share. This amount of stock was sold through a private sale at $40 per share to General Motors Corporation in the latter part of December. A further saving to Managers Securities Company was made possible by delivering stock covered by this sale out of the block

of common stock purchased in 1928 at a cost fractionally lower than $60 a share, resulting in an income tax saving of $521,-282.04, which otherwise would not have been possible. The funds received from the sale of this stock were used to liquidate the bank loans incurred at the time the stock was purchased."

The transaction by which Managers Securities sold to General Motors 239,800 shares of General Motors common stock on December 31, 1930 for $9,592,000 ($40 a share) had the following results: (1) Managers Securities Company was able to take a tax loss on the last day of the year resulting in an income tax saving to Managers Securities Company of $521,282.14; (2) the proceeds of the sale of this stock were used to pay off a note of $9,403,592.61 held by J. P. Morgan & Co.; (3) the 239,800 shares supplied General Motors with the greater part of the stock to be used on the Raskob-Brown transaction. The first deal with Mr. Raskob (subsequently revoked) took place January 3, 1930. It is a fact that a certificate for 239,800 shares (No. WC 49481) was used on June 4, 1930 in making delivery of the 243,392 shares of stock to Mr. Raskob's Regent Corporation. (Ex. AAAA-6)

There was no mention of Mr. Brown's December 1929 commitment to Mr. Raskob in Mr. Brown's report to the Finance Committee on April 8, 1930 (Ex. CCCCC-2). Neither Mr. Brown nor Mr. Raskob, who attended the Finance Committee meeting of June 9, 1930, reported that the exchange had been consummated June 4, 1930. The 2,400 B shares received from Regent Corporation on June 4, 1930 were not transferred out of the name of Regent Corporation until September 11th, 1930, on which date new certificates were issued to a nominee of General Motors and dated back to September 8, 1930, so that General Motors could receive a dividend declared on the B stock payable to holders of record as of September 10, 1930. No entry of the Raskob-Brown transaction was made on the books of General Motors Corporation or on the consolidated working sheets containing the Second Managers Securities account until December 31, 1930. Mr. Sloan, the President of General Motors Corporation testified that he did not learn of it until about that time.

■ Assets of a corporation are forbidden to directors for their individual enterprises. Directors are fiduciaries, hold-

ing positions of great trust, and a strict code controls their dealings with the corporate assets. As Judge Collin stated in Pollitz v. Wabash R. R. Co., 207 N.Y. 113, at page 124, 100 N.E. 721, 724: "It is, however, the inflexible rule that they [directors] cannot exercise the corporate powers for their private or personal advantage or gain. The law stringently and rigorously forbids to them the use or disposition of the funds or assets of the corporation for their individual enterprises or acquisition, and for any misfeasance or breach of duty or trust resulting in damage to the corporation they are subject to be called to account by the corporation in the appropriate action. These principles, based upon a sound public policy and morality, are so firmly fixed in our jurisprudence that they are not open to discussion, and so familiar that authorities declaring them need not be cited."

In Kavanaugh v. Kavanaugh Knitting Co., 226 N.Y. 185, 123 N.E. 148, 151, the same Judge again reminded directors of the standards of rectitude by which their official conduct would be judged. He wrote: "The relation of the directors to the stockholders is essentially that of a trustee and cestui que trust. The directors are bound by all those rules of conscientious fairness, morality, and honesty in purpose, which the law imposes as the guides for those who are under the fiduciary obligations and responsibilities. They are held, in official action, to the extreme measure of candor, unselfishness, and good faith. Those principles are rigid, essential, and salutary."

Mr. Justice Douglas in writing the opinion of the court in Pepper v. Litton, 308 U. S. 295, at page 306, 60 S.Ct. 238, at page 245, 84 L.Ed. 281, stated: "A director is a fiduciary. Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 588, 23 L.Ed. 328. So is a dominant or controlling stockholder or group of stockholders. Southern Pacific Co. v. Bogert, 250 U.S. 483, 492, 39 S.Ct. 533, 537, 63 L.Ed. 1099. Their powers are powers in trust. See Jackson v. Ludeling, 21 Wall. 616, 624, 22 L.Ed. 492. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. Geddes v. Anaconda Copper

Mining Co., 254 U.S. 590, 599, 41 S.Ct. 209, 212, 65 L.Ed. 425. The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside."

 Mr. Brown breached his fiduciary duty as a director here in New York when he agreed with Mr. Raskob to the terms of the exchange of the 2,400 shares of Class B, Managers Securities Company stock owned by Regent Corporation for General Motors common stock and gave orders that the 243,392 shares of General Motors common stock be taken from the vault in New York City for delivery to Mr. Raskob in Wilmington, Delaware. Mr. Brown did not himself deliver the stock to Mr. Raskob. The cause of action of General Motors Corporation against Mr. Brown arose in New York between June 2nd and June 4th, 1930. The present suits were instituted in October 1936. The New York Statute of Limitations applies. ˙Mr. Brown did not receive any part of the profits. Mr. Raskob and Mr. Pierre S. duPont made from this deal through their holding company, Regent Corporation. Accordingly, the six-year Statute of Limitations is a bar to the cause of action against Mr. Brown. N.Y. Civil Practice Act former § 48, subd. 3. Goldstein v. Tri-Continental Corp., 282 N.Y. 21, 29, 24 N. E.2d 728; Potter v. Walker, 276 N.Y. 15, 11 N.E.2d 335. That Brown's breach of his fiduciary duty was intentional, deliberate and wilful does not make the action against him sound in fraud. The gravamen of the action, so far as it concerns Mr. Brown, is not fraud within the meaning of subdivision 5 of Section 48 of the New York Civil Practice Act. Druckerman v. Harbord, 174 Misc. 1077, 22 N.Y.S.2d 595, citing pertinent cases.

In like manner any cause of action against the defendant, Mr. Smith, for his part in the Brown-Raskob transaction is barred by the New York six-year Statute of Limitations.

The facts relating to the Brown-Raskob transaction developed collaterally at the trial when the alleged $10,057,539.00 "non-operating profit" (Ex. 56) was being considered in connection with the sale of 1,-375,000 shares of General Motors common stock to General Motors Management Corporation under the contract executed April 30, 1930.

The defendants, Mr. Brown, Mr. Bradley, Mr. Smith and Mr. Sloan knew on December 30, 1930 of General Motors' loss on the Brown-Raskob transaction. They owned Managers Securities B stock and were familiar with the terms of the merger of that company with General Motors Securities Company in December 1930. They were members of the Board of Directors of General Motors. Both the facts relating to the transaction and the loss sustained by General Motors were kept from the Board of Directors. It was the duty of these directors to divulge these facts to the Board so that appropriate legal measure could be taken.

Even in a corporation of the magnitude of General Motors this transaction was no small matter. The transaction involved over twelve million dollars. That General Motors lost $427,645.50 on the deal was determined and known on December 30, 1930. Indeed the loss might have been much greater if the shares retained as indemnity (20% of 230,906 shares) had been released by General Motors Securities Company before January 4th, 1934. On that date the General Motors common stock had a value of $34.25 a share, the same as the December 30, 1930 price. But in the intervening years the price had dropped to a low of $8.00 a share in July of 1932.

In General Rubber Co. v. Benedict, 215 N.Y. 18, 109 N.E. 96, L.R.A.1915F, 617, Judge Cardozo had occasion to discuss the duty of a director when he learned of the defalcation of the general manager of a subsidiary of the corporation. The charge was made that the director knew of the misuse of the monies and that he acquiesced in it and approved of it. He neglected to inform his own corporation of the wrongdoing of the subsidiary's manager. As to the liability of the director, who with knowledge of the wrongdoing remained silent, Judge Cardozo wrote: (page 21 of 215 N.Y., page 97 of 109 N. E., L.R.A.1915F, 617)

"He was a director of the plaintiff. Because of that relation, he owed to the plaintiff the duty of good faith and vigilance in the preservation of its property. The duty and the breach, coupled, it is here alleged, with damage, make out a cause of action. Ashby v. White, 3 Ld. Raym. 320.

\* \* \* \* \*

"The defendant, as a director of a corporation, should have taken the same care

of its property that men of average prudence take of their own property. Hun v. Cary, 82 N.Y. 65, 37 Am.Rep. 546; Latimer v. Veader, 20 App.Div. 418, 428, 46 N.Y.S. 823; Bosworth v. Allen, 168 N.Y. 157, 61 N.E. 163, 55 L.R.A. 751, 85 Am.St.Rep. 667." (Page 23 of 215 N. Y., page 97 of 109 N.E., L.R.A.1915F, 617)

■ There is no allegation in the voluminous consolidated amended complaint to sustain a cause of action against these directors for failing to disclose to the corporation the ultra vires and illegal acts of Mr. Brown, Mr. Smith, Mr. Raskob and Mr. Pierre S. duPont in the exchange of stock, or, for failing to take appropriate action for the corporation against those who were legally liable to the Corporation for the damages and profits resulting from the deal. An amendment of the complaint in that regard would in effect be a new pleading as of the date of the amendment and would be subject to the defense of the six-year New York Statute of Limitations. Goldstein v. Tri-Continental Corp., 282 N.Y. 21, at page 29, 24 N.E.2d 728, citing Harriss v. Tams, 258 N.Y. 229, 243, 179 N.E. 476. Accordingly no relief can be granted in this action against the defendants Messrs. Bradley and Sloan for their neglect in that regard.

Neither Mr. Raskob nor Mr. Pierre S. duPont are now before this Court as defendants in this action. What remedies the General Motors Corporation or a stockholder may have against them or what Statute of Limitations applies, it is unnecessary to discuss.

*Weiss Judgment—Not Res Adjudicata.*

■ Three defendants, Mr. Morgan, Mr. Whitney and Mr. Prosser, plead as res adjudicata of the issues herein, a judgment entered in the New York State Supreme Court on February 2, 1939 in a suit brought by Meyer Weiss as a stockholder of General Motors Corporation. They were the only three individual defendants served in that action, although a score or more were named as defendants.

General Motors Corporation was an indispensable party defendant to the Weiss suit, a derivative action brought by plaintiff Weiss against the directors for certain alleged acts of misfeasance. Grant v. Greene Consolidated Copper Co., 169 App.

Div. 206, 215, 154 N.Y.S. 596; City of Davenport v. Dows, 85 U.S. 626, 18 Wall. 626, 21 L.Ed. 938; Busch v. Mary A. Riddle Co., D.C., 283 F. 443; Wilhelm v. Consolidated Oil Corporation, 10 Cir., 84 F.2d 739, 749, citing cases in footnote #20; Hanrahan v. Andersen, 108 Mont. 218, 90 P.2d 494; Starr v. Heald, 28 Okl. 792, 116 P. 188. As stated by Judge Lehman in Isaac v. Marcus, 258 N.Y. 257, 264, 179 N.E. 487, 489:

"The remedy sought is for wrong done to the corporation; the primary cause of action belongs to the corporation; recovery must enure to the benefit of the corporation. The stockholder brings the action, in behalf of others, similarly situated, to vindicate the corporate rights, and a judgment on the merits is a binding adjudication of these rights. Grant v. Greene Consolidated Copper Co., 169 App.Div. 206, 154 N.Y.S. 596, affirmed 223 N.Y. 655, 119 N.E. 1046."

■ The judgment roll in the Weiss suit contains nothing to show that General Motors Corporation, a Delaware corporation, named as a party defendant, was actually served with the summons in the action or that it had served a notice of appearance. The complaint alleged that General Motors was a foreign corporation, organized under the laws of Delaware. It contained no allegation that the corporation maintained an office in New York State or did business here. None of the acts complained of were alleged to have occurred in the State of New York. There is a presumption that a State Court of general jurisdiction had jurisdiction of the subject-matter and of the person against whom judgment was rendered, unless the contrary affirmatively appears from the judgment roll. Galpin v. Page, 85 U.S. 350, 18 Wall. 350, 21 L.Ed. 959; Settlemier v. Sullivan, 97 U.S. 444, 24 L.Ed. 1110; Fishel v. Kite, 69 App.D.C. 360, 101 F.2d 685, citing cases in footnotes 9 and 10. It is doubtful, that the presumption of jurisdiction over the person survives an allegation in the complaint that a defendant corporation is a foreign corporation organized and existing under the laws of another state, without more.

"The presumptions indulged in support of the judgments of superior courts of general jurisdiction are also limited to jurisdiction over persons within their territorial limits, persons who can be reached by their process, and also over proceedings

which are in accordance with the course of the common law.

"The tribunals of one State have no jurisdiction over the persons of other States unless found within their territorial limits; they cannot extend their process into other States, and any attempt of the kind would be treated in every other forum as an act of usurpation without any binding efficacy." Galpin v. Page, supra, 85 U.S. at page 367, 18 Wall. 350, 21 L.Ed. 959.

"Whenever, therefore, it appears from the inspection of the record of a court of general jurisdiction that the defendant, against whom a personal judgment or decree is rendered, was, at the time of the alleged service, without the territorial limits of the court, and thus beyond the reach of its process, and that he never appeared in the action, the presumption of jurisdiction over his person ceases, and the burden of establishing the jurisdiction is cast upon the party who invokes the benefit or protection of the judgment or decree." Galpin v. Page, supra, 85 U.S. page 368, 18 Wall. 350, 21 L.Ed. 959.

See, also, Old Wayne Life Ass'n v. McDonough, 204 U.S. 8, 27 S.Ct. 236, 51 L.Ed. 345.

■■■ On the trial of the present suit I received evidence offered by said three defendants to prove that General Motors Corporation had in fact been served with the summons and complaint in the Weiss suit on December 8, 1938 and had served on Weiss' attorney a notice of appearance on December 28, 1938. I have concluded that the defendants may thus support the Weiss judgment to show that the State Court had personal jurisdiction of the corporation, although the judgment roll would create a presumption to the contrary.

However, neither the corporation nor its attorney of record was served with the motion papers of the defendants, Morgan, Whitney and Prosser on their application for a summary judgment dismissing the Weiss complaint on the merits. The notice of motion was addressed only to the attorney for plaintiff Weiss. General Motors Corporation took no part in the argument of the motion. The notice of motion and the recitals in the Court's order establish those facts. Neither the corporation nor its attorney was served with a copy of the Court's order or with any notice of the application for judgment. The same is true of the judgment itself, entered, February 2, 1939.

When I recently reopened the trial of the present case to receive further evidence on a question involved in the calculation of the bonus, the attorney for Messrs. Morgan, Whitney and Prosser took occasion to put in evidence three letters he had written in January and February 1939, while the motion for summary judgment was pending in the Weiss suit. They were addressed to a lawyer in the office of John T. Smith, general counsel for the Corporation. The letter of January 4, 1939 enclosed a copy of the motion papers for the lawyer's "files", requested suggestions of matter for replying affidavits and asked to be advised if plaintiff Weiss sought to obtain answering affidavits from officers and employees who were not defendants. The clear inference from the letter is that the motion papers were not formally served on a prospective adversary and that they were not intended as notice of the pendency of the motion so that the Corporation could come in and conduct the same. A letter of January 23, 1939 advised the attorney that the motion had been adjourned and asked for copies of certain papers. The third letter, February 10, 1939, enclosed at the request of the lawyer, copies of the order and judgment on the motion for summary judgment.

The three letters (Exs. KKKKK (1), (2), (3) ) together with the subsequent effort of the corporation's general counsel to have Weiss' attorney sign a stipulation (Ex. 18) dated February 10, 1939, dismissing the suit as against the corporation "with prejudice and on the merits", show that insofar as the corporation and those three defendants were concerned their attorneys cooperated and both had the common objective of having the Weiss suit dismissed on the merits. Under the circumstances the conclusion is warranted that the corporation was not given notice of the application for summary judgment. The letters do not contradict the admission made on this trial that the Corporation was not served with the motion papers. Nor do they overcome the clear recitals of the order and judgment in the Weiss case.

A question is thus presented as to whether or not, in a stockholders derivative action, a defendant director is required to give notice to the corporate defendant of any application for summary judgment, dismissing the complaint on the merits. Is a judgment entered on the application valid and res adjudicata, if the corporation has

not received notice of the application for judgment? I have been unable to find any case in the State Court which has passed upon that point. Counsel for the parties have advised me that their search has been equally fruitless. But Rules 190 and 193 of the Rules of Civil Practice of the New York Supreme Court indicate that even where a defendant, who has appeared generally, has made default in pleading, the defaulting defendant is entitled to notice of an application to the Court for judgment against him, either before or at the trial. In the Weiss case General Motors, at the time of the application for summary judgment, had appeared and was not in default in pleading. Unless it can be said that the corporate defendant in a stockholders derivative suit is so nominally a defendant that it may be ignored in the action, after it has been served with the summons and complaint, it would seem that the corporation is entitled to notice of an application for summary judgment dismissing the complaint on the merits.

Rule 150 of the Rules of Civil Practice of the New York Supreme Court requires that a note of issue shall be served "upon the attorney for each party who has appeared in the action". The note of issue acts as a notice of trial and "no other or further notice of the trial of the action shall be necessary". General Motors would have been entitled to receive a notice of trial (the note of issue) in the Weiss case if the action had gone to trial. It seems reasonable to require that if a summary judgment is to be sought, without a trial, the corporation should receive notice of the application for summary judgment. The rights of the Corporation would be affected by the judgment, whether rendered after a trial or on an application for summary judgment.

A stockholder is permitted to bring a derivative action only on a showing that the directors who legally represent the corporate body have failed to bring the action on behalf of the corporation after being requested to do so, or that a request would be futile. The capacity of the stockholder to sue on behalf of the corporation depends upon a proper showing to that effect. The corporation should be permitted to answer those allegations. No judgment should be entered, depriving the corporation of its cause of action, until the corporation has answered the complaint or defaulted. In the Weiss suit the summary judgment was entered before the corporation had answered.

I am not unmindful of decisions of the New York Court of Appeals to the effect that the stockholder in a derivative action has the right to control the action. It has been held that at any time before judgment he may discontinue the suit. Brinckerhoff v. Bostwick, 99 N.Y. 185, 194, 1 N.E. 663. Of course, that would not be a judicial determination of the issue. The corporation in a proper derivative stockholders action is necessarily represented by the stockholders. The reason for this authority is that the corporation is, on the facts, either unable to act independently for itself in asserting its rights to the claims for which the stockholder sues, or else has refused to sue in its own behalf after notice and demand that it do so. Rogers v. Hill, D.C., 34 F.Supp. 358, 369. But control of the action does not mean that the corporation may be ignored, after the summons and complaint are served.

The attorney for Weiss submitted no papers in opposition to the motion for summary judgment, which appeared on the motion calendar January 27, 1939. The next day the Law Journal reported the motion as "granted, no opposition. Settle order". A short form order, entered the day the motion came up for argument, January 27, 1939, also stated that the motion was "granted, no opposition. Settle order". The long form order settled January 31, 1939, contained the recital that counsel for the plaintiff had "stated in open court that he had read the said motion papers and that the plaintiff could not answer the same". The order then provided "that this action be and the same hereby is dismissed on the merits as to the defendants Junius S. Morgan, Seward Prosser and George Whitney, and the Clerk of this Court be and he hereby is directed to enter judgment accordingly." Judgment was entered to that effect February 2, 1939.

Plaintiff's counsel in the Weiss case did not call the attention of the Justice in the State Court to the fact that these consolidated actions were pending in this Court; that he had sought to intervene on behalf of Weiss in these actions and that his application had been denied; that thereafter he instituted the action in the State Court; that the actions in this Court named the same defendants except one; that a proper regard for the rights of the Corporation and its stockholders would require a dis-

continuance of the action in the State Court, not its dismissal on the merits. Plaintiff's counsel admits that he knew at the time that the three defendants, who were making the motion in the State Court action, might plead its dismissal on the merits as a defense to these prior actions in this Court. They later pleaded the judgment in the Weiss action as "res adjudicata" of the issues in the present actions.

The surrounding circumstances suggested that the Court should inquire if the Weiss judgment was a collusive judgment. After hearing the testimony of Weiss' attorney at the present trial, I concluded that there was no proof of any fraud or connivance in connection with the entry of the Weiss judgment. But on the facts disclosed I am convinced that the attorney who acted as counsel for Weiss did not properly protect the rights of the corporation in the suit of that plaintiff stockholder. The general counsel of the corporation, a director-defendant, was in no position to serve the corporation disinterestedly.

██ Assuming that in the Weiss suit the State Court had jurisdiction over the person of General Motors Corporation and that the motion of the defendants, Morgan, Prosser and Whitney did not require notice to General Motors, nevertheless the three defendants raising the defense of "res adjudicata" must show the precise issues litigated and determined in the Weiss suit and the extent to which they are before this Court in the present actions. Jasper v. Rozinski, 228 N.Y. 349, 356, 127 N.E. 189; People ex rel. Village of Chateaugay v. Public Service Comm., 255 N.Y. 232, 238, 174 N.E. 637; Marine T. Corp. v. Switzerland Gen. Ins. Co., 263 N.Y. 139, 146, 188 N.E. 281. According to the attorney for Weiss he was presenting in his complaint as issues to be adjudicated (1) the legality of the reduction in the interest rate from 6 to 5 per cent in March 1934 on the debentures of General Motors Management Corporation held by General Motors Corporation, and (2) the legality of the use of General Motors common stock in the payment of the bonus, at a value which was less than the market value and book value of the stock when paid. However, we must look to the Weiss complaint itself to determine the issues it presented. In addition to the two issues just mentioned the Weiss complaint also contained allegations that the bonus plans were adopted pursuant to a conspiracy of the defendant directors "to utilize the funds of General Motors Corporation for the purpose of acquiring shares of stock of said corporation to be allocated and held in such manner as to perpetuate their control of the corporation". Weiss was attacking the bonus plans as the illegal objective of the conspiracy he alleged.

In August 1940 the defendants, Morgan, Prosser and Whitney moved for summary judgment in these present consolidated actions and annexed to their motion papers practically all the documents submitted on their motions in the Weiss case. I held— "no facts have been shown by the plaintiffs on this motion, which would support the charge that the bonus plans were part of a fraudulent conspiracy or scheme of any kind". The record of votes at the stockholders meeting approving the plans and authorizing their execution had been overwhelming; in some instances almost unanimous. The same was true of the amendment of the Management Plan in 1934, which was inherently a proper amendment. Lyon v. Holton, 172 Misc. 31, 36, 14 N.Y.S.2d 436, affirmed 259 App.Div. 877, 20 N.Y.S.2d 1015, modified on another point, 286 N.Y. 270, 36 N.E.2d 201. I also held that by not adopting the end of the year price in making the stock allotments for the years 1930 to 1937, and by employing the cost figure for 1930 and 1931 and using the average daily market price for the years 1933 to 1936, "the corporation in every year used the more advantageous price". Winkelman v. General Motors Corporation, D.C., 39 F.Supp. 826, 830.

In these present actions there are presented issues that were not embraced in the allegations of the Weiss complaint. The trial has dealt principally with the administration of the bonus plans, with the manner in which the annual bonus fund was calculated and determined—what items were improperly included in income or excluded from capital employed. Proof was also offered of the so-called equalization payment of 36,071 shares of the Corporation's treasury stock in February 1931, in which defendant-directors shared, and of the Raskob-Brown transaction of June 4, 1930, involving 243,392 shares of the Corporation's treasury stock. Both Mr. Brown and Mr. Raskob were directors.

Paragraph 23 of the consolidated amended complaint in these present actions, alleges: "23. From time to time after the plaintiff Jacobson became a shareholder, down to the present time and during the

1022

period of the grievances herein complained of, the defendants, as the result of an unlawful conspiracy entered into by them, planned and schemed among other things to convert to their own use or principally for the use and benefit of the individual defendants who during such period were Motors' executive officers and directors, and Motors' property, assets and cash, to unjustly enrich themselves out of Motors' assets; to obtain for themselves profits, benefits and advantages to which they were not entitled and which rightfully belonged to Motors; to employ its assets in their own interests and for their own benefit, profit and advantage; to make illegal use of their fiduciary positions and their positions as officers and directors for their own benefit and profit; to commit waste and spoliation of its property, to misappropriate or to convert its property to their own use and to cause it great damage. In carrying out and consummating such scheme, they, among other things, employed from time to time during such period divers, illegal and improper means, devices, subterfuges, coerced Motors to enter into fictitious, illegal, improper and ultra vires transactions, arrangements and agreements with themselves and with corporations which were their tools and agents, among them Securities and Management, made transfers to themselves directly and indirectly and to Securities and Management of Motors' property, gratuitously and without proper, adequate or legal consideration, and committed other acts of malfeasance, and non-feasance, all as will more specifically hereafter be made to appear."

There are no comparable allegations in the Weiss complaint. The burden rested upon the defendants, Morgan, Whitney and Prosser to establish that the precise issues presented by the consolidated amended complaint herein and litigated on the present trial were presented and determined in the Weiss suit. Marine T. Corp. v. Switzerland Gen. Ins. Co., supra; People ex rel. Village of Chateaugay v. Public Service Comm., supra.

"If there be uncertainty as to whether or not the question was passed upon, the judgment is not conclusive as evidence." Bell v. Merrifield, 109 N.Y. 202, 211, 16 N.E. 55, 58, 4 Am.St.Rep. 436.

■ No issue, decided adversely to the three defendants on the present trial, was presented by the pleadings in the Weiss suit or included in the documentary evidence submitted by the three defendants, Morgan, Prosser and Whitney to the State Court for determination, on their motion for summary judgment in that suit. The Weiss judgment is not a defense.

*Demand that the directors bring suit on behalf of the Corporation.*

■ No demand was made by plaintiffs upon the directors of General Motors to take appropriate action on behalf of the Corporation in respect to the claims now before this Court. As to the Raskob transaction and the so-called equalization payment, plaintiffs did not know of these matters until the trial of this action. The chairman of the Board of Directors and several of its most influential directors and executives had known of the Raskob transaction for years and had done nothing to protect and assert the rights and claims of General Motors Corporation. The general counsel of the Corporation, who is a defendant and who participated in the Raskob transaction, has sought to get a dismissal on the merits of the issues involved in this transaction. He has pleaded the Statute of Limitations on behalf of the General Motors Corporation to all claims herein, even amending the plea to assert a shorter statute of Delaware after the facts in relation to this transaction were developed at the trial. No directors who were represented in this action have expressed any desire that they be permitted to have the Corporation's claim prosecuted in the name of the Corporation. In fact their attorneys have joined in the effort of all the defendants to have the claim dismissed.

As to the equalization payment, most of the members of the Finance Committee and the Board of Directors who ratified and approved it are still on the Board and are named as defendants in this action. For these reasons demand on the directors that they enforce the claim would be futile and not in the best interest of General Motors Corporation. On the other claims, almost all the directors are named as defendants.

The Board of Directors according to the annual report for the year ending December 31, 1940 consisted of twenty-seven members. Twenty-three of them were directors in 1936 when these actions were instituted. Twenty-two were named as parties defendant in the present actions, although the action proceeded to trial with only ten of them before the Court. Of the others, two died before the trial and ten were not served.

Directors could not be expected to sue themselves, on behalf of the Corporation, with any enthusiasm. Even if they wished to, the decisions are against entrusting the conduct of the litigation on a corporation's claim to the directors who would be held liable if the litigation were successful. They would "stand in a dual relation which prevents an unprejudiced exercise of judgment". United Copper Securities Co. v. Amal. Copper Co., 244 U.S. 261, 264, 37 S.Ct. 509, 510, 61 L.Ed. 1119. The allegations of paragraph "12" of the complaint when read in connection with paragraphs "13", "14-A", "14-B" and "17" meet the requirements of Rule 23(b) (2) F.R.C.P. The evidence in this case presents very satisfactory reasons why plaintiffs were not required to seek from the board of directors the institution of an action on behalf of the Corporation against those directors who might be liable on the claims herein asserted. Doctor v. Harrington, 196 U.S. 579, 25 S.Ct. 355, 49 L.Ed. 606; Delaware & Hudson Co. v. Albany & Susquehanna R. Co., 213 U.S. 435, 29 S.Ct. 540, 53 L.Ed. 862.

The defendant, C. M. Woolley, was a member of the Board of Directors from June 15, 1920 to June 6, 1938. He was never a member of the Finance Committee or of the Bonus and Salary Committee. He did not attend the meeting of the Board of Directors of May 6, 1931, which ratified and approved the so-called equalization payment nor did he sign the minutes of that meeting. The complaint as against him will be dismissed. His name has not been connected with any specific acts of negligence or breach of fiduciary duty.

The defendant, John J. Schumann, Jr., became a member of the Board of Directors on November 5, 1934. He was never a member of the Finance Committee or of the Bonus and Salary Committee. He has not been shown to have been guilty of any negligence or of any breach of fiduciary duty. The complaint as against him will be dismissed.

The trial of this case covered the greater part of the period from May 7th to August 7th, 1941. More than 5,000 printed pages of testimony were taken and hundreds of accounting schedules and other exhibits were offered in evidence. In the course of my consideration of this case, the record was supplemented, at my request, by two stipulations (December 23rd, 1941 and March 2nd, 1942) to which additional exhibits were attached. On March 10th, 1942 the case was reopened for further testimony. I am filing, together with this opinion, my findings of fact and conclusions of law as required by Rule 52, F.R.C.P. A proposed judgment in accordance with the conclusions of law should be submitted for my approval on notice.